UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
                                                 :
United States of America                         :
                                                 :
                    - v -                         :              19 Cr. 541 (JSR)
                                                 :
Hugh Brian Haney,                                :
                                                 :
                         Defendant.              :
------------------------------------------------ x


**EMERGENCY MOTION FOR COMPASSIONATE RELEASE**


                              DAVID PATTON, ESQ.
                              Federal Defenders of New York, Inc.
                              Attorney for Defendant
                              HUGH BRIAN HANEY
                               52 Duane Street - 10th Floor
                              New York, New York 10007
                              Tel.: (212) 417-8737

                              MARTIN S. COHEN
                              *Of Counsel*


TO:   GEOFFREY BERMAN
      United States Attorney
      Southern District of New York
      One. St. Andrew's Plaza
      New York, New York 10007
      Attn:  SAMUEL RAYMOND and TARA LAMORTE, ESQS.
             Assistant United States Attorneys

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Hugh Brian Haney, through undersigned counsel, respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release.  The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Mr. Haney's health.  The virus thrives in densely packed populations, and the MDC is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Mr. Haney.  Mr. Haney's age – 61 years old – makes him especially vulnerable to the deadly risks of COVID-19, and the MDC has placed Mr. Haney on its list of inmates who are at high risk of contracting and succumbing to COVID-19.  Allowing Mr. Haney to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus. Moreover, Mr. Haney has a safe place to live, where he will have the best opportunity of surviving this pandemic, and for the reasons described in our sentencing memorandum, the Court can expect that Mr. Haney will be wholly compliant with home detention and all the other conditions of release. *See United States v. Haney*, 19 Cr. 541 (JSR), Dkt. Entry 13.

Attached for the Court's consideration in connection with this motion is an expert affidavit that generally addresses the increased public health risks from keeping at-risk inmates incarcerated during the pandemic, *see* Affidavit of Dr. Brie Williams, attached as Exhibit A, and an expert affidavit that specifically address conditions at the MDC, *see* Affidavit of Dr. Jonathan Giftos, attached as Exhibit B.

I.      **Procedural History.**

On February 12, 2020, this Court sentenced Mr. Haney to a term of 42 months.  Mr.

Haney has been incarcerated since July 18, 2019.  The BOP has yet to calculate his release date;

by my calculations, it will be around July 13, 2022.

II.     **Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Haney's Sentence and Release Him to Home Confinement.**

The First Step Act ("FSA") expressly permits Mr. Haney to move this Court to reduce his

term of imprisonment and seek compassionate release.  *See* 18 U.S.C. § 3583(c)(1)(A)(i).  Under

normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP

declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the

warden's receipt of the defendant's request, whichever is earlier.  *Id.*  On March 26, 2020,

counsel transmitted Mr. Haney's request to the warden of MDC via email. *See* e-mail attaching

letter of Martin Cohen to MDC Warden Edge, Attached as Exhibit C.  Although the BOP has yet

to rule on the request (and thirty days have yet to pass), Mr. Haney files this motion now in light

of the urgent nature of this matter.  *See* discussion, *infra* Part II. A.

After exhausting the administrative process, "a court may then 'reduce the term of

imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction'

and 'such a reduction is consistent with applicable policy statements issued by the Sentencing

Commission.'"  *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No.

384) (S.D.N.Y. Jan. 8, 2020).  "In making its decision, a court must also consider 'the

[sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" *Id.*

(quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement

on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reasons." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).  However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments.  *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4.  Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release."  *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

> ### A.   The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.

The Court need not and should not wait for Mr. Haney to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Haney.  *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency.  *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords

with general administrative law principles and the exception to administrative exhaustion

requirements in numerous statutory schemes.  *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672

(9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional

circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129

(1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative

exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New

York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided

by the policies underlying the exhaustion requirement."  *Bowen v. City of New York*, 476 U.S.

467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)).  Those policies

were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing
> premature interference with agency processes, so that the
> agency may function efficiently and so that it may have an
> opportunity to correct its own errors, to afford the parties
> and the courts the benefit of its experience and expertise,
> and to compile a record which is adequate for judicial
> review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social

Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be

especially sensitive" to irreparable and severe medical harm resulting from blind adherence to a

statutory exhaustion requirement, particularly "where the Government seeks to require claimants

to exhaust administrative remedies merely to enable them to receive the procedure they should

have been afforded in the first place."  476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also

Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a

statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose

an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding.  Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Mr. Haney's motion for compassionate release.  *Bowen*, 476 U.S. at 484.  To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ."  18 U.S.C. § 3582(c)(1)(A) (emphasis added).  In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion.  *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through MDC).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days.  § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)).  With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance.  Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765.  The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  And the MDC Legal Department has confirmed to counsel that it has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic.  Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in

the prisons.  As one Court held on March 19th:

> The Court is glad to hear that there are currently no
> reported cases of COVID-19 at Maguire, but is unsure what
> that means if people are not being tested.  And, as the
> [prison's] management plan itself acknowledges, symptoms
> of COVID-19 can begin to appear 2-14 days after exposure,
> so screening people based on observable symptoms is just a
> game of catch up.  That's why the Bay Area is on
> lockdown.  We don't know who's infected.  Accordingly,
> the government's suggestion that Toledo should wait until
> there is a confirmed outbreak of COVID-19 in Maguire
> before seeking release, *see* ECF No. 113 at 6 ("If the
> situation with respect to COVID-19 at Maguire changes,
> Toledo is free to seek reconsideration of the issue at that
> point."), is impractical.  By then it may be too late.

*In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1, 19-
MJ-71055 (MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

With the speed and unpredictability of this pandemic in New York City—now the

epicenter of the pandemic—waiting even 30 days will be too late. Accordingly, this Court should

exercise jurisdiction over Mr. Haney's emergency motion for compassionate release and

dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

> **B.**   **"Extraordinary and compelling reasons" warrant a reduction in Mr.
> Haney's sentence.**
>
> > 1.   *COVID-19 is a public health disaster that threatens vulnerable
> > incarcerated persons like Mr. Haney.*

The COVID-19 pandemic continues to roil New York City.  As of this writing, New

York, the epicenter of the crisis, has over 67,000 positive cases, with the death toll surpassing

1,200. [1] (The death rate in the United States has *tripled* since I submitted my request to the

Warden for Mr. Haney's release on March 26, 2020. *Id.*)  COVID-19 is already sweeping

---

[1] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, *available at*
https://nyti.ms/2UIkCz4; when I drafted this sentence yesterday, those numbers were 60,000 and
1,000.

through the city's jails and prisons, too.  *See* N.Y. Times, *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars* (March 30, 2020) ("The coronavirus is spreading quickly in America's jails and prisons, where social distancing is  impossible and sanitizer is widely banned, prompting authorities across the country to release thousands of inmates in recent weeks to try to slow the infection, save lives and preserve medical resources.") As of March 25, 2020, at least 52 inmates and prison employees at Rikers Island and other city jails had tested positive for COVID-19.[2]

On March 28, 2020, Patrick Jones, a 49-year-old inmate in a low-security BOP facility in Oakdale, Louisiana, became the first person in federal custody to die from COVID-19.[3] Locally, the BOP has confirmed at least one inmate case and four staff cases at MDC Brooklyn, and three inmate cases and two staff cases at MCC New York.[4]  The numbers are likely higher, as testing is limited.  *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested").  A number of other inmates are in isolation or quarantine at both MDC Brooklyn and MCC New York.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19.  *See* Affidavit of Dr. Brie Williams, Aff. ¶ 14, attached as Exhibit A ("Because inmates live in close quarters, there is an extraordinarily high risk of

---

[2] Sydney Periera, *Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure to Release People in Custody*, *available at* https://gothamist.com/news/confirmed-coronavirus-cases-rise-nyc-jails-increasing-pressure-release-people-custody.

[3] *See* Letter from Jerrold Nadler and Karen Bass to Attorney General William P. Barr, dated March 30, 2020, attached as Exhibit D.

[4] Federal Bureau of Prisons, COVID-19 Coronavirus, *available at* https://www.bop.gov/coronavirus/index.jsp.

accelerated transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat

together and use the same bathrooms and sinks.  . . . . They are not given tissues or sufficient

hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical*

*Infectious Diseases* 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842

(noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is

increased by crowding, delays in medical evaluation and treatment, rationed access to soap,

water, and clean laundry, [and] insufficient infection-control expertise").  BOP employees are

complaining that they lack masks and gloves, hand sanitizer, and even soap.[5]  Pretrial detention

centers—like MDC—are even more imperiled, as detainees transit through weekly.  *See*

Williams Aff. ¶ 13 ("The risk of exposure is particularly acute in pre-trial facilities where the

inmate populations shift frequently").  Despite the general lockdown in New York State, BOP

continues to transport inmates to and from MDC and MCC and has confirmed, on March 25,

2020, that it will not stop admitting new inmates.[6]  This exacerbates the risk of transmission.

Though the BOP emphasizes that it screens inmates before moving them,[7] as the *Manrique* Court

put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can

---

[5] *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, *CBS News* (March 19, 2020), *available at* https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/;  Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), *available at* https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators*.'" NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[6] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources*, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416%22.

[7] BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp.

begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . .  We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.[8]

The MDC has disclosed to the Chief Judges that as of March 25, 2020, over 500 inmates – including Mr. Haney – are considered high-risk within the CDC's definition, creating a powerful likelihood that the coronavirus will spread throughout the facility, and particularly endanger the at-risk inmates.  In the context of this unprecedented and rapidly evolving emergency, the MDC is simply not equipped to provide adequate medical attention to its detainees, let alone curb the spread of the virus.  It has only three doctors on staff to care for 1700 inmates, 537 of whom are at-risk. *See* Giftos Aff., attached as Exhibit B.  Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the MDC's prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus's impact will likely be "grave and enduring."  *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

2. *Mr. Haney's vulnerability to COVID-19 is an extraordinary and compelling reason that warrants a sentence reduction.*

At 61 years old, Mr. Haney is particularly vulnerable to contracting and succumbing to COVID-19, and  has been designated as high-risk by the MDC. *See* Giftos Aff. ¶ 10 (older people diagnosed with COVID-19 are more likely to be very sick; about 85% of fatalities

---

[8] In fact, according to information the BOP provided to the U.S. Marshals Service, the positive case at MDC Brooklyn came from a new inmate who had left Rikers on March 16, 2020, was brought to MDC Brooklyn that evening, and passed all of MDC Brooklyn's screening tests.  He became symptomatic two days later and was sent to Lutheran Hospital for testing, and returned to the MDC Brooklyn to await the results.  Between March 16, 2020 and when the positive test result was received on March 21, 2020, this inmate had contact with many other inmates and with correctional officers.

involve people over 60).  This is an "extraordinary and compelling reason" for his release.  *See* U.S.S.G. § 1B1.13 Application Note 1 (recognizing that there are "other reasons," in addition to medical condition, age, and family circumstances, that can constitute  an extraordinary and compelling reason to grant compassionate release).  Here, Client's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there.  Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like MDC to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Mr. Haney has already been identified as "high risk," this Court should find that Mr. Haney's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

The letter of Representatives Jerrold Nadler and Karen Bass to Attorney General Barr, on behalf of the Judiciary Committee, underscores this position. After an "explosion" of COVID-19 at a low-security facility in Louisiana, resulting in the death of one inmate, the Representatives asked the Attorney General "in the most urgent of terms . . . to immediately move to release medically-compromised, elderly, and pregnant prisoners in the custody of the BOP," recognizing that for those high-risk inmates, COVID-19 is an extraordinary and compelling reason warranting release under the First Step Act.[9]  Similarly, fourteen U.S. senators of both parties wrote to U.S. Attorney General William Barr and BOP Director Michael Carvajal, urging those

---

[9] Letter of Rep.'s Nadler and Bass, Ex. D.

officials to "take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible."[10]  And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring."  *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread.  For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island.[11] Approximately 1,700 inmates have been released from Los Angeles County Jails,[12] and 1,000 inmates are to be released from New Jersey jails.[13]  Therefore, while COVID-19 remains an unprecedented emergency, many states (and officials) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

---

[10]https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf.

[11] https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html.

[12] https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-prevent-coronavirus-outbreak-behind-bars/.

[13] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

**III.    Mr. Haney Can Live Indefinitely With His Sister in North Carolina, Where He Will Be Safer and The Public Will Be Safer.**

If released to home detention, Mr. Haney will live with his sister and her husband in Richlands, North Carolina. The house is large enough that Mr. Haney will have a floor to himself, where he will be able to quarantine for the requisite period of time to assure that he has not yet contracted the virus. (On March 26, 2020, I spoke by phone with Mr. Haney's sister, Belinda Pickelsimer, who said that the second floor of their house is kept reserved for guests, that Mr. Haney will be able to get upstairs without coming into close contact with anyone, and that she would be able to prepare food for him and leave it at the door during the quarantine period.) Once the quarantine period is over, Mr. Haney will be able to socially distance himself from other members of the household, and follow all the strictures of home detention and supervised release without endangering his health or that of the public. If Mr. Haney does become ill, he will receive infinitely better health care in a small town in North Carolina, than whatever undefined services may be provided by the BOP, in an overcrowded prison inside a city where hospitals are already overwhelmed by COVID-19.

The contrast between home detention in the Pickelsimer home and continued incarceration at the MDC could not be starker. *See* Giftos Aff. P 15 (describing conditions at the MDC, where it is impossible for an inmate to follow even the most basic steps to minimize exposure). The public-health implications are straightforward but terrifying: Mr. Haney has been designated at high risk of contracting and succumbing to COVID-19 while incarcerated in the overcrowded and under-resourced MDC; whereas on home detention in Richlands, North Carolina (pop. 1,700) it is highly likely that Mr. Haney will be able to survive this deadly pandemic.

Under the "compassionate release" statute, Courts are directed to consider "the factors set

forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Here, those 3553(a) factors favor release to home detention. As argued in our sentencing submission, Mr. Haney has much to offer his family and community, and the Court can expect that once released he will be a wholly positive contributor to those around him. While at sentencing, even Mr. Haney requested more incarceration than he has served to date, no one anticipated this pandemic, or the threat that it poses to Mr. Haney's health, and potentially to his life.

**IV.     Conclusion**

For the foregoing reasons, Mr. Haney respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement and a period of supervised release.

Respectfully Submitted,


/s/_____
Martin Cohen
Ass't Federal Defender
(212) 417-8737
martin_cohen@fd.org


cc: Samuel Raymond and Tara LaMorte, Esq. by ECF and e-mail

Exhibit A

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
                                                                 :
                                                                 :
                                                                 :
                                                                 :
APPLICATION FOR RELEASE FROM            :    AFFIDAVIT OF BRIE WILLIAMS,
CUSTODY                                 :    M.D.
                                                                 :
                                                                 :
                                                                 :
                                                                 :
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

I, Brie Williams, hereby affirm as follows:

1.      I am a doctor duly licensed to practice medicine in the State of California.

2.      I am currently a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. In that capacity, my clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research. I have developed new methods for responding to the unique health needs of criminal justice-involved older adults—including an evidence-based approach to reforming compassionate release policies and the design of a new tool to assess physical functioning in older prisoners. I was previously a consultant for the California Department of Corrections and Rehabilitation, as well as for other state prison systems.

3.      I have extensive experience working with vulnerable populations, in particular the incarcerated and the elderly.

4.      I submit this affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines.  The statements in this affidavit are based only on the current state of emergency and the circumstances described below.

**The Risk of Infection and Accelerated Transmission of COVID-19 within Jails and Prisons is Extraordinarily High.**

5.      Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day.  Access to testing for correctional staff has been "extremely limited," guards have reported a "short supply" of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms.[1]

6.      The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently.[2]  For example, despite the federal government's guidance to stay

---

[1] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

*See also* Daniel A. Gross, *"It Spreads Like Wildfire": The Coronavirus Comes to New York's Prisons*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons; Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona.' Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time (Mar. 24, 2020), https://time.com/5808020/rikers-island-coronavirus/; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075; Cassidy McDonald, *Federal Prison Workers Say Conflictings Orders on Coronavirus Response Is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[2] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/.

2

inside and many states' stay-in-place orders, many prosecutors are still arresting individuals and seeking detention.[3]  Pre-trial detention facilities are still accepting new inmates who are coming from communities where COVID-19 infection is rampant.  As of today's date, the Bureau of Prisons is still moving inmates from facility to facility, including prisoners in New York.[4]

7.     Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat together and use the same bathrooms and sinks.  They eat together at small tables that are cleaned only irregularly.  Some are not given tissues or sufficient hygiene supplies.[5]  Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.[6]

**Inmate Populations Also Have the Highest Risk of Acute Illness and Poor Health Outcomes if Infected with COVID-19.**

8.     There are more than 2.3 million people incarcerated in the United States[7]

---

[3] Stephen Rex Brown, *'Business as Usual' For Federal Prosecutors Despite Coronavirus, Nadler Writes, Calling for Release of Inmates*, N.Y. Daily News (Mar. 20, 2020), https://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story.html.

[4] Courtney Bublé, *Lawmakers, Union Urge Halt to All Prison Inmate Transfers*, Government Executive (Mar. 25, 2020), https://www.govexec.com/management/2020/03/lawmakers-union-urge-halt-all-prison-inmate-transfers/164104/; Hamilton, *Sick Staff, Inmate Transfers*; Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates*, ABC News (Mar. 23, 2020),https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

[5] Justine van der Leun, *The Incarcerated Person Who Knows How Bad It Can Get*, Medium (Mar. 19, 2020), https://gen.medium.com/what-its-like-to-be-in-prison-during-the-coronavirus-pandemic-1e770d0ca3c5 ("If you don't have money, you don't have soap or tissues."); Keri Blakinger and Beth Schwartzapfel, *How Can Prisons Contain Coronavirus When Purell Is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[6] Rosa Schwartzburg, *'The Only Plan the Prison Has Is to Leave Us To Die in Our Beds'*, The Nation (Mar. 25, 2020), https://www.thenation.com/article/society/coronavirus-jails-mdc/.

[7] Kimberly Kindy *et al.*, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

approximately 16% of whom are age 50 or older.[8]  The risk of coronavirus to incarcerated seniors is high.  "Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination."[9]  To make matters worse, correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to suffer from chronic health conditions than the general public.

9.      An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, some of the most common of which are diabetes, hypertension, and heart problems.[10] According to the CDC, each of these conditions—as well as  chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease, and certain neurological and neurologic and neurodevelopment conditions[11]—puts them at a "high-risk for severe illness from COVID-19."[12]

---

[8] Brie Williams *et al.*, *Strategies to Optimize the Use of Compassionate Release from US Prisons*, 110 AJPH S1, S28 (2020), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305434; Kimberly A. Skarupski, *The Health of America's Aging Prison Population*, 40 Epidemiologic Rev. 157, 157 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5982810/.

[9]  Weihua Li and Nicole Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*, The Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[10] Brie A. Williams *et al.*, *How Health Care Reform Can Transform the Health of Criminal Justice-Involved Individuals*, 33 Health Affairs 462-67 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4034754/; Brie A. Williams *et al.*, *Coming Home: Health Status and Homelessness Risk of Older Pre-release Prisoners*, 25 J. Gen. Internal Med. 1038-44 (2010), *available at*  https://link.springer.com/content/pdf/10.1007/s11606-010-1416-8.pdf; Laura M. Maruschak *et al.*, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept of Justice (Oct. 4, 2016), at 5, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[11] Harvard Health Publishing, *Coronavirus Research Center*, Harvard Medical School (Mar. 25, 2020), https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center.

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated Mar. 22, 2020).

10.     However, even many young federal prisoners suffer from asthma, rendering them also very vulnerable to coronavirus.[13]

11.     But it is not only the elderly, or those with preexisting medical conditions that are at risk of coronavirus in a correctional setting.  As of March 23, 2020, New York City reported that "[p]eople ranging in ages from 18 to 44 have accounted for 46 percent of positive tests."[14] Across the United States, 38% of those hospitalized are between the ages of 20 and 54 and 12% of the intensive care patients are between 20 and 44.[15]

12.     This data is of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age.[16]  Therefore, the consensus of those who study correctional health is that inmates are considered "geriatric, by the age of 50 or 55 years."[17]  It is not clear that prison health care administrations are taking accelerated ageing into account when determining the eligibility criteria for age-related screening tools and medical care protocols for coronavirus, potentially leaving large swathes of the prison population at risk.[18]

---

[13] Laura Maruschak, *Medical Problems of Jail Inmates*, Dep't of Justice (Nov. 2006), at p. 2, *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf.

[14] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing That They Can Get Coronavirus, Too*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html.

[15] *Id.*

[16] Brie A. Williams *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Public Health 1475-81 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; *see also* Brie Williams *et al.*, *Detained and Distressed: Persistent Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55 (2016), https://onlinelibrary.wiley.com/doi/pdf/10.1111/jgs.14310 ("For example, older jail inmates with an average age of 60 in this study reported poor or fair health [and] chronic lung disease . . . at rates similar to those reported by community-based lower income older adults with an average age of 72.").

[17] Brie A. Williams *et al.*, *The Older Prisoner and Complex Chronic Medical Care* 165-70 in World Health Organization, *Prisons and Health* (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf.

13.    In one study, we found that inmates who died in hospitals were, on average, nearly two decades younger than non-incarcerated decedents, had significantly shorter hospitalizations, and had higher rates of several chronic conditions including cancer, liver disease and/or hepatitis, mental health conditions, and HIV/AIDS."[19]

**The Entire Community is at Risk If Prison Populations Are Not Reduced**

14.    As the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease.[20]

15.    As of March 24, 2020, at least 38 people involved in the New York City correctional system have tested positive for Covid-19.[21]   Already, three inmates and three staff at federal correctional facilities across the United States have tested positive for the coronavirus, according to the Federal Bureau of Prisons.[22]

16.    Jails and prisons are fundamentally ill-equipped to handle a pandemic.

17.    Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital.  Some correctional facilities have no formal medical ward and no place to quarantine

---

[18] Brie A. Williams *et al.*, *Differences Between Incarcerated and Non-Incarcerated Patients Who Die in Community Hospitals Highlight the Need For Palliative Care Services For Seriously Ill Prisoners in Correctional Facilities and in Community Hospitals: a Cross-Sectional Study*, 32 J. Pallitive Med. 17-22 (2018), *available at* https://journals.sagepub.com/doi/pdf/10.1177/0269216317731547.

[19] *Id.* at 20.

[20] Hannah Summers,  *'Everyone Will Be Contaminated'*: *Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[21] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons.*

[22] Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

sick inmates, other than the facilities' Special Housing Unit (SHU).[23]  While the cells in the SHU have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, they rarely have intercoms or other ways for sick inmates to contact officers in an emergency.[24]  This is particularly dangerous for those with COVID-19 infection since many patients with COVID-19 descend suddenly and rapidly into respiratory distress.[25]

18.     Even those facilities that do have healthcare centers can only treat relatively mild types of respiratory problems for a very limited number of people.[26]  This means that people who become seriously ill while in prisons and jails will be transferred to community hospitals for care. At present, access to palliative care in prison is also limited.

19.     Corrections officers may also be particularly vulnerable to coronavirus due to documented high rates of diabetes and heart disease.[27]  Prison staff in Pennsylvania, Michigan, New York and Washington state have tested positive for the virus, resulting in inmate quarantines. In Washington, D.C., a U.S. marshal who works in proximity to new arrestees tested positive for the virus, meaning dozens of defendants headed for jail could have been exposed.[28]  In New York,

---

[23] MCC New York COVID 19 Policy Memo, Mar. 19, 2020, https://www.documentcloud.org/documents/6818073-MCC-New-York-COVID-19-Policy-Memo.html; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[24] Brie Williams *et al.*, *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/.

[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19–Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[26] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*; Li and Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19.*

[27] Brie Williams, *Role of US-Norway Exchange in Placing Health and Well-Being at the Center of US Prison Reform*, https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305444 (published Jan. 22, 2020).

[28] Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WSJ (Mar. 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("We're all headed for some dire consequences," said Daniel Vasquez, a former warden of San Quentin and Soledad state prisons in

236 members of the New York Police Department have tested positive for coronavirus and 3,200 employees are sick, triple the normal sick rate.[29]  Two federal prison staffers have also tested positive.[30]

20.     For this reason, correctional health is public health. Decreasing risk in prisons and jails decreases risk to our communities.

21.     Reducing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently.  With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff.

 I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
        March 27, 2020

_____
Dr. Brie Williams

---

California. "They're in such close quarters—some double- and triple-celled—I think it's going to be impossible to stop it from spreading.").

[29] Erin Durkin, *Thousands of NYPD Officers Out Sick Amid Coronavirus Crisis*, Politico (Mar. 25, 2020), https://www.politico.com/states/new-york/albany/story/2020/03/25/thousands-of-nypd-officers-out-sick-amid-coronavirus-crisis-1268960.

[30] Elinson and Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*.

Exhibit B

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
                                                              :
                                                              :
APPLICATION OF VULNERABLE                                     :
                                                              :      AFFIDAVIT OF JONATHAN
INMATE FOR RELEASE FROM                                       :      GIFTOS, M.D.
                                                              :
MDC BROOKLYN                                                  :
                                                              :
                                                              :
                                                              :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

I, Jonathan Giftos, hereby affirm as follows:

      1.     I am a doctor duly licensed to practice medicine in the State of New York. I am board certified in internal medicine and addiction medicine.

      2.     I am currently the Medical Director of Addiction Medicine & Drug User Health at Project Renewal and a Clinical Assistant Professor in the Department of Medicine at Albert Einstein College of Medicine.  I was previously the Clinical Director of Substance Use Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island. In that capacity I was responsible for the diversion, harm reduction, treatment and reentry services for incarcerated patients with substance use disorders. I further served as the medical director of the Key Extended Entry Program (KEEP), the nation's oldest and largest jail-based opioid treatment program that provides methadone and buprenorphine to incarcerated patients with opioid use disorders. I successfully led an effort to remove non-clinical barriers to opioid treatment program enrollment in 2017, which dramatically expanded treatment access from 25% to over 80%, while also reducing post-release mortality for people with opioid use disorder.

3.      I have extensive experience working with vulnerable populations such as the incarcerated and those experiencing homelessness.

4.      I submit this affidavit in support of vulnerable defendants' (as defined by the CDC) Motion for Temporary Release from Custody during the COVID-19 pandemic.

## I.      Coronavirus Epidemic in New York City

5.      On March 11, 2020, the World Health Organization declared that the rapidly spreading outbreak of COVID-19, a respiratory illness caused by a novel coronavirus, is a pandemic, announcing that the virus is both highly contagious and deadly.[1]  To date, the virus is known to spread from person-to-person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[2]  The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[3]  Experts are still learning how it spreads.

6.      As of March 18, 2020, novel coronavirus has infected over 193,475 people, leading to 7,864 deaths worldwide.[4]  In the United States, there are at least 5,881 confirmed cases and there have been at least 107 deaths.[5] There are confirmed coronavirus cases in every state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.

---

[1]  World Health Organization, Media Briefing on March 11, 2020: https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] Centers for Disease Control and Prevention, Coronavirus Disease 2019: *How it Spreads,* https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html

[3] *Id.*

[4]  *Novel Coronavirus Situation Dashboard*,  World Health Organization https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd.

[5] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 18, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

7.      Governor Cuomo declared a State of Emergency in New York State on March 7, 2020.  Mayor De Blasio declared a State of Emergency in New York City on March 12, 2020.  As of March 18, 2020, there are 2,382 positive cases in New York State with 1,339 of those cases being in New York City.[6]  Among the positive cases in New York City are a number of people who work in courthouses, law enforcement, legal offices, and the medical field, increasing the likelihood of exposure to and by inmates: a security officer and an agent in the U.S. Attorney's Office, SDNY;[7] a NYC Department of Corrections investigator (who has since died from COVID-19);[8] a lawyer with an office in Midtown Manhattan (and his wife and son);[9] a healthcare worker in Manhattan; an attorney and legal intern in local New York State courts; and an attorney at the Brooklyn Supreme Court.[10]

8.      There is currently no vaccine or cure.  The primary focus is on preventing the spread of the virus at this juncture. To prevent new infections, the Centers for Disease Control and Prevention strongly recommend the following actions: thorough and frequent handwashing, cleaning surfaces with EPA approved disinfectants, keeping at least 6 feet of space between people,

---

[6] *Information on Novel Coronavirus,* New York Department of Health, https://www.health.ny.gov/diseases/communicable/coronavirus (last visited March 17, 2020).

[7] Email Communication with Edward Tyrrell, U.S. Attorney's Office, SDNY (March 14, 2020).

[8] *NYC Corrections Officer Dies of Coronavirus*, https://www.pix11.com/news/coronavirus/nyc-correction-officer-dies-of-coronavirus

[9] *Midtown Lawyer, Family and Friends Test Positive,* https://www.nbcnewyork.com/news/local/nyc-attorney-in-critical-condition-city-works-to-trace-movements-awaits-more-tests/2311723/

[10] *Information about Coronavirus and New York State Courts*, https://www.nycourts.gov/whatsnew/covid.shtml; *see also Two People with Coronavirus were in Manhattan and Brooklyn Courts, https://twnews.us/us-news/two-people-with-coronavirus-were-in-manhattan-brooklyn-courts.*

3

and avoiding group settings.[11]   Social distancing has also been encouraged to slow the rate of COVID-19 infections so that hospitals have the resources to address infected individuals with urgent medical needs.[12] The President's *Coronavirus Guidelines for America*, to slow the spread of the coronavirus, warns that social gatherings in groups of more than 10 people should be avoided.[13]   In correctional settings, such sanitation, social distancing, and self-quarantining measures are nearly impossible especially when inmates are routinely shackled and escorted with other prisoners.[14]

**Certain Identifiable Populations Are Far More Vulnerable To COVID-19 Than The Population At Large Is.**

9.      The Centers for Disease Control have identified two groups of people at higher risk of contracting and succumbing to COVID-19: adults over 60 years old and people with chronic medical conditions.[15]

10.     COVID-19 is more dangerous to persons in these high-risk groups than to the general population.  Older people who contract COVID-19 are more likely to die than people under the age of 60.  In a February 29th WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 60-69 had an overall 3.6% mortality rate and those 70-79

---

[11]  *How to Protect Yourself*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html.

[12]  *Coronavirus, Social Distancing, and Self-Quarantine*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[13] *The President's Coronavirus Guidelines for America*, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

[14] *See We Are Not a Hospital: A Prison Braces for the Coronavirus*, New York Times, March 18, 2020, https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[15] *If You Are at Higher Risk*, Centers for Disease Control and Prevention, https://tinyurl.com/vtbebzc; *see also Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19)*, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf at 12.

years old had an 8% mortality rate.[16]  For individuals 40 years and younger, the mortality rate was

as low as .2%.  It has been found that older people diagnosed with COVID-19 are more likely to

be very sick and require hospitalization to survive because the acute symptoms include respiratory

distress, cardiac injury, arrhythmia, septic shock, liver dysfunction, kidney injury and multi-organ

failure.   Access to a mechanical ventilator is often required.   People with chronic medical

conditions (no matter their age) are also at significantly greater risk from COVID-19 because their

already-weakened systems are less able to fight the virus. These chronic medical conditions

include lung disease, cancer, heart failure, cerebrovascular disease, renal disease, liver disease,

diabetes, immunocompromising conditions, and pregnancy.   Those with pre-existing medical

conditions have a higher probability of death if infected. The WHO-China Joint Mission Report

provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes,

8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[17]

In a March 17th *Washington Post* article tracking the 100 United States COVID-19

deaths, it is reported that many of the fatalities had underlying medical conditions, which made it

harder for their bodies to fight off COVID-19.  And nearly all — about 85 percent — were older

than 60; about 45 percent were older than 80.[18]

### Correctional Settings Increase The Risk Of Transmission

11.     Correctional settings increase the risk of contracting an infectious disease, like

COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in a

---

[16] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart,
https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO-China Joint Mission Report, *supra*).

[17] *Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19),*
https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf at 12.

[18] *U.S. Coronavirus Death Toll Reaches 100*, The Washington Post, March 17, 2020, at
https://www.washingtonpost.com/national/us-coronavirus-death-toll-reaches-100/2020/03/17/f8d770c2-67a8-11ea-b313-df458622c2cc_story.html.

setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.  Correctional facilities house large groups of inmates together, and move inmates in groups to eat, do recreation, and go to court. They frequently have insufficient medical care for the population, and, in times of crisis, even those medical staff cease coming to the facility.  Hot water, soap and paper towels are frequently in limited supply.  Inmates, rather than professional cleaners, are responsible for cleaning the facilities and often not given appropriate supplies.  This means there are more people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible.

12.     Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[19]

13.     Inmates in New York City have already begun to test positive for COVID-19.  An inmate at Rikers and an inmate at Nassau County Correctional Facility (which houses both state and federal pre-trial detainees) tested positive this week.[20]  A corrections officer at Rikers has also tested positive.[21]

**Specific Conditions At MDC Brooklyn**

14.     Based on my understanding of the specific conditions at the federal pre-trial detention center in Brooklyn ("MDC Brooklyn") as contained in published reports and communicated to me by Deirdre D. von Dornum, Attorney-in-Charge of the Federal Defenders of

---

[19] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[20] *Id.*; *Nassau County Jail Inmate Tests Positive*, https://www.pix11.com/news/coronavirus/inmate-at-nassau-county-jail-long-island-tests-positive-for-coronavirus-officials.

[21] *Rikers Island Inmate Tests Positive for Coronavirus, in a First for New York City*, New York Magazine (March 18, 2020).

6

New York, these conditions pose heightened risks to already vulnerable inmates of contracting the novel coronavirus and of developing acute symptoms from the virus.

15.     The size of the population and the conditions of confinement at MDC Brooklyn increase the risk of infection substantially because it is impossible for inmates to maintain a 6-foot distance from others, to avoid large groups, or to implement sufficient hand-washing and sanitization of surfaces.

a.     Approximately 1700 inmates are held at the MDC, at least 10% of whom (and likely a higher percentage) fall into the high risk groups identified by the CDC.[22]

b.     New inmates arrive at MDC Brooklyn from all over the world each week.  These new inmates are screened only for fever and recent travel to designated hotspot countries.[23]

c.     Correctional officers who live in New York, New Jersey, and Pennsylvania come in and out of the facility each day without medical screening.[24]  Significantly, in a March 18th CDC report, an epidemiological investigation revealed that coronavirus-infected staff members contributed to the outbreak in a nursing home facility with ineffective infection control and prevention and staff members working in multiple facilities.[25] The Seattle nursing home outbreak demonstrates that individuals with underlying health conditions and

---

[22] *See* "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on Inmates," OIG Report (Sept. 2019), at 1 (MDC Brooklyn houses approximately 1700 pretrial and designated inmates); Telephone Conversation With MDC Legal (March 17, 2020) (approximately 10% of inmates at MDC Brooklyn are high-risk for COVID-19 within the CDC's definition).

[23] Telephone Conversation With MDC Legal (March 17, 2020).

[24] Telephone Conversation With MDC Legal (March 17, 2020).

[25] *COVID-19 in a Long-term Care Facility—King County Washington, February 27-March 9, 2020*, https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e1-H.pdf.

advanced age, in a shared location, are at a high risk of death, especially when resources and staffing become inadequate.[26]

 d.   Inmates at MDC Brooklyn are housed either in small two-man cells (designed to hold a single inmate) with a single shared toilet and sink or in large open dormitory units housing up to 70 inmates with shared toilets and sinks.[27]   Windows in the units do not open. Inmates cannot go outside.

e.    No hand sanitizer is available to inmates at MDC Brooklyn.[28]

f.    Tissues are not readily available.  Inmates use toilet paper to blow their noses.  Each inmate is provided only one roll of toilet paper per week.

g.    Each inmate is given one small bar of soap a week, at most.  Some units at MDC have received no soap since the lockdown of the facility began on March 13, 2020.  Access to additional soap is limited to those inmates who have sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.

h.    Inmates prepare all inmate meals and this meal preparation, with the exception of kosher and halal meals, is performed in a single kitchen.[29]

i.    Inmates eat meals in large groups.[30]

---

[26] *Id.*

[27] *See* "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on Inmates," OIG Report (Sept. 2019) (describing housing units).

[28] Statement of Associate Warden Andy Cruz at EDNY Security Committee Meeting (March 11, 2020).
[29] "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on Inmates," OIG Report (Sept. 2019), at 4 (all meals are prepared by inmates who work for Food Services in a central kitchen area).

[30] "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on Inmates," OIG Report (Sept. 2019).

j.   Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so.

k.   Inmates have not been informed of the symptoms of COVID-19, or of how to prevent the spread of the infection.

l. Inmates who are at lower and higher risks (because of age and pre-existing medical conditions) of contracting the virus are not separated.[31]  Instead, they are mixed together in small two-man cells and locked together in those cells for at least 10 out of every 24 hours.[32]

m.  The facility has not informed the inmate population of what the protocol will be for symptomatic inmates;[33] absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.

n.   MDC Brooklyn currently has no COVID-19 test kits.

16.   Inmates at MDC Brooklyn who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because MDC Brooklyn lacks the medical resources to care for symptomatic inmates.

a.   There is no separate medical unit or facility for ill inmates.[34]  Unlike many Federal Correctional Institutions and even Rikers' Island, MDC Brooklyn has no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing.

---

[31] Statement of Associate Warden Andy Cruz at EDNY Security Committee Meeting (March 11, 2020).

[32] *Id.*

[33] *Id.*

[34] Statement of Associate Warden Andy Cruz at EDNY Security Committee Meeting (March 11, 2020).

  b.  On weekdays, there are only three doctors available at MDC Brooklyn to care for all 1700 inmates.  Even this highly limited number is likely to decrease as doctors themselves go into quarantine.  None of these doctors specialize in infectious diseases.

  c.  There are no doctors at MDC Brooklyn on weekends or evenings.

  d.  People who contract COVID-19 can deteriorate rapidly, even before a test result can be received.  They need constant monitoring. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires specialized equipment in limited supply as well as an entire team of specialized care providers.  MDC Brooklyn does not have that specialized equipment or specialized providers.

17.  MDC Brooklyn is already short-staffed.[35]  This staffing shortage will only increase as employees need to stay home to care for children whose schools are closed, elderly family members, and other personal health situations.  With fewer staff, correctional officers are less able to monitor inmates' health.

**Reducing Population Size At Specific Correctional Facilities Is A Crucial Public Health Measure**

18.  Every effort should be made to reduce chances of exposure to the novel coronavirus; however given the proximity and high number of inmates, correctional staff, and healthcare workers at pre-trial detention facilities, it will be extremely difficult to sustain such

---

[35] "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on Inmates," OIG Report (Sept. 2019).

efforts. Therefore, it is an urgent priority to reduce the number of people in detention facilities during this national public health emergency.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: Brooklyn, New York
   March 18 , 2020

                    _____
                    Dr. Jonathan Giftos

Exhibit C

Hugh Brian Haney - 67030-061

Martin Cohen

Thu 3/26/2020 2:43 PM

To BRO/Exec Assistant~ <bro/execassistant~@bop.gov>;

🖈 1 attachments (80 KB)
Hugh Brian Haney 67030-061.pdf;


Attached please find a letter to Warden Edge requesting compassionate release for Mr. Haney pursuant to 18 USC section 3582 grounded in the COVID-19 pandemic.

Thank you for your consideration of this request.

Martin Cohen
Assistant Federal Defender
Federal Defenders of New York
52 Duane Street - 10th Floor
New York, NY 10007
fax: 212-571-0392
tel: 212-417-8737
martin_cohen@fd.org

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 26, 2020

Warden Derek Edge
MDC Brooklyn
80 29th Street
Brooklyn, NY
By email to: *Bro/ExecAssistant@bop.gov*

Re:   Request for Reduction in Sentence/Compassionate Release

Dear Warden Edge,

Please accept this request for a reduction in sentence pursuant to 18 U.S.C. § 3582 on behalf of inmate Hugh Brian Haney, Reg. No. 67030-061.  Given the extraordinary and compelling circumstances created by the ongoing coronavirus pandemic, Mr. Haney is not able to file this request himself.

Mr. Haney seeks a reduction in sentence based on his age (61 years old), which places him at significantly greater risk of contracting and/or suffering acutely from COVID-19, according to the Centers for Disease Control. Mr. Haney's risk is heightened by the particular circumstances at MDC, which presents an ideal situation for COVID-19 to spread.  One inmate has already tested positive, and several other inmates are being monitored for symptoms.  Mr. Haney cannot practice regular hand hygiene, and cannot effectively socially distance himself from other inmates as the CDC cautions every person in the United States must do to stop COVID-19's spread.

If released, Mr. Haney can reside with his sister, Belinda Pickelsimer. (I spoke with Ms. Pickelsimer today, and she confirmed that Mr. Haney can live with her, and also that they have sufficient space to quarantine Mr. Haney upon arrival for the requisite two weeks.) The address of the residence is 100 N. Academy St., Richlands, NC 28574.

Please inform me of your decision on this request as soon as you can.

Thank you for your consideration of this request.

Very Truly Yours,

/s/_____
Martin Cohen
Ass't Federal Defender
212-417-8737

Exhibit D

JERROLD NADLER, New York
CHAIRMAN

JIM JORDAN, Ohio
RANKING MINORITY MEMBER

# 𝔘.𝔖. 𝔥𝔬𝔲𝔰𝔢 𝔬𝔣 𝔯𝔢𝔭𝔯𝔢𝔰𝔢𝔫𝔱𝔞𝔱𝔦𝔳𝔢𝔰

## ℭ𝔬𝔪𝔪𝔦𝔱𝔱𝔢𝔢 𝔬𝔫 𝔱𝔥𝔢 𝔍𝔲𝔡𝔦𝔠𝔦𝔞𝔯𝔶

### 𝔚𝔞𝔰𝔥𝔦𝔫𝔤𝔱𝔬𝔫, 𝔇ℭ 20515–6216

#### 𝔒𝔫𝔢 ℌ𝔲𝔫𝔡𝔯𝔢𝔡 𝔖𝔦𝔵𝔱𝔢𝔢𝔫𝔱𝔥 ℭ𝔬𝔫𝔤𝔯𝔢𝔰𝔰

March 30, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Attorney General Barr:

On the evening of March 28, 2020, we sadly learned of the first death of a prisoner in the custody of the federal Bureau of Prisons (BOP) due to COVID-19.[1]  The decedent was a 49-year-old African-American man who, according to the BOP's press release announcing his death, had "long-term, pre-existing medical conditions which the CDC (Centers for Disease Control and Prevention) lists as risk factors for developing more severe COVID-19 disease."[2]  He was housed in a *low-security* facility in Oakdale, Louisiana.[3]  Reports now indicate that one guard at the same facility is in intensive care due to COVID-19 and there have been positive test results for another 30 prisoners and staff.[4]  This death and the explosion of cases in the Oakdale prison underscore the urgency of taking action to prevent more avoidable deaths of individuals in federal custody.

The Department of Justice (DOJ) and BOP presently have the authority to request, under 18 U.S.C. § 3582(c)(1)(A)(i), that courts modify the sentences of prisoners who present "extraordinary and compelling reasons."[5]  We call on you, in the most urgent of terms, to do the

---

[1] *See* BOP Press Release, Mar. 28, 2020.
[2] *Id.*
[3] *Id.*
[4] Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana*, Wash. Post, March 29, 2020.
[5] *See* 18 U.S.C. § 3582(c)(1)(A) ("The court may not modify a term of imprisonment once it has been imposed except that---in any case—the court, upon motion of the Director of the Bureau of Prisons,…may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent they are applicable, if it finds that…extraordinary and compelling reasons warrant such a reduction and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.").  The relevant policy statement of the U.S. Sentencing Commission provides that "extraordinary and compelling reasons" are ones which involve (A) the medical condition of the defendant, (B) the age of the defendant, (C) his or her family circumstances, and (D) any "other" extraordinary and compelling reason not described in (A) through (C) that the Director of the Bureau of Prisons determines to be, in combination with (A) through (C) or on its own, an extraordinary and compelling reason.  *See* U.S.S.G. § 1B1.13, Policy Statement n.1 (2018).

right thing and exercise this authority and immediately move to release medically-compromised, elderly, and pregnant prisoners in the custody of the BOP.

In addition, we urge that you use every tool at your disposal to release as many prisoners as possible, to protect them from COVID-19. Along those lines, and as you move forward with planning for and executing the release of what we hope will be an appropriately sizable number of BOP prisoners, we urge you to consider the issues raised below.

## Home Confinement Release Authority Under the CARES Act

On March 27, 2020, the House passed, and President Trump signed into law, the Coronavirus Aid, Relief, and Economic Security Act," or the "CARES Act."[6]  Among other things, the CARES Act broadens the authority of the Attorney General and the Director of the BOP, during the COVID-19 crisis, to release prisoners to home confinement.[7]  We ask that both you and the Director of the BOP interpret and exercise this new authority as broadly as possible, given that thousands of lives are at stake.

As you know, before BOP can exercise its authority under the CARES Act, the Attorney General must make a finding that "emergency conditions will materially affect the functioning of the Bureau [of Prisons]."[8]  On March 26, 2020, you issued a memorandum directing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic.[9]  Your memorandum certainly implies that the COVID-19 pandemic is "materially affect[ing] the functioning" of BOP.[10]  Your memorandum further urges the Director of the BOP to "prioritize the use of [his] various statutory authorities for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[11]  In order for the Director of the BOP to exercise his statutory authority under the CARES Act, the Attorney General must first find that COVID-19 is materially affecting the functioning of the BOP. We urge you to make this finding immediately.

## Memorandum of March 26, 2020

Although we were encouraged to see that you have already issued a directive to the Director of the BOP prioritizing home confinement as appropriate in response to the COVID-19 pandemic, your memorandum raises a number of concerns:

(1) **Public Health.** We are troubled by your statement that "[m]any inmates will be safer in BOP facilities where the population is controlled and there is ready access to

---

[6] *See* Coronavirus Aid, Relief, and Economic Security Act (CARES Act), H.R. 748, 116th Cong. (2020).
[7] *See* H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2).
[8] *Id*.
[9] *See* Attorney General William P. Barr, Memorandum for Director of Bureau of Prisons ("Barr Memorandum"), Mar. 26, 2020.
[10] *See generally id.*
[11] *Id.* at unnumbered page 1.

doctors and medical care."[12]  While that may well be the case for some inmates, we hope this statement does not indicate that you believe that prison is a safe place for anyone to be during a pandemic.  Quite the contrary, as already demonstrated by the death of a medically-compromised BOP prisoner and the growing numbers of infected persons in BOP facilities across the country.[13]  For instance, we are not aware that BOP facilities, as a whole, have "ready access to doctors"; a 2019 report by DOJ's Office of the Inspector General found that "staffing prisoners with qualified healthcare workers is a challenge for the BOP."[14]  This is likely even more true at the present time, with large numbers of healthcare workers being deployed to battle COVID-19 outside the prison walls.  In addition, the CDC have encouraged "social distancing" and increased hygiene to prevent COVID-19.[15]  Unfortunately, many BOP facilities utilize close quarter housing,[16] which makes it impossible to accomplish adequate distancing between prisoners.  And, it is no secret that hygienic conditions are lacking in BOP facilities,[17] as they are in prisons across the country. For all these reasons, the best way to ensure that our prisons do not become epicenters of this incredibly virulent, contagious, and deadly disease is to release as many people as possible.

(2) **Criteria for Home Confinement Assessment.**  The criteria you set forth for BOP to utilize in prioritizing who should be placed in home confinement during the COVID-19 pandemic, although discretionary, will likely preclude the expeditious release of many prisoners who should be released.  The following criteria are especially problematic and raise some questions:

(a) *Use of PATTERN.*[18]  Although BOP has begun to use PATTERN, the tool developed pursuant to the First Step Act to assess inmates with regards to their

---

[12] *Id.*

[13] As of March 29, 2020, BOP had confirmed 14 inmates and 13 staff had tested positive for the COVID-19, but, according to union officials, there is a "lag" between the cases reported by the union and the cases reported by prison officials.  Kindy, *supra* note 4.  One alarming example of what could go wrong in federal prisons, as cases grow in other parts of the country, is Rikers Island, where the rate of infection for COVID-19 is seven times higher than in New York City and 87 times higher than in the rest of the United States.  *See* CBS New York, *Coronavirus Update:  Rikers Island Rate of Infection 7 Times Higher Than Citywide, Legal Aid Says*, Mar. 26, 2020, https://newyork.cbslocal.com/2020/03/26/coronavirus-rikers-island/ (citing findings by the Legal Aid Society of New York City).

[14] U.S. Dep't Just., Office of the Inspector General, *Top Management and Performance Challenges Facing the Department of Justice-2019*, Oct. 18, 2019, at 3.  "Nationwide provider shortages, the BOP's inability to provide competitive compensation to providers, and the BOP's rural facility locations each contribute to . . .difficulties [in staffing healthcare provider positions]. In addition to the problems of recruiting and retaining qualified healthcare professionals, providing adequate healthcare to inmates remains a challenge for the BOP."  *Id.* at 4.

[15] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): How to Prepare—How to Protect Yourself*, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html.

[16] Letter from Kevin A. Ring, President, FAMM to AG Barr and BOP Director Michael Carvajal, Mar. 26, 2020, at 2.

[17] *See* Nathalie Baptiste, *The Coronavirus is Spreading and Reportedly There's No Soap at this Federal Jail in Brooklyn*, Mother Jones, Mar. 9, 2020, https://www.motherjones.com/politics/2020/03/the-coronavirus-is-spreading-and-reportedly-theres-no-soap-at-this-federal-jail-in-brooklyn/.

[18] Barr Memorandum, at 2.

recidivism risk, it is still an incomplete tool; it has yet to be independently validated, as required by the First Step Act.[19]  Indeed, many questions remain about PATTERN's validity because of possible racial/ethnic and gender bias and because of the tool's overemphasis on static factors such as criminal history. Moreover, as you know, PATTERN was created for an entirely different purpose than for assessing whether prisoners should be released during a pandemic.  For these reasons, we urge BOP *not* to use a prisoner's PATTERN score as a consideration for whether they should be released to home confinement during the COVID-19 pandemic.

(b) ***Re-Entry Plan.***  One of the criteria you set forth is that the inmate have a "demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety."[20]  How will you measure whether a plan prevents recidivism and maximizes public safety?  Will you be providing guidance on how the BOP Director is to make this assessment?  If so, what are the parameters? How will you ensure that meeting this criterion is not unduly burdensome for inmates, especially those who are elderly or medically-compromised?  We also note that this criterion (i.e., having a proper reentry plan) appears to apply to individuals who are already in the "pipeline" for release.  We note this to urge that you do not restrict the home confinement prioritization only to individuals who are already "seeking" transfer.  There will certainly be individuals who would be newly eligible after the CARES Act, but who may not be aware they are eligible and, for that reason, are not yet seeking transfer to home confinement.  Due to the enactment of the CARES Act, we urge you to proactively direct the BOP to identify *all* individuals who would be eligible for release to home confinement under the newly expanded statutory authority, notify them that they are eligible, and assess them for release.  Please advise whether you intend to do this.

(c) ***Prioritization of Low and Minimum Security Facilities and Discouragement of Release for Inmates with Serious Offenses.***  Your memorandum specifies that priority should be given to inmates in low- and minimum-security facilities and that "serious" offenses should weigh more heavily *against* consideration for home detention.[21]  These limitations, unfortunately, beg the question of what you do with individuals who are at a high risk for contracting COVID-19 who are not in low- or minimum-security facilities, who have been convicted of serious offenses, or who have high PATTERN risk scores.  We urge you to consider that even individuals in these categories should be assessed for release because they may be elderly or particularly vulnerable.[22]  Pregnant prisoners, in all circumstances, should be released to home confinement forthwith.  We further urge you to assess

---

[19] First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5215, § 107 (2018),

[20] *Id.*

[21] *Id.*

[22] The man who died on March 28, 2020 was convicted of a serious offense, but he presented *known* risk factors and was housed in a low-security facility.

4

the risk of contracting COVID-19 of *every* individual in BOP custody, regardless of the type of institution in which they are housed, the seriousness of their offense, or the potential recidivism risk they may present.  If BOP decides to keep these individuals detained, what specific provisions are being made for those among them who are at high risk for contracting COVID-19?  What plans are being made to communicate information to these individuals, their attorneys, and their loved ones, about the plan for their care behind bars during the COVID-19 pandemic?

(3) **Location Monitoring.**  Your memorandum states that any individuals released because of the COVID-19 pandemic will be released with location monitoring.[23]  If this is the case, we ask that you ensure that there are enough resources to provide monitoring equipment free of charge to those individuals released and that you ensure that there is enough equipment available, so that no one is kept behind bars because of a lack of availability of equipment.  Please confirm whether it is your intent to ensure this and, if not, why not.

### Full Utilization of Second Chance Act Elderly Home Confinement Program

You should also exercise your authority to release as many people as possible into home confinement, under the elderly home confinement pilot program established under the Second Chance Act.[24]  The elderly home confinement program authorizes you to waive the requirements of section 3624 of title 18, "as necessary to provide for the release of some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention."[25]  In other words, the statute authorizes, and indeed it *encourages,* you to place *all* eligible elderly offenders in the pilot program—without regard for any of the time constraints set forth in section 3624.  Current conditions underscore the need to exercise this authority fully. Please advise us whether you will seek to do so.

### Residential Reentry Centers

We want to highlight an issue that has been brought to our attention regarding persons who are currently finishing out their BOP sentences in residential reentry centers.  Under the CARES Act, you have been granted authority, if you choose to exercise it, to release to home confinement every person who is currently finishing out his or her sentence in a residential reentry center.  In particular, if they have been released to a residential reentry center and have been there without incident, you should, at a minimum, consider these individuals to have a "lower risk level." We have been dismayed to hear, in the last few days, several stories of elderly

---

[23] *Id.*

[24] *See* Second Chance Act, Pub. L. No. 110-199 122 Stat. 657, 687 (2008), at § 231 (codified at 34 U.S.C. § 60541).

[25] 34 U.S.C. § 60541(g)(1)(C).

and vulnerable inmates who are residing in close-quarters in residential reentry centers and are fearful of getting sick.  If they otherwise qualify, these individuals should be allowed to be placed on home confinement under the CARES Act.  We urge you to pay particular attention to this issue, and to inform us whether these individuals have been released or whether they will be considered for release pursuant to the new authority granted under the CARES Act and, if not, why not.

### Movement of Prisoners from Facility to Facility

We are familiar with BOP's directive suspending internal movement during the COVID-19 pandemic, with limited exceptions—among these are, transportation for forensic testing and treatment and movements to ameliorate overcrowding in certain facilities.  Unfortunately, I have heard multiple reports that BOP is transporting prisoners *outside* of the limited exceptions BOP has enumerated.  Please confirm whether all BOP facilities are complying with the directive to suspend internal movements during the COVID-19 pandemic.  We are also deeply troubled by the fact that those being moved are merely being given exit "screenings."  As you know, carriers of COVID-19 can be completely asymptomatic.  If BOP is going to continue moving prisoners from facility to facility it *must* test—not merely screen—prisoners prior to moving them, else there is a high risk of transmission among facilities.  We understand that BOP's Emergency Operations Center is tracking and monitoring prisoner movement during this time.  Please provide us with the information you are collecting about prisoner movements, explaining what factors necessitated the movement.

### Data-Gathering and Reporting

We also ask that you collect and maintain comprehensive data about the release of inmates into home confinement in response to the COVID-19 pandemic for the purpose of reporting the information to Congress.  Specifically, we ask that you gather data pertaining to every inmate in BOP and whether they were considered for release and if not, why not.  With regards to those who were considered for release, but were ultimately not released, please provide an explanation for why they were not released.  Please ensure that this data is collected and organized in a way that it can be searched in relation to demographic factors, such as age, race and ethnicity, and gender.

Finally, it goes without saying that we are deeply concerned about what is going on in BOP facilities around the country during this pandemic, especially now that a federal prisoner has died from COVID-19 and reports of increasing numbers of infected prisoners and correctional officers.  In the coming weeks, we hope you will institute aggressive measures to release medically-compromised, elderly and pregnant prisoners, as well as universal testing in BOP facilities--to protect everyone.  As we have told you before, we are ready to work with you

to address the needs of prisoners during this difficult time.  We appreciated your response to our earlier letters on the topic of COVID-19.  We look forward to receiving your response to this letter in the same prompt manner.  Urgent action is required because lives depend on it.


Sincerely,


Jerrold Nadler
Chairman

Karen Bass
Chair, Subcommittee on Crime,
Terrorism, and Homeland Security


cc:    Jim Jordan, Ranking Member
       John Ratcliffe, Ranking Member
       Subcommittee on Crime, Terrorism,
       and Homeland Security