UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------  x
                                                     :
United States of America                             :
                                                     :
            - v -                                    :            19 Cr. 541 (JSR)
                                                     :
Hugh Brian Haney,                                    :
                                                     :
                        Defendant.                   :
---------------------------------------------------  x


**REPLY MEMORANDUM  OF LAW IN SUPPORT OF HUGH BRIAN HANEY'S
EMERGENCY MOTION FOR COMPASSIONATE RELEASE**



                        DAVID PATTON, ESQ.
                        Federal Defenders of New York, Inc.
                        Attorney for Defendant
                        HUGH BRIAN HANEY
                         52 Duane Street - 10th Floor
                        New York, New York 10007
                        Tel.: (212) 417-8737

                        MARTIN S. COHEN
                        *Of Counsel*


TO:   GEOFFREY BERMAN
      United States Attorney
      Southern District of New York
      One. St. Andrew's Plaza
      New York, New York 10007
      Attn:   SAMUEL RAYMOND and TARA LAMORTE, ESQS.
              Assistant United States Attorneys

## REPLY MEMORANDUM OF LAW IN SUPPORT OF HUGH BRIAN HANEY'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE

The government writes as if in a vacuum. 17 days ago, there were no reported cases of COVID-19 in the BOP system. As of March 26, 2020, when the "Compassionate Release" request was submitted on behalf of Mr. Haney to the Warden, the BOP reported that nationwide, 10 inmates and 8 staff members had tested positive, and as far as the federal defenders are aware, there were no recorded deaths. *See BOP-Reported Positive Tests for COVID-19 Nationwide*, attached as Exhibit A. As I write this (on April 7, 2020), the BOP has reported that 196 inmates and 69 staff members have tested positive for COVID-19, and we know of at least 8 inmates who have died. Those numbers increase daily, and will be significantly higher by the time the hearing takes place on Wednesday, April 8, 2020. Moreover, the number of inmates who have already contracted COVID-19 is significantly higher than the numbers reported by the BOP for the simple reason that the BOP is not testing inmates. For example, in a letter to Judge Mauskopf, the MDC and MCC Wardens wrote that as of April 2, 2020, the MDC had tested only *seven* inmates, two of which were positive; and the MCC had tested only *five* inmates, four of whom tested positive. *See* letter of  Wardens Licon-Vitale and Edge, attached as Exhibit B; *see also* Frank Runyeon, *Prison Says It Tested Just 2 More Inmates Despite Virus Cases* (April 1, 2020).[1]

In other words, the risk of Mr. Haney contracting COVID-19 increases on a daily basis. And yet the Government characterizes Mr. Haney's argument that he is at grave risk of contracting this deadly virus as speculative, and argues that the Court must wait an additional 17 days before *deciding* whether Mr. Haney – designated by the MDC as being of high-risk to

---

[1] Available at: https://www.law360.com/articles/1259489/prison-says-it-tested-just-2-more-inmates-despite-virus-cases.

contract COVID-19 –  should be released so that he does not risk dying in a federal prison wholly incapable of following the CDC's Guidelines.

For the reasons discussed below, the Court can dispense with the exhaustion requirement of 18 U.S.C. § 3582(c). But fundamentally, it is perverse to be forced to argue about the "exhaustion" of administrative requirements – which the Government well knows will be futile in this case – in the context of this rampant, deadly pandemic. The Government could easily waive the requirement, as it does when *it* supports release. Instead, the Government argues that the Mr. Haney and his family must wait an additional 17 days before the Court can decide this motion. The Government's callousness in these cases is stunning; after all, we are not asking that the Government support the motion, we are simply asking that the Court be allowed to decide it.

A.    **The relief sought: a reduction in sentence so that Mr. Haney will remain on home detention for some period – perhaps three to six months – and then return to custody.**

At the outset, I want to make clear that Mr. Haney is not seeking to avoid serving his sentence; he is seeking to serve his sentence in a safe environment, as the Constitution provides, and not die in prison because the Department of Justice could not protect him from COVID-19. Indeed, the right and just result during this crisis is for Mr. Haney – who poses neither a risk of flight nor a danger to the community, and has a verified safe place to shelter – to remain home until the facility to which he has been designated is deemed safe, and he can then return there to finish his sentence.[2]

There are several ways the Court can reach this just result:

---

[2] When I filed the motion, I believed – as the Government will argue – that the only available relief under 18 U.S.C. § 3582(c) was a reduction in sentence to a term of time served. But, as described above, there are alternatives.

First, the plain language of § 3582(c) gives the Court the power to craft the requested sentence modification: "the court . . . may *reduce* the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable . . . ." While the statute was fashioned for the purpose of releasing people from prison, there is nothing in the statutory language that would prohibit a court from reducing the sentence in the manner suggested.

Second, the Court could grant the motion, reduce Mr. Haney's sentence so that he can be released, and then later reconsider its decision based on changed circumstances; that is, when the threat of the virus in the facility to where Mr. Haney has been designated has abated. *See United States v. Bayless*, 201 F.3d 116, 131 (2d Cir. 2000) (explaining that a district court has the discretion to reopen a hearing after a motion has been decided.).

Third, the Court can sidestep the § 3582(c) process altogether and allow Mr. Haney to file a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on the grounds that the current conditions of the MDC pose a threat to Mr. Haney's well-being. *See Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (The Second Circuit has "long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as . . . prison conditions."); *see generally Hassan Chun v. Warden Derek Edge*, 20 cv 1590 (E.D.N.Y), Dkt. No 1, Class Action Petition Seeking Writ of Habeas Corpus (March 27, 2020) (lodged on behalf of high-risk inmates at the MDC in light of the COVID-19 pandemic). The Court could then release Mr. Haney on bail while the petition is pending, or until the unconstitutional conditions have been resolved. *See Muja v. United States*, 2011 WL 1870290, at *1 (E.D.N.Y. May 16, 2011) (to obtain bail petitioner "'must demonstrate that the habeas petition raises

substantial claims and that extraordinary circumstances exist that make the grant of bail

necessary to make the habeas remedy effective.'"  (quoting *Grune v. Coughlin*, 913 F.2d 41, 44

(2d Cir.1990)).

There may well be other alternatives, but the point here is that the relief Mr. Haney seeks

is simply to be safe during the pandemic, and then to return to custody to complete his sentence

once the threat has abated. As argued, the Court has the power to effectuate this outcome. If

however, the Court finds that none of these alternatives are viable, we respectfully request that

the Court reduce Mr. Haney's sentence to a term of time served pursuant to 18 U.S.C. § 3582(c),

and impose appropriate conditions of supervised release for the remainder of his term.

**B.      The Court can waive the exhaustion requirement of 18 U.S.C. § 3582(c)**

**1.      Claim-processing rules, such as that contained in Section 3582(c)(1)(A), may
be waived by a court.**

Under the recently-enacted First Step Act, 18 U.S.C. § 3582(c)(1)(A), a sentencing court,

> upon motion of the Director of the Bureau of Prisons, or
> *upon motion of the defendant after the defendant has fully
> exhausted all administrative rights to appeal a failure of the
> Bureau of Prisons to bring a motion on the defendant's
> behalf **or the lapse of 30 days from the receipt of such a
> request by the warden of the defendant's facility,
> whichever is earlier***, may reduce the term of
> imprisonment …, after considering the factors set forth in
> section 3553(a) to the extent that they are applicable, if it
> finds that—
> (i) extraordinary and compelling reasons warrant such a
> reduction; …
> and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission ….

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

For the reasons described below, the Court should find that the 30-day waiting period contained in this statute is a non-jurisdictional claim-processing rule, which can be waived by the Court under the unique emergency circumstances here.

          **a.**       **Section 3582(c)(1)(A) contains a non-jurisdictional claim-processing rule.**

To start, the requirement that a defendant exhaust administrative remedies *or* await the passage of 30 days before applying directly to a district court for release is a "claim-processing" rule and is not jurisdictional.

The Supreme Court recently explained the distinction between these two types of rules in *Fort Bend City, Texas v. Davis*, 139 S. Ct. 1843 (2019). As the Court noted, the term "jurisdictional" is generally "reserved to describe the classes of cases a court may entertain (subject-matter jurisdiction) or the persons over whom a court may exercise adjudicatory authority (personal jurisdiction)." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019). "Jurisdictional" prerequisites to a suit may be raised by the court or a party at any time and are not subject to forfeiture or waiver. *See id.* at 1849; *see also Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017). In contrast, non-jurisdictional claim-processing rules, including statutory exhaustion requirements, can be waived by a party if they are not timely asserted and may be subject to equitable waiver by a court. *See Davis*, 139 S. Ct. at 1849 & n.5 (noting Supreme Court has reserved question of whether mandatory claim processing rules are subject to equitable exceptions); *see also Smith v. Berryhill*, 139 S. Ct. 1765, 1774 (2019) (stating that non-jurisdictional statutory exhaustion requirements can be waived by courts); *Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) (explaining difference between jurisdictional requirements versus "claim-processing rule[s]," "like a filing deadline or an exhaustion requirement," which require the parties to take certain procedural steps at certain specified times); *United States v. Kwai Fun Wong*, 575

U.S. 402, 405 (2015) (ruling that certain statutory claim processing rules are subject to equitable tolling); *Bowen v. City of New York*, 476 U.S. 467, 482-83 (1986) (waiving statutory exhaustion requirements, in part, because claimants would suffer irreparable injury if exhaustion requirements were enforced against them).

In *Davis*, the Supreme Court held that the rule at issue was a non-jurisdictional "claim-processing rule" because the statute spoke to a party's "procedural obligations," requiring the party "to submit information to [a particular administrative agency] and to wait a specified period before commencing a civil action." *Id.* at 1851. The statute's requirement was thus "a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *Id.*

Like the statute at issue in *Davis*, Section 3582(c)(1)(A) contains a non-jurisdictional claim-processing rule. The Second Circuit has not ruled on whether this specific subsection of the statute is jurisdictional. However, in the context of other Section 3582(c) motions, the Second Circuit has joined the majority of circuits to consider the issue in stating that this is not a jurisdictional statute. In *United States v. Johnson*, the Second Circuit explicitly cautioned against characterizing Section 3582(c) as "jurisdictional." *See* 732 F.3d 109, 116 n.11 (2d Cir. 2013). The Circuit explained that the provision was not jurisdictional because the source of a court's jurisdiction over a federal sentence, and the question of whether a federal sentence could be reduced, derived from other sources. *See id.* (citing 28 U.S.C. § 1331); *see also* 18 U.S.C. § 3231.

This accords with the opinions of most Circuits to consider the issue— including the Third, Fourth, Fifth, Seventh, and Eleventh—which have found that it is improper and incorrect to characterize Section 3582(c) as jurisdictional. *See United States v. Taylor*, 778 F.3d 667, 670-71 (7th Cir. 2015) (explaining in context of § 3582(c)(2) motions that "§ 3582 is not part of a

jurisdictional portion of the criminal code" and stating "[t]he general rule that has emerged is that 'when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character'") (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)); *United States v. Carlton*, 900 F.3d 706, 710-11 (5th Cir. 2018) (finding this statute is not "jurisdictional" and stating that when Congress does not clearly characterize a statutory limitation as jurisdictional, courts should not treat it as jurisdictional); *United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017) (same); *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1245 (11th Cir. 2017) (same); *United States v. Weatherspoon*, 696 F.3d 416, 421 (3d Cir. 2012) (same).

This also makes sense in light of the remaining statutory provisions. Section 3582(c) sets forth different circumstances under which a district court may lower a previously-imposed sentence. The statute assumes a court's jurisdiction over these sentences; it is not the statutory provision that provides that jurisdiction.

Finally, the fact that the government has waived exhaustion and/or the 30-day waiting period in certain cases, and that courts have accepted this waiver, shows that the statute is not jurisdictional. *See, e.g.*, *United States v. Eli Dana*, No. 14 Cr. 405 (JMF), ECF Docket No. 108 (S.D.N.Y. Mar. 31, 2020) (granting compassionate release motion without exhaustion of administrative remedies, where government consented); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC), ECF Docket No. 1325-1326 (E.D.N.Y. Mar. 30, 2020) (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19). If the 30-day waiting period were jurisdictional, a court would not have the power to waive it, even if the government consented.

>           **b.      Claim processing rules like Section 3582(c)(1)(A)'s 30-day waiting**
>                     **period can be waived by a court.**

Because Section 3582(c) contains a non-jurisdictional claim-processing rule, this Court can waive its application—even without government consent.

The Second Circuit and other Courts of Appeals have routinely held that claim-processing rules are subject to equitable defenses and can be waived by courts.[3] *See, e.g.*, *Boos v. Runyon*, 201 F.3d 178, 183 (2d Cir. 2000) (holding that administrative exhaustion requirement is a claim processing rule and is not jurisdictional, meaning that the court "may waive it, in appropriate circumstances" and waiving requirement in interests of judicial economy); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (stating that "[e]ven where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute" and finding that exhaustion can be waived where it would be futile, where the agency is unable to provide an adequate remedy, or where it would result in undue harm).

For example, in the context of employment discrimination claims, the Second Circuit has recognized that statutory exhaustion requirements can be waived if adequate remedies are not available through the agency or if exhaustion would be "futile." *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385-86 (2d Cir. 2015) (holding that Title VII's statutory exhaustion requirement is a "precondition to suit," but not jurisdictional, and therefore "is subject to equitable defenses" and may be waived by a court); *Fernandez v. Chertoff*, 471 F.3d 45, 58 (2d Cir. 2006) (same).

---

[3] As noted, the Supreme Court has not yet definitely decided this issue, *see Davis*, 139 S. Ct. at 1849, n.5, though it has seemingly endorsed a court's power to waive these requirements, *see, e.g.*, *Berryhill*, 139 S. Ct. at 1774.

Similarly, in the context of claims under the Social Security Act, the Second Circuit has recognized that courts may waive statutory exhaustion requirements, including where attempts at exhaustion would be futile and result in irreparable injury. *See, e.g.*, *New York v. Sullivan*, 906 F.2d 910, 917-18. (2d Cir. 1990).

Regarding habeas motions, 28 U.S.C. § 2254(b)(1) contains a statutory exhaustion requirement before a prisoner can bring a habeas motion, and lists a limited number of exceptions. Despite this statutory language, federal courts have found additional equitable bases to waive exhaustion beyond those listed in the statute. *See, e.g.*, *Granberry v. Greer*, 481 U.S. 129, 135-36 (1987) (explaining that even statutory exhaustion requirements are not "rigid and inflexible," in part because they are assumed to be subject to the same exceptions that existed before Congress began codifying exhaustion) (citing *Frisbie v. Collins*, 342 U.S. 519 (1952)); *see also, e.g.*, *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving exhaustion where "exceptional circumstances of peculiar urgency are shown to exist").

To give one final example, immigration statutes include mandatory, statutory exhaustion requirements. Nonetheless, courts have recognized their ability to waive those exhaustion requirements under certain circumstances. *See, e.g.*, *Grullon v. Mukasey*, 509 F.3d 107, 111 (2d Cir. 2007) (recognizing that "mandatory" "statutory" exhaustion requirements under immigration law were still subject to waiver in certain situations, including where an agency could not provide the relief an immigrant sought); *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 173 (2d Cir. 2004) (same); *Iddir v. I.N.S.*, 301 F.3d 492, 498 (7th Cir. 2002) (collecting authorities as to when immigration exhaustion requirements can be waived).

In light of the fact that claim-processing requirements such as Section 3582(c)(1)(A)'s 30-day waiting period are subject to equitable exceptions, several courts have already waived this

requirement in light of exigencies cause by the COVID-19 pandemic. *See, e.g.*, *United States v. Wilson Perez*, No. 17 Cr. 513 (AT), ECF Docket No. 98, (S.D.N.Y. Apr. 1, 2020) (granting release based on health issues and finding court could waive exhaustion requirement); *United States v. Zuckerman,* No. 16 Cr. 194 (AT), 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020) (same); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC), ECF Docket No. 1325-1326 (E.D.N.Y. Mar. 30, 2020) (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH), ECF Docket No. 97 (D.D.C. Mar. 27, 2020) (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19).

## 2. The Court should waive the 30-day waiting period here because it is futile and Mr. Haney will be irreparably harmed by this delay.

Given the current crisis, the Court cannot expect the BOP  to make a determination on Mr. Haney's compassionate release application within 30 days. The Bureau of Prisons has not established any special or expedited procedure to hear compassionate release claims by at-risk prisoners based on COVID-19. And when courts request a firm date for high-risk individuals seeking compassionate release, the BOP states that it cannot provide any time frame for processing these applications. In two recent cases, for example, Judge Furman ordered the BOP to "set forth a firm date by which it will reach a decision . . . "mindful that each day that passes exposes [the inmate] to more peril and that, under the circumstances, [awaiting 30 days] may result in irreparable harm." *See United States v. Nkanga Nkanga*, No. 18 Cr. 713 (JMF), ECF Dkt. 104) (S.D.N.Y. Apr. 3, 2020). In its response, the MDC ignored Judge Furman's order and

refused to provide a date. In her affidavit, Caryn Flowers, an Associate Warden, outlined the administrative process for reviewing compassionate release applications, stated that due to the "volume of incoming requests, the BOP cannot set forth a firm date by which the BOP will reach a decision on Petitioner's pending application," and noted that the inmate may "present his claims to the his sentencing court" in 30 days) *Id.* Dkt. 112-1, attached as Exhibit C; *see also United States v. Robert Russo*, 16 Cr. 441 (LJL), ECF Dkt. No. 53 (S.D.N.Y. Apr. 2, 2020) (stating "the Bureau of Prisons is unable to give a specific time frame" as to when it will resolve a compassionate release request). On average, under ordinary circumstances, the BOP takes around 141 days to process an approval of compassionate release and 196 days to process a denial. *See* January 16, 2018 Letter from Assistant Attorney General Stephen E. Boyd, *available at* https://www.themarshallproject.org/documents/4369114-1-2018-BOP-response. As a result, there is no basis to believe that the BOP will take any meaningful action on this request within 30 days. And, of course, if the BOP did take any action, it would deny the requested relief. *Cf. United States. v. Majid Ghorboni*, 18 Cr. 255 (PLF), Dkt. No. 129, n. 1 (D.D.C. April 3, 2020) (In a joint submission, the Government agreed that a court can waive the administrative requirements in a § 3582(c) application where exhaustion would be futile.).

Waiving the 30-day waiting period is also completely consistent with Congressional intent. The First Step Act's amendment to 18 U.S.C. § 3582(c)(1)(A) was titled "Increasing the Use and Transparency of Compassionate Release." It was enacted against the backdrop of the BOP's infrequent use of compassionate release and was intended to increase and expedite compassionate release applications. *See, e.g.*, *United States v. Redd*, No. 97 Cr. 06 (AJT), 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) (discussing legislative history and Congressional intent); *United States v. Young*, No. 00 Cr. 02 (AAT), 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 4, 2020) (same);

164 Cong. Rec. S7753-01, 164 Cong. Rec. S7753-01, S7774. (noting First Step Act "expands compassionate release under the Second Chance Act and expedites compassionate release applications"). The statutory scheme also shows that when Congress anticipated a potential emergency, it sought to compel the BOP to consider those emergency applications in an expedited fashion. Where an inmate has a "terminal illness," the statute requires BOP to inform the inmate's attorney and family within 72 hours, so that they can prepare a compassionate release application to a court, and requires the BOP to act on the inmate's release request within 14 days. *See* 18 U.S.C.A. § 3582(d)(2). In other words, where Congress anticipated an emergency, the statute reflects its intent that the inmate receive a response from both the BOP and a court on an expedited basis. However, it seems fair to say that Congress would not have anticipated the type of emergency situation presented here.

Finally, to the extent the statute is ambiguous as to whether the Court can waive the 30-day requirement, the rule of lenity requires the Court to resolve the issue in Mr. Haney's favor. *See*, *e.g. United States v. Simpson*, 319 F.3d 81, 86 (2d Cir. 2002) ("where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.") (internal quotation omitted).

***

For the reasons outlined in our motion, Mr. Haney should be released so that he doesn't die in a federal prison that cannot adequately protect him during this pandemic. Our preference is that the Court fashion a remedy that requires Mr. Haney to return to prison once the danger has abated, but if the Court finds that to be beyond its power, it should release Mr. Haney nevertheless pursuant to 18 U.S.C. § 3582(c)(1)(A). It cannot be, as the Government seems to suggest, that it is only after Mr. Haney contracts the virus that he should be released. *See* Gov't

12

Response at 16 ("He does not contend that he has yet contracted the virus, or that he has been exposed to the virus, or that he has experienced symptoms associated with the virus.").

Here, extraordinary and compelling reasons warrant a reduction in Mr. Haney's sentence.

Dated:

New York, New York
April 7, 2020

/s/ _____

Martin Cohen
Ass't Federal Defender
212-417-8737

Exhibit A

BOP-Reported Positive Tests for COVID-19 Nationwide[1]

| Date | Number of Positive Inmates | Number of Positive Staff | Number of Inmate Deaths |
|------|------|------|------|
| 3/19/2020 | 0 | 0 | 0 |
| 3/20/2020 | 0 | 2 | 0 |
| 3/21/2020 | 1 | 2 | 0 |
| 3/22/2020 | 1 | 2 | 0 |
| 3/23/2020 | 3 | 3 | 0 |
| 3/24/2020 | 6 | 3 | 0 |
| 3/25/2020 | 6 | 3 | 0 |
| 3/26/2020 | 10 | 8 | 0 |
| 3/27/2020 | 14 | 13 | 0 |
| 3/28/2020 | 19 | 19 | 1 |
| 3/29/2020 | 19 | 19 | 1 |
| 3/30/2020 | 28 | 24 | 1 |
| 3/31/2020 | 29 | 30 | 1 |
| 4/1/2020 | 57 | 37 | 3 |
| 4/2/2020 | 75 | 39 | 6 |
| 4/3/2020 | 91 | 50 | 7 |
| 4/4/2020 | 120 | 54 | 8 |
| 4/5/2020 | 138 | 59 | 8 |
| 4/6/2020 | 196 | 63 | 8 |

---

[1] Numbers obtained from www.bop.gov/coronavirus on a daily basis.  Media has reported that this website may understate the number that have tested positive.  This report appears to be accurate, given that, *e.g.*, on April 3, 2020, the website reports no positive inmates at MDC Brooklyn, but BOP staff have confirmed to the Chief Judge of EDNY that as of that date there are 2 positive inmates.  Accordingly, this chart likely understates significantly the actual number of inmates who have tested positive.  BOP does not provide any information on its website as to how many tests have actually been administered.





Percentage of Increase of Infected BOP People (Inmates and Staff)

Since 3/20/2020[2]

| Date | Number of BOP Cases | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of U.S. Cases |
|------|------|------|------|------|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103321 |
| 3/29/2020 | 38 | 1800% | 651% | 140904 |
| 3/30/2020 | 52 | 2500% | 772% | 163539 |
| 3/31/2020 | 59 | 2850% | 892% | 186101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330891 |
| 4/6/2020 | 259 | 12850% | 1845% | 364723 |

[2] National numbers obtained from www.cdc.gov and
https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6



Exhibit B



**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**
*Metropolitan Correctional Center*

*150 Park Row*
*New York, New York 10007*

April 3, 2020

The Honorable Roslynn R. Mauskopf
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    <u>**Administrative Order**</u>
       **No. 2020-14**

Dear Judge Mauskopf:

The Court has ORDERED that the MDC and MCC respond to concerns about the institutions'
response to the COVID-19 pandemic.  Specifically, the Court asked about protocols for
screening and testing inmates, staff and others entering or leaving each facility; the number of
inmates tested and the number of positive tests, the number of staff and/or others testing positive;
and all efforts undertaken to mitigate the spread of COVID-19 both generally and in response to
any symptomatic inmate(s) and/or positive test(s).

Staff have been tasked with screening each and every staff member who walks in the door at both
facilities.  Specifically, a temperature is being taken and the staff member is asked to fill out a
screening form. If the staff member has a fever or answers yes to any of the questions, a medical
professional can deny entry to the institution.

Medical staff are also screening new inmate arrivals to the institution the same way.  Specifically,
staff who are conducting the screening are to wear appropriate personal protective equipment
(PPE) in accordance with guidance promulgated by the Center for Disease Control (CDC).
Inmates with a temperature greater than or equal to 100.4 degrees, or overt respiratory symptoms
are placed in isolation.  New arrivals with a temperature of less than 100.4 degrees are placed in
quarantine for fourteen days as a precautionary measure.  Inmates leaving either BOP facility are
also screened.

Any inmate currently in BOP custody who presents with COVID-19 like symptoms is assessed
by the institution health services staff.  An inmate exhibiting symptoms consistent with COVID-
19 will be placed in isolation. The remainder of the inmates on his or her unit will be quarantined
to ensure additional inmates do not develop symptoms. The inmates medical isolation will be
evaluated by medical staff at least twice a day, and the inmates on a medically quarantined unit
will have their temperature checked twice a day.

Currently, the BOP has enacted a national 14-day action plan to increase social distancing in the facilities. Specifically, inmates in every institution will be secured in their assigned cells. At MDC and MCC, the inmates will be released from their cells 3 days per week in order to shower, use the phones, and utilize the TRULINCs system. This will be done in small groups and social distancing has been encouraged. The national action plan will not, however, affect the provision of legal phone calls. Inmates will still be taken out of their cells for legal phone calls.

Inmate orderlies are cleaning the common areas of all housing units, and inmates have been instructed to continue to wipe down and sanitize their living quarters.

MCC and MDC unit team staff and officers are available to the inmate population to address any and all issues, including medical concerns, property concerns, and/or food related requests. Unit team staff are providing legal calls to attorneys. Any inmate can also request medical care from health services providers when they make rounds on the housing units.

With regard to the numbers as of April 3, 2020 for MDC:
Inmates tested: 7
Inmates positive: 2
Staff Positive: 5

With regard to the numbers as of April 2, 2020 for MCC:
Inmates tested: 5
Inmates positive: 4
Staff Positive: 7

Respectfully submitted,


s/

M. Licon-Vitale
Warden
MCC New York


s/


D. Edge
Warden
MDC Brooklyn

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA    :

      - v. -    :

NKANGA NKANGA,    :

        Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

**<u>AFFIDAVIT OF CARYN FLOWERS</u>**

18 Cr. 713 (JMF)

Caryn Flowers, under penalties of perjury pursuant to 28 U.S.C. § 1746, declares as follows:

1. I currently hold the position of Associate Warden for Programs at the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"). I supervise the Reduction in Sentence ("RIS") Coordinator at MDC Brooklyn. In my official capacity, I have access to many records maintained in the ordinary course of business at MDC Brooklyn, including records maintained in the Bureau of Prisons ("BOP") computerized database.

2. I understand Nkanga Nkanga, Federal Register Number 86195-054 (hereinafter "Petitioner"), is seeking compassionate release.

3. I further understand the Court is directing the BOP to provide a firm date by which the BOP will reach a decision on Petitioner's pending application.

4. To the best of my knowledge, MDC Brooklyn did not receive Dr. Nkanga's request for consideration for RIS until April 1, 2020.

5. Section 3582(c)(1)(A) of Title 18 of the United States Code provides that a sentencing court, "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a

failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the laps of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . if it finds that—(i) extraordinary and compelling reasons warrant such a reduction . . . ."

6. 28 C.F.R. § 571.60 provides that the "Bureau uses . . . 18 U.S.C. § 3582(c)(1)(A) in particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing."

7. Accordingly, an inmate must submit his or her request for compassionate release or a reduction in sentence to the Warden of the facility at which he or she is housed. Should the request be denied, he or she must also exhaust his or her administrative remedies through the Administrative Remedy Program set forth in Program Statement 1330.18 and 28 C.F.R. § 542.10, *et seq.*

8. Requests for compassionate release such as this one entail reviewing the inmate's medical records as well as the following factors:

   a.  Nature and circumstances of the inmate's offense.

   b.  Criminal history.

   c.  Comments from victims.

   d.  Unresolved detainers.

   e.  Supervised release violations.

   f.  Institutional adjustment.

   g.  Disciplinary infractions.

   h.  Personal history derived from the PSR.

    i.        Length of sentence and amount of time served. This factor is considered with respect to proximity to release date or Residential Reentry Center (RRC) or home confinement date.

    j.        Inmate's current age.

    k.      Inmate's age at the time of offense and sentencing.

    l.       Inmate's release plans (employment, medical, financial).

    m.    Whether release would minimize the severity of the offense.

9. When a request for compassionate release is received, it is routed to medical staff and the inmate's unit team for research and review. Medical staff assess the inmate's general medical conditions and determine whether they meet the criteria set forth under terminal conditions, debilitating conditions, or elderly offenders' deteriorating medical conditions. Unit team staff assess the other enumerated factors, which may also involve contacting outside parties such as probation and the inmate's victims. Once the information has been gathered, the unit team will make a recommendation to the Warden.

10. Pursuant to 28 C.F.R. §571.62, if the Warden, upon an investigation of the request determines that the request warrants approval, the Warden shall refer the matter in writing with recommendation to the Office of General Counsel, who then refers it to the Director after several layers of review, including seeking the opinions of the medical and/or correctional programs divisions. As such, even if the Warden recommends approval, it will still take more time for the Director's final approval.

11. If a request is denied, pursuant to 28 C.F.R. §571.63, the inmate will receive written notice and a statement of reasons for the denial. The inmate may appeal the denial through the Administrative Remedy Procedure (28 CFR part 542, subpart B).

12. Due to the nature of the review and the volume of incoming requests, the BOP cannot set forth a firm date by which the BOP will reach a decision on Petitioner's pending application. However, pursuant to policy, statute, and regulation, Petitioner may present his claims to his sentencing court 30 days after submission to the Warden at MDC Brooklyn.

C. Flowers

4-6-2020
Date