UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
                                 :

United States of America           :
                                 :

        - v -               :           19 Cr. 541 (JSR)
                                 :

Hugh Brian Haney,           :
                                 :

                Defendant.     :
------------------------------------------------------ x

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HUGH BRIAN HANEY'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE

DAVID PATTON, ESQ.
Federal Defenders of New York, Inc.
Attorney for Defendant
HUGH BRIAN HANEY
 52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8737

MARTIN S. COHEN
*Of Counsel*

TO:   GEOFFREY BERMAN
       United States Attorney
       Southern District of New York
       One. St. Andrew's Plaza
       New York, New York 10007
       Attn:  SAMUEL RAYMOND and TARA LAMORTE, ESQS.
           Assistant United States Attorneys

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HUGH BRIAN
HANEY'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE**

Hugh Brian Haney faces a very serious risk of contracting COVID-19 while incarcerated

at the overcrowded and under-resourced MDC. When he does contract the virus, the MDC will

not be equipped to provide either necessary medical care or, in a worse-case scenario, palliative

care. Mr. Haney does not seek to avoid serving his sentence. He asks for release from the MDC,

under strict conditions that will constrain his liberty, until he can report to a BOP facility that has

been made safe for high-risk individuals like himself. As Judge Furman noted in a the case of

another older, sentenced inmate at the MDC, temporary release is "the right and rational result."

*See United States v. Nkanga*, 18 Cr. 713 (JMF), Dkt. 87 (March 31, 2020) (denying release while

railing against an unjust system; release granted on April 7, 2020 in the form of bail pending a

habeas petition brought under 28 U.S.C. § 2255. *Id.* Dkt. 120).

I write to address four points raised at the hearing on April 8, 2020: (1) the various means

by which this Court can reach the "rational and right result" in this case; (2) why the Court

cannot rely on any assertion from the Government that COVID-19 is under control at the MDC,

and thus should not adopt a wait-and-see approach; (3) why Mr. Haney, given his age, health,

and family support, which includes a safe place for him to quarantine and then remain under

home detention, should be released; and (4) why Mr. Haney does not pose a risk of flight.

**I.      Mr. Haney may be temporarily released under 18 U.S.C. 3582(c); alternatively, the
         Court can release Mr. Haney on bail under 18 U.S.C. §§ 2241 or 2255.**

There are several avenues through which the Court can temporarily release Mr. Haney

under the "compassionate release" statute, 18 U.S.C. § 3582(c).

1.     *The plain language of 18 U.S.C. § 3582(c) authorizes the Court to "reduce" Mr. Haney's sentence, but sets no other parameters on the form such a reduction must take.*

Section 3582(c) reads, in pertinent part, that the court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction." The statute provides no limiting language on the form such a sentence reduction can take. A plain reading of the statute is that the Court can "reduce" Mr. Haney's sentence by imposing, say, a three-month term of home detention, to be followed by incarceration for the remainder of his sentence.

Merriam-Webster's online dictionary defines "reduce" as follows: "to diminish in size, amount, extent, or number." The Court sentenced Mr. Haney to 42 months' imprisonment. A sentence of three-months of home detention, to be followed by 39 months of incarceration, is a sentence that has been diminished in size and extent. There is nothing in the statute that prohibits the Court from reducing Mr. Haney's sentence in this manner.

While two judges in this district have found otherwise, there is no binding precedent that would prohibit the Court from providing *compassionate* release in this fashion.[1] Judge Engelmayer stated simply that the court was not aware of any "legal authority that "can provide the relief [defendant] seeks." *See United States v. Credido*, 19 Cr. 111 (PAE), Dkt. No 66 (Apr. 2, 2020) at 2 (while agreeing with Judge Furman that temporary release for Ms. Credido was "the rational and right result."). And Judge Furman cited only to Judge Engelmayer's decision in *Credido* and to *Dillon v. United States*, 560 U.S. 817 (2020), which addressed a different provision, 18 U.S.C. § 3582(c)(2), and stands for the proposition that where a sentencing range

---

[1] Webster's defines compassion as: "sympathetic consciousness of others' distress together with a desire to alleviate it."

has been lowered by the Commission, the court cannot further reduce a sentence below the minimum of the amended range. Neither opinion explains why the plain language of the statute does not allow reducing the sentence to allow for a brief period of home detention while the BOP takes the necessary steps to protect those in its custody. *Cf. United States. V. Mamau*, 2020 WL 806121, at *8 (D. Utah, Feb. 18, 2020) (granting § 3582(c)(1) motion, but scheduling resentencing hearing for later date, noting that "notwithstanding the colloquial references to [defendant's] motion as one for 'compassionate release,' the court need not actually modify the sentence to effectuate [defendant's] immediate release from prison.").

Although the Court should find the plain language of the statute to be unambiguous, to the extent there is any ambiguity as to whether the court can reduce the sentence as requested, the rule of lenity requires the Court to resolve the issue in Mr. Haney's favor. *See*, *e.g.*, *United States v. Simpson*, 319 F.3d 81, 86 (2d Cir. 2002) (where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.") (internal quotation omitted).

2. *The Court can release Mr. Haney on bail pending decision on the motion for compassionate release.*

Releasing Mr. Haney on bail pending decision on the motion for compassionate release presents the simplest option for the Court, as it need not immediately decide the motion, or the form that a sentence reduction should take. The added benefit of releasing Mr. Haney on bail while deciding the motion is that it provides the most flexibility in terms of when Mr. Haney should return to custody. The Court could thus release Mr. Haney on bail with strict conditions, order the government to provide counsel with the name of the institution to which Mr. Haney has been designated, and then require monthly updates on conditions at the designated facility. As soon as the Court is satisfied that conditions are safe for Mr. Haney's return to custody, he could be ordered to report to complete his sentence.

Section 3582(c)(1)(A) does not explicitly address bail while a motion for a sentence reduction is pending. However, in the analogous contexts of motions challenging criminal sentences or detention pursuant to 28 U.S.C. §§ 2255 and 2241, and challenging immigration detention, the Second Circuit has repeatedly recognized a district court's inherent authority to grant bail, even without express statutory authorization.

Federal courts have the inherent power to grant bail in any case where they may properly assert jurisdiction. *Mapp v. Reno*, 241 F.3d 221, 224-26 (2d Cir. 2001) (explaining that "the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction."); *see also*, *e.g.*, *Argro v. United States*, 505 F.2d 1374, 1377 (2d Cir. 1974) (recognizing court's inherent power to grant bail pending parole determination, although there was no explicit constitutional or statutory right to bail); *Johnston v. Marsh*, 227 F.2d 528, 530-31 (3d Cir. 1955) (finding that basis for court's authority to set bail stems from fact that prisoner is within its jurisdiction and a statute empowers the court to hear the prisoner's substantive application, meaning that the court can grant bail, just as it can regulate the manner of any trial or hearing before it; collecting authorities regarding court's inherent authority to set bail, even without statutory authorization); *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968) (ordering habeas petitioner immediately released on bail while he exhausted his state remedies, since such release was necessary to make any remedy effective after exhaustion)*; S.N.C. v. Sessions*, No. 18 Civ. 7680 (LGS), 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (affirming that courts' inherent authority to grant bail does not depend upon express statutory grant and releasing immigration petitioner on bail); *United States v. Valesquez*, -- F. Supp. 3d --, No. 20 Civ. 583 (KAM), 2020 WL 565407, at *8 (E.D.N.Y. Feb. 4, 2020) (finding that court has inherent power to grant bail pending parole determination); *Acosta v. United States*, No. 03 Cr.

4

11 (MAT), 2019 WL 4140943, at *9 (W.D.N.Y. Sep. 2, 2019) (releasing defendant on bail

pending resentencing on § 2255 motion).

In *Mapp v. Reno*, the Second Circuit expanded upon its precedents granting bail

in the context of criminal habeas motions to permit bail during the pendency of immigration-

related petitions. See 241 F.3d at 227; see also *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151,

153-54 (2d Cir. 2007) (Sotomayor, J.) (holding that courts' inherent power to grant bail extends

outside the habeas context, to when the court reviews BIA orders on petitions for removal). The

circuit has also recognized courts' power to grant bail pending extradition, even though there is

no statute authorizing bail and release must be limited to "special circumstances." *See United*

*States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986); *In re Extradition of Garcia*, 615 F. Supp. 2d

162, 166-69 (S.D.N.Y. 2009); *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999).

The Second Circuit has recognized this inherent authority to grant bail in other contexts as well.

*See Close-Up Int'l, Inc. v. Berov*, 411 F. App'x 349, 355 (2d Cir. 2010) (summary order)

(finding district court could set bail pending appeal of a civil contempt order, although it was not

a criminal appeal and there was no statute regarding bail standard). Thus, in the Second Circuit,

it is well established that a district court has the inherent power to grant bail to anyone within the

court's jurisdiction, even if there is no express statutory provision allowing for bail.

While acknowledging this power, the Second Circuit has cautioned that the

power should be exercised in a limited fashion, "in special cases only." *Mapp*, 241 F.3d at 226.

Specifically, the circuit has stated that bail should be granted only where a defendant's motion

raises substantial claims and bail is necessary to make the remedy sought effective. *See id.*; *see*

*also Vacchio v. Ashcroft*, 404 F.3d 663, 673 (2d Cir. 2005) (summarizing circuit's basis for

granting bail to immigration petitioner, who made a strong showing on the merits of his petition

and whose circumstances "were sufficiently extraordinary to make bail necessary"); *Kiadii v. Decker,* No. 18 Civ. 1584 (AT), -- F. Supp. 3d --, 2018 WL 10456549, at *1 (S.D.N.Y. Mar. 2, 2018) (explaining that bail should be granted where petitioner has set forth "substantial claims," demonstrated a likelihood of success on the merits, and extraordinary circumstances make release on bail necessary to make any remedy effective).

A number of courts in this district have recently found that a defendant's particular characteristics coupled with the ongoing COVID-19 pandemic create the sort of "extraordinary" circumstances that justify bail pending further proceedings in the case. For example, Judge Furman recently applied this standard to grant bail to a defendant with a pending 28 U.S.C. § 2255 motion. *See United States v. Nkanga Nkanga*, 18 Cr. 713 (JMF), ECF Dkt. 120 (S.D.N.Y. Apr. 7, 2020) (discussed below). Similarly, several judges in this district have recently granted bail to immigration detainees pending the disposition of their cases, given detention facilities' inability to adequately protect the health of at-risk detainees during the COVID-19 pandemic. *See, e.g., Avendano Hernandez v. Decker*, No. 20 Civ. 1589 (JPO), 2020 WL 1547459, at *2-3 (S.D.N.Y. Mar. 31, 2020) (finding petitioner had demonstrated extraordinary circumstances because of his continued risk of exposure to COVID-19 and the need to grant release to help him avoid infection); *Coronel v. Decker*, No. 20 Civ. 2472 (AJN), 2020 WL 1487274, at *9 (S.D.N.Y. Mar. 27, 2020) (same); *Jovel v. Decker*, No. 20 Civ. 308 (GBD), 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) (finding *Mapp* standard applied and ordering bail release).

Here, because Mr. Haney's motion for "compassionate release" raises substantial claims, and because release on bail is necessary to make any remedy effective, the Court can release Mr. Haney on bail pending  resolution of this motion.

3. *The Court can grant the motion, vacate the prior judgment, and schedule sentencing for a future date; or could grant the motion subject to reconsideration.*

There are two other options under Section 3582(c): First, the Court could grant the motion, vacate the prior judgment, schedule a sentencing hearing to determine the size of the appropriate reduction in this case, and release Mr. Haney on bail pending resentencing. *See Mamau*, 2020 WL 806121, at *8 (granting § 3582(c)(1) motion, but scheduling resentencing hearing for later date); *United States v. Young*, 2020 WL 104785, at *8 (M.D. Tenn. Mar. 4, 2020) (same). Second, the Court could grant the motion, release Mr. Haney on strict conditions of supervised release, but note that the Court's decision is subject to reconsideration once the conditions that endanger Mr. Haney's life have abated; that is when the conditions at the facility to which Mr. Haney has been designated are sufficiently safe to warrant his return to custody. *Cf. United States v. Bayless*, 201 F.3d 116, 131) (2d Cir. 2000) (explaining that a district court has the discretion to reopen a hearing and reconsider its earlier decision after a motion has been decided).

For the reasons set forth above, the Court has the authority to temporarily release Mr. Haney under section 3582(c)(1), which is the "right and rational result." If it finds, however, that – as the Government argues – it does not have the authority under this statute or any other to temporarily release Mr. Haney, the Court should then grant the motion and impose strict conditions of supervision, which could include a long term of home detention and other constraints on Mr. Haney's liberty.

4. *The Court can grant bail pending decision on a habeas petition brought under 28 U.S.C. §§ 2241 and 2255.*

There are at least two other means by which the Court can reach the rational and right result here: to construe this motion as including a petition for relief pursuant to the habeas

statutes,  28 U.S.C. § 2241 and § 2255, and to grant Mr. Haney bail pending decision on that petition.

a. *Mr. Haney has a substantial claim for relief under 28 U.S.C. § 2241.*

The current conditions of the MDC pose an existential threat to Mr. Haney's well being, violate Mr. Haney's rights under the Fifth and Eighth Amendments to the Constitution, and raise a substantial claim for relief under 28 U.S.C. § 2241. *See Thompson v. Choinski*, 525 F. 3d 205, 209 (2d Cir. 2008) (The Second Circuit has "long interpreted § 2241 as applying to . . . prison conditions."). In support of this section of the application, I respectfully request that the Court incorporate the Class Action Petition filed in the Eastern District on behalf of high-risk individuals at the MDC, *Chunn v. Edge*, 20 cv. 1590, Dkt. 1 (March 27, 2020), attached as Exhibit A. The petition persuasively explains why Mr. Haney should be excused from section 2241's exhaustion requirement, why the conditions at the MDC are unconstitutional, and why MDC's failure to take steps to mitigate the transmission of the coronavirus constitutes deliberate indifference to Mr. Haney.

b. *Mr. Haney has substantial claims under 28 U.S.C. § 2255.*

Mr. Haney has at least two substantial claims that the sentence was imposed in violation of the constitution: first, that counsel was ineffective for not seeking an adjournment of sentence and release on bail in light of the encroaching pandemic; and second, that the imposition of sentence in light of the pandemic – which changes the sentence from 42 months to a de facto life sentence – violates the Eighth Amendment's prohibition on cruel and unusual punishment.

On Tuesday, Judge Furman granted bail pending decision on a § 2255 motion brought on behalf of an older, sentenced inmate at the MDC. *See United States v. Nkanga*, 18 Cr. 713 (JMF), Dkt. 120 (Apr. 7, 2020). Judge Furman found that Dr. Nkanga had raised at least one

substantial claim, that counsel was ineffective for failing to request bail pending sentencing, which would have enabled Dr. Nkanga to remain out of custody during the pandemic, and that "extraordinarily or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." (quoting *Mapp v. Reno*, 241 F. 3d 221, 226 (2d Cir. 2001)).

Here, counsel was similarly ineffective in not recognizing the likely effect of the pandemic on those incarcerated at the MDC. As of the sentencing date (February 12, 2020), the media was reporting that the coronavirus had infected over 45,000 people worldwide; that a new case of coronavirus was confirmed in Southern California, and that cruise ships (which are confined, congregate settings, benign and supposedly pleasurable forms of incarceration), are particularly vulnerable. *See*, *e.g.*, CNN, *February 12 coronavirus news* (Feb. 12, 2020); Bloomberg, *Virus Update* (Feb. 11, 2020).[2] And epidemiologists have long documented the extreme danger a deadly virus poses to those incarcerated. *See*, *e.g.*, Joseph A. Bick*, Infection Control in Jails and Prisons*, Clinical Infectious Diseases, Vol. 43, Issue 8 (Oct. 2007) (describing how the danger of infection is greatly increased in the crowded confines of a prison);[3] *see generally* Aff. of Dr. Brie Williams, attached as Exhibit A to the original motion in this case (Dkt. No. 22). Under these circumstances, counsel should have sought to adjourn sentencing, and request bail pending sentence to protect Mr. Haney from the impending pandemi**c**.

In addition, Mr. Haney' sentence, because of the COVID-19 pandemic, has morphed from a sentence of 42 months to one where there is a significant possibility of death, and thus violates the Eighth Amendment's prohibition against cruel and unusual punishment.

---

[2] Available at: https://www.cnn.com/asia/live-news/coronavirus-outbreak-02-12-20-intl-hnk/index.html; https://www.bloomberg.com/news/articles/2020-02-11/disease-gets-official-name-death-toll-now-1-112-virus-update.

[3] Abstract available at https://www.ncbi.nlm.nih.gov/pubmed/17879924.

Because Mr. Haney's habeas petitions raise substantial claims, and because the grant of bail is "necessary to make the habeas remedy effective," if the Court finds that it does not have the authority to release Mr. Haney temporarily under 18 U.S.C. § 3582(c)(1), it should release him on bail pursuant to 28 U.S.C. §§ 2241 or 2255.

## II.     Mr. Haney faces a significant risk of contracting and succumbing to COVID-19 at the MDC

The Court should not conclude that because the MDC has "only" reported 12 positive cases and no deaths as of April 9, 2020, that COVID-19 is under control such that Mr. Haney can remain incarcerated there.[4] The MDC has not reported how many inmates have COVID-19 symptoms but have not been tested, nor how many are being kept in isolation because of COVID-19 symptoms.

More disturbingly, statements of the Warden concerning the measures being taken to combat COVID-19 are contradicted not just by our clients but by correction officers at the MDC. As included in a letter from our office to Judge Karas, the Vice President of the Union representing correctional staff at the MDC sent the Warden an e-mail on April 9, 2020, stating, among other things, that two inmates who have tested positive were returned to regular housing units after less than seven days had passed, that those units were not quarantined, and that staff on those units were not given appropriate personal protective gear; that, more generally, exposed staff are not being quarantined, and are not even being informed about other staff members who have tested positive in order to determine whether additional staff members should be quarantined. *See United States v. Rabadi*, 13 Cr. 353 (KMK), Dkt. No. 90 (Apr. 9, 2020), attached as Exhibit B; *see also* The Intercept, *Internal Prison Guard Email Contradicts*

---

[4] *See* letter to Chief Judge Mauskopf from the MDC and MCC Wardens dated April 9, 2020, indicating that 3 inmates and 9 staff members have tested positive, attached as Exhibit C.

*Government's Claims to Judges About Containing Coronavirus at Federal Detention Center*;[5]
OSHA Imminent Danger Report, filed by the President of the Council of Prisons Local 33
(March 31, 2020) (describing how the BOP has directed staff throughout the Bureau of Prisons
who have come in contact with individuals with  COVID-19 symptoms, to nevertheless report to
work despite CDC Guidelines to the contrary), attached as Exhibit D; *see also*  Gov't Executive,
*Federal Prisons Pose 'Imminent Danger' in Spreading COVID-19, Union Says* (Apr. 6, 2020). [6]

Our clients' reports also belie the assertions that steps are being taken to prevent the
virus's spread. As I described at the hearing, Mr. Haney reported that a "nice doctor" came and
took the temperature of the people in his unit on April 2nd, and said that he would come every
day. As of the hearing on April 8, 2020, he had not returned (and I have not been able to contact
Mr. Haney since that time to learn whether anything had changed). At the hearing Mr. Haney
described another person in his unit who is severely medically compromised, and yet the MDC is
likewise not monitoring his well-being. Those of us who are not incarcerated are being told that
we must wear masks at all time to prevent the spread of COVID-19, and yet our clients are not
being provided with the masks that every person in New York is urged to wear.

The MDC is not testing inmates for COVID-19, is not quarantining exposed guards, is
not providing protective gear to guards or inmates, and is not even taking the daily temperature
of the inmates the MDC itself has designated at high-risk for contracting and succumbing to this
deadly pandemic.

---

[5] https://theintercept.com/2020/04/10/prison-coronavirus-mdc-bop/.
[6] https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-danger-spreading-
covid-19-union-says/164390/.

Under these circumstances, the Court cannot afford to adopt a wait-and-see attitude before releasing Mr. Haney. As Mr. Haney's mother so eloquently put it, if the MDC was flooding, the Court would not wait until someone had drowned before acting.

### III.   Mr. Haney's age and health place him at grave risk of contracting and succumbing to COVID-19

The MDC has already designated Mr. Haney as being at high-risk to contract and succumb to COVID-19,  presumably because of his age (61 years old). There are powerful reasons to find that a 61-year-old is significantly more susceptible to COVID-19; in addition, Mr. Haney's overall health, as described in the letter of his sister, Belinda Pickelsimer, provides further support for a finding that Mr. Haney is at high-risk of contracting and succumbing to the virus. *See* Exhibit E.

As described by city officials, the media, and doctors working with COVID-19 patients, men over 60 years of age are particularly vulnerable to COVID-19:

- NYC Coronavirus Fact Sheet: "People who are at most risk of severe illness are people 50 years of age or older."[7]

- ICE has "instructed its field offices to identify individuals who are considered particularly vulnerable, such as those who were over age 60 or pregnant."[8]

- CNN: "The novel coronavirus can infect anyone, but it's older adults — ages 60 and up — who are more likely to get seriously sick from it. . . . Infectious disease experts define 'older adults' as anyone age 60 and up."[9]

- BBC: "Coronavirus also appears to disproportionately affect men in their 50s and 60s."[10]

---

[7] https://www1.nyc.gov/assets/doh/downloads/pdf/imm/coronavirus-factsheet.pdf.
[8] NY Times, *Coronavirus Updates* (Apr. 8, 2020). https://www.nytimes.com/2020/04/08/us/coronavirus updates.html?action=click&module=Spotlight&pgtype=Homepage#link-7634e187.
[9] https://www.cnn.com/2020/03/12/health/what-60-older-need-to-know-coronavirus-wellness-trnd/index.html (March 13).
[10] https://www.bbc.com/news/health-52197594.

- ABC: "80% of deaths from COVID-19 occurred among people age 60 and older in China."[11]

- US News & World Report: "The head of the World Health Organization said that almost everyone who has died of the coronavirus in Europe has been over the age of 60."[12]

- Dr. Louise Anderson, UCSF Professor: "Although the media is saying it's "old" people, I know at my medical center it says "anybody age 60 or older." That's really based on the data from Wuhan, where we saw as late as January that the rates of death were very, very low in the young but that as your age goes up, so does your chance of dying — dramatically.[13]

The Court should conclude that Mr. Haney's age places him at significant risk, such that release is necessary here.

In her letter to the Court, Belinda Pickelsimer explains that her brother's history of substance use, tobacco and alcohol have "compromised his lungs, heart, kidneys and liver; all of which are the exact organs fiercely affected by the Covid-19 virus." *See* Ex. __.  As detailed in the presentence report, Mr. Haney took enormous quantities of prescription opioids between 2001 and 2012, which he then followed by years of excessive drinking (over a quart of vodka a day by the time of his arrest). *See* PSR ¶¶ 74-78. While his physical condition has improved during this period of incarceration, the years of abuse have wreaked havoc on his organs. According to the NIH, COVID-19 hits those who have abused substances particularly hard: "Because it attacks the lungs, . . . COVID-19 could be an especially serious threat to those who smoke tobacco . . . or vape. . . . People with opioid use disorder . . . may also be vulnerable due to those drugs' effects on respiratory and pulmonary health." *See* NIH, *Covid-19: Potential*

---

[11] https://abcnews.go.com/Health/60-odds-exercise-caution-health-assessing-covid-19/story?id=69789335 (March 25, 2020).
[12] https://www.usnews.com/news/world-report/articles/2020-04-02/who-nearly-all-coronavirus-deaths-in-europe-are-people-aged-60-and-older (Apr. 2, 2020).
[13] https://www.citylab.com/equity/2020/03/coronavirus-vunerable-elderly-adults-ageism-younger-people/608224/.

*Implications for Individuals with Substance Use Disorders* (Apr. 6, 2020);[14] *see also* Dipak

Sarkar et al., *Alcohol and the Immune System*, Alcohol Research, vol 37(2), 153-155 (2015)

("Clinicians have long observed an association between excessive alcohol consumption and

adverse immune-related health effects . . .and slower and less complete recovery from

infection.").[15]

In sum, the Court should find that Mr. Haney's age and physical condition place him at

significant risk of contracting and succumbing to COVID-19, such that his release from the

MDC is necessary at this time. As argued, Mr. Haney can quarantine on a separate floor of his

sister's house, and will report to his designated facility once it is safe to do so.

**IV.     Mr. Haney does not pose a risk of flight**

Hugh Haney does not pose a risk of flight. While Mr. Haney was detained when first

presented, those determinations were made based on the representations of the government that

Mr. Haney had amassed $19 million dollars in drug proceeds, and that his guideline range was in

excess of 200 months. Mr. Haney did not seek further review of the bail decision because he

wanted to take full responsibility for his conduct, which he knew would include a significant a

term of incarceration.

His situation now is utterly different. He has already been sentenced to 42 months'

imprisonment, of which he has already served 10 months, is more stable mentally than he has

been in decades, has re-found his belief in God, and has re-established his deep connections to

his loving family (who came from North Carolina and Ohio to attend sentencing, and who were

present telephonically during the April 8, 2020 hearing). Mr. Haney will be wholly compliant

---

[14] https://www.drugabuse.gov/about-nida/noras-blog/2020/04/covid-19-potential-implications-individuals-substance-use-disorders.
[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4590612//.

with all the conditions of release, and will appear as required at the facility to which he has been designated, or wherever directed by the Court or the Probation Office.

I will submit a proposed bail order for the Court's consideration, but can represent that Mr. Haney's sister, brother-in-law, brother, and two sons are all willing to sign a bond on his behalf, and that his mother is willing to post her home if necessary to further secure Mr. Haney's release.

*** 

Mr. Haney is differently situated from many at the MDC. Not only is he at significant risk of contracting and succumbing to COVID-19 due to his age and health, but he has already been sentenced, has a safe place to quarantine, has the support of his family, will be wholly compliant with strict conditions of home confinement, and will report to the designated facility to serve the remainder of his term whenever it safe to do so, whether it is three weeks or three months from today. Mr. Haney is not seeking to avoid his sentence, but he was sentenced to 42 months imprisonment, and not death. We respectfully request that Court do the "rational and right" thing, which is to temporarily release Mr. Haney to protect him from this deadly pandemic.

Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASSAN CHUNN; NEHEMIAH McBRIDE; AYMAN RABADI by his Next Friend Migdaliz Quinones; and JUSTIN RODRIGUEZ by his Next Friend Jacklyn Romanoff, <br><br> individually and on behalf of all others similarly situated, <br><br>                        Petitioners, <br><br>                 *-against-* <br><br> WARDEN DEREK EDGE, <br><br>                    Respondent. | No. 20 Civ. 1590 <br><br> **CLASS ACTION PETITION SEEKING WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241** |

Hassan Chunn, Nehemiah McBride, Ayman Rabadi, and Justin Rodriguez ("Petitioners"), on behalf of themselves and others similarly situated, and by and through their attorneys, Emery Celli Brinckerhoff & Abady LLP, the Cardozo Civil Rights Clinic, and Alexander A. Reinert, allege as follows:

## PRELIMINARY STATEMENT

1.     New York City is the epicenter of the Country's struggle with the novel COVID-19 virus and resulting coronavirus disease ("COVID-19"). As this disease ravages our City, infecting more than 25,000 and killing over 366 to date, the risks posed by COVID-19 to people confined in jails and prisons—in terms of transmission, exposure, and harm—are stark and alarming. For reasons beyond their control, people in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning or laundry, avoid high-touch surfaces, or sanitize their own environment. People in jails and prisons are more vulnerable and susceptible to the risks of coronavirus because they are more likely to have chronic underlying health conditions,

such as diabetes, heart disease, chronic lung and liver diseases, asthma, and lower immune systems from HIV. People have limited opportunities to access medical care under normal circumstances in jails; medical facilities are limited, and as staff become sick, fewer people are present to care for those who remain confined. The outbreak of a highly infectious, deadly virus in a closed detention setting is a disaster, calling for urgent and decisive action to protect the health of those confined in the jail, those who work there, and the medical professionals who will treat those who become infected.

2. Five days ago, a person jailed at the Metropolitan Detention Center ("MDC") in Brooklyn, New York tested positive for COVID-19, the first coronavirus case of a detainee in the federal prison system. As of March 26, 2020, four people in BOP custody in New York City, including one at the MDC, have tested positive. At least four staff members at the MDC have tested positive, with two staff-member cases reported just today. The coronavirus is spreading in the MDC and federal BOP system, fast.

3. Unfortunately, the Warden of the MDC has failed to respond to the urgent and serious threat to the health of people confined at the MDC. Although the Warden has identified that 537 medically vulnerable individuals are confined in his facility according to CDC guidelines, the Warden has failed to release these most vulnerable individuals. Instead, the facility has acted at a slow pace to respond to requests for emergency compassionate relief and to take other measures appropriate for a public health crisis.

4. Petitioners Hassan Chunn, Nehemiah McBride, Ayman Raybadi, and Justin Rodriguez are four of the 537 individuals confined at the MDC who face an imminent risk of serious injury or death at the MDC if exposed to COVID-19. Petitioners suffer variously from conditions such as chronic heart disease, asthma, high blood pressure, and respiratory problems.

Because of their pre-existing chronic medical conditions and the nature of the jail environment, Petitioners cannot be adequately protected from contracting COVID-19 if they remain confined in the MDC. Instead, they face a risk of serious illness if they become infected.

5.      The MDC has a terrible track record of neglecting individuals with serious health needs under ordinary circumstances. And the MDC is grossly ill-equipped to identify, monitor, and treat a COVID-19 epidemic. The combination of an epidemic striking a facility that houses 1,700 people and the MDC's inability to provide appropriate medical care under normal circumstances is likely to result in serious illness and death, if people remain confined there at current population levels and under current conditions.

6.      According to the The New York Times, cities around the country, including New York, are moving to release hundreds of high-risk individuals from jail to stem the spread of the virus among the incarcerated. Courts in this Circuit and around the country have also ordered the release of incarcerated and detained individuals due to their heightened risk of contracting COVID-19-related serious illnesses. *See infra* n.21. New York State announced this evening that it is releasing 1,100 people from state prisons who are incarcerated on parole violations.[1]

7.      Petitioners and similarly situated medically vulnerable individuals must be released from the MDC in order to avoid serious harm to their health. Now is the time to act to stop the spread of coronavirus to high-risk and older people confined at the MDC, and to protect them and the broader community from the serious risk to their health and safety.

---

[1] Brendan J. Lyons, *NY to release 1,100 parole violators as coronavirus spreads*, Times Union (Mar. 27, 2020), https://www.timesunion.com/news/article/Deaths-surge-again-in-New-York-from-coronavirus-15160973.php.

## PARTIES

8.      Petitioner Hassan Chunn is a 46-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. Chunn was in the custody of the Federal Bureau of Prisons ("BOP") at the MDC.

9.      Petitioner Nehemiah McBride is a 34-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. McBride was in the custody of BOP at the MDC.

10.     Petitioner Ayman Rabadi is a 59-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. Rabadi was in the custody of BOP at the MDC.

11.     Petitioner Justin Rodriguez is a 26-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. Rodriguez was in the custody of BOP at the MDC.

12.     Derek Edge ("Respondent") is the Warden at the MDC. As Warden of the MDC, Respondent Edge is responsible for and oversees all day-to-day activity at the MDC. He is responsible for all aspects of the operation and function of the MDC. His responsibilities include ensuring the safety of all in the institution and ensuring the orderly running of the institution. Approximately 1,700 people are detained at the MDC. Respondent Edge is aware of and has adopted and enforced a policy that leaves Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. Defendant Edge is the immediate physical custodian responsible for the detention of the Petitioners. He is sued in his official capacity.

## JURISDICTION AND VENUE

13.    The Petitioners bring this action pursuant to 28 U.S.C. § 2241 for relief from custody in violation of the Fifth and Eighth Amendments to the U.S. Constitution.

14.    The Court has subject matter jurisdiction over this Petition pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); the Fifth and the Eighth Amendments to the U.S. Constitution; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (All Writs Act); and 28 U.S.C. § 2241 (habeas corpus). In addition, the Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

15.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.    Petitioners are all excused from 28 U.S.C. § 2241's prudential exhaustion requirement. The statutory exhaustion requirement of the Prison Litigation Reform Act does not apply to this action. *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001). In cases brought under 28 U.S.C. § 2241, courts may excuse failure to strictly comply with administrative procedures where good cause is found. Exhaustion can be excused where "'(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a party has raised a substantial constitutional question.'" *Sanchez v. United States*, No. 12 Civ. 01540 (CBA), 2012 WL 5987858, at *1 (E.D.N.Y. Nov. 29, 2012) (quoting *Beharry v. Aschcroft,* 329 F.3d 51, 62 (2d Cir. 2003).

17.    The only process ostensibly available to Petitioners is the BOP's Administrative Remedy Program ("ARP"), a lengthy process that does not purport to provide the requested

relief of release to home confinement and that here would have been futile. *See* Ex. 1,

Declaration of Deirdre von Dornum, dated March 27, 2020, ¶¶ 22, 23 ("von Dornum Decl."). As

Deirdre von Dornum explains in her declaration, the Federal Defenders of New York, Inc. ("the

Federal Defenders") has engaged in a weeks-long effort to secure release of vulnerable clients

and to advocate for the MDC to take steps to mitigate risk. *Id.* ¶¶ 3-7, 9-11, 20, 21, 23. The MDC

has had ample opportunity to take appropriate action, but has failed to do so. Because the ARP

does not provide the requested relief, because engaging in the ARP would have been futile given

that seasoned advocates with far greater resources could not secure the requested relief, and

because Petitioners are likely to experience irreparable injury while waiting for that process to

unfold, they are excused from exhaustion.

## STATEMENT OF FACTS

### I.      The Covid-19 Crisis

18.     The novel coronavirus that causes COVID-19 has led to a global pandemic.[2] As

of March 26, 2020, there were more than 500,000 reported COVID-19 cases throughout the

world and more than 1,000 deaths in the United States. The number of COVID-19 cases in the

United States is expected to grow exponentially. Projections by the Centers for Disease Control

and Prevention ("CDC") indicate that over 200 million people in the United States could be

infected with COVID-19 over the course of the epidemic without effective public health

intervention, with as many as 1.5 million deaths in the most severe projections.[3]

---

[2] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794.

[3] Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7m-dead.html.

19.     The COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs, including the heart and liver. To date, the virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.

20.     People over the age of fifty face greater chances of serious illness or death from COVID-19. In a February 29, 2020 WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 60-69 had an overall 3.6% mortality rate and those 70-79 years old had an 8% mortality rate. For individuals age 40-49, the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was as low as 0.2%.[4]

21.     People of any age who suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, are at elevated risk as well.[5] The WHO-China Joint Mission Report provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[6]

---

[4] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO-China Joint Mission Report).

[5] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[6] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those

22.     In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe. Most people in higher risk categories who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.

23.     COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

24.     Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

---

with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

8

25.     Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

26.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[7] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.

27.     Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.

28.     There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19.

## II.     Incarcerated People and Staff in New York City Are Particularly Vulnerable

29.     New York is currently at the epicenter of the coronavirus pandemic. On March 23, 2020, approximately six percent of confirmed coronavirus cases in the world were in New York State. Governor Cuomo declared a state of emergency in New York State on March 7, 2020. Mayor DeBlasio declared a state of emergency in New York City on March 12, 2020.

---

[7] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM) https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879.

30.     As of March 27, 2020, there are 44,745 positive cases in New York State with more than 25,000 of those cases being in New York City. To date, there have been 519 deaths from COVID-19 just in New York, with 366 of those deaths in New York City. Ex. 2, Declaration of Jonathan Giftos, MD, dated March 27, 2020, ¶ 7 (Giftos Decl.").

31.     People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes. People who are confined in prisons, jails, and detention centers will find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, even with the best-laid plans. The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.

32.     On March 20, 2020, Governor Cuomo took the strictest measure yet to fight the virus's spread, issuing a "stay at home" executive order for all residents. In a statement to the public, Governor Cuomo explained that the order prohibits non-essential gatherings of any size, requires all non-essential businesses to close and 100 percent of their employees to work from home, and recommends that people stay at least six feet away from others. "We know the most effective way to reduce the spread of this virus is through social distancing and density reduction measures," Governor Cuomo said.[8]

33.     Correctional settings increase the risk of contracting an infectious disease, like COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in

---

[8] *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*, New York State (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others. Giftos Decl. ¶ 11.

34.    Correctional facilities house large groups of people together, and move people in groups to eat, do recreation, and go to court. They frequently have insufficient medical care for the population, and, in times of crisis, even those medical staff cease coming to the facility. Hot water, soap, and paper towels are frequently in limited supply. Incarcerated people, rather than professional cleaners, are responsible for cleaning the facilities and often are not given appropriate supplies. This means there are more people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible.

35.    Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases. Giftos Decl. ¶ 12.

36.    For this reason, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center. Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

37.     Internationally, governments and jail and prison staff have recognized the threat posed by COVID-19 and released detainees. In Iran, for example, more than 70,000 people were temporarily released from jails to curb the spread of coronavirus.[9]

38.     In the United States, the stimulus package that is on the verge of becoming law as of the time of this filing includes funding for federal prisons to purchase protective gear and test kits for COVID-19 and authorizes the Justice Department to lengthen the maximum amount of time that a prisoner can be placed in home confinement during the pandemic.[10]

39.     On March 23, 2020, a bipartisan group of fourteen U.S. Senators sent a letter to U.S. Attorney General Barr and BOP Director Carvajal to express their "serious concern for the health and wellbeing of federal prison staff and inmates . . . especially those who are most vulnerable to infection." The Senators wrote that they reviewed the BOP's COVID-19 Action Plan, noting that it did not include any measures to protect the most vulnerable staff and inmates. The Senators urged DOJ and BOP to release to home confinement certain individuals who were elderly, ill, or incarcerated for non-violent offenses and are near release.

40.     On March 26, 2020, Attorney General William Barr sent a memo to the Director of BOP "directing [him] to prioritize the use of [his] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the COVID-19 pandemic." The Attorney General specifically recognized that "there are some at-risk inmates who are non-

---

[9] *Iran Temporarily Releases 70,000 Prisoners as Coronavirus Cases Surge*, Reuters (Mar. 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

[10] Todd Ruger, *Prisons and Courts Get Coronavirus Help in Senate Relief Bill*, Roll Call (Mar. 25, 2020, 2:21PM) https://www.rollcall.com/2020/03/25/prisons-and-courts-get-coronavirus-help-in-senate-relief-bill/.

violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than BOP facilities."[11]

41. Senator Dick Durbin has called on the federal government to take action to protect staff and people detained in federal prisons. "Federal prisons will inevitably be a hotspot for the spread of coronavirus, especially among vulnerable staff and inmates," Durbin said. "It is imperative for BOP to take immediate action to protect staff and inmates at federal prisons throughout the country and ensure that facilities are prepared to address this threat."[12]

42. Some jurisdictions, including Los Angeles and Chicago, have already taken steps to protect people in custody from the impending spread of COVID-19 by releasing people in an effort to reduce populations.[13]

43. In New York City, public officials, the jail oversight board, and even doctors working at Rikers Island have acknowledged that the City's jails are simply unsafe and releasing people is the only humane option.[14] *See* Statement of New York City Board of Correction,

---

[11] Memo from Attorney General to Director of Bureau of Prisons, March 26, 2020, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[12] *Durbin Discusses Coronavirus Threat At Federal Prisons With Council Of Prison Locals*, Dick Durbin United States Senator Illinois (Mar. 24, 2020), https://www.durbin.senate.gov/newsroom/press-releases/durbin-discusses-coronavirus-threat-at-federal-prisons-with-council-of-prison-locals.

[13] Thirty-one district attorneys from around the country put out a joint statement calling for a reduction in jail populations. Jurisdictions in California, Illinois, and Ohio have already released people from jail, and officials in Louisiana, Oregon, Pennsylvania, and Virginia have made announcements that they will begin releasing people soon. Other cities are putting plans in place to do the same. *See, e.g.* Allen Kim, *Cities in the US Move to Lower Inmate Populations as Coronavirus Fears Grow*, CNN (Mar. 16, 2020), https://www.cnn.com/2020/03/16/us/inmates-released-jail-coronavirus-trnd/index.html; Megan Cassidy, *Coronavirus: San Francisco, Contra Costa Prosecutors Join National Call for Jail Releases*, San Francisco Chronicle (Mar. 17, 2020) https://www.sfchronicle.com/crime/article/Coronavirus-San-Francisco-Contra-Costa-15137291.php.

[14] *See* Ross MacDonald (@RossMacDonaldMD), Twitter (March 18, 9:51 p.m.) https://twitter.com/RossMacDonaldMD/status/1240455796946800641 (Dr. MacDonald is the Chief Medical Officer for Correctional Health Services ("CHS"), which provides healthcare to New York City's Department of Corrections); Rachel Bedard, (@rachelbedard), Twitter (March 18, 8:34 a.m.) https://twitter.com/rachaelbedard/status/1240255196644741120 (Dr. Bedard is the Director of Geriatrics and Complex Care for CHS); Jonathan Giftos (@JonGiftosMD), Twitter (March 18, 10:37 p.m.)

March 17, 2020 (calling on the City to release people from criminal custody, prioritizing people over 50, those with underlying health conditions, detained for administrative reasons, and those who have been convicted and sentenced to one year or less).[15] On March 20, 2020, Dr. Robert Cohen, a member of New York City's Board of Correction, said, "The most important thing we can do right now is discharge all of the people who are old and have serious medical issues — those people are likely to die from a coronavirus infection."[16]

44. Several doctors working in New York City's jails have echoed the calls to release vulnerable people. Dr. Rachael Bedard, senior director of the geriatrics and complex care service at Rikers Island, has described depopulation as "[t]he only meaningful public health intervention."[17] In correctional facilities, "if you think about how many excess human contacts [there are], even compared to something like a shelter setting, you can imagine why viral spread in this environment is extra dangerous."

45. Incarcerated people in New York City have already begun to test positive for COVID-19. Among the 5,200 people incarcerated by the New York City Department of Correction, seventy-five people in city custody have tested positive for coronavirus. This is a higher rate of infection than seen outside of detention facilities.

---

https://twitter.com/JonGiftosMD/status/1240467288198873088 (until January 2020, Dr. Giftos was the Clinical Director of Substance Use Treatment for CHS).

[15] *New York City Board of Correction Calls for the City to Begin Releasing People from Jail as Part of Public Health Response to COVID-19* (Mar. 17, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/2020.03.17%20-%20Board%20of%20Correction%20Statement%20re%20Release.pdf

[16] Jen Ransom and Alan Feuer, *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, N.Y. Times (March 20, 2020), https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

[17] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients From the Coronavirus*, New Yorker (Mar. 20, 2020), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

46.     As of March 26, 2020, four people in BOP custody in New York City, including one at the MDC, have tested positive.[18] And the virus is spreading like wildfire across the population held on Rikers Island. Giftos Decl. ¶ 15.

47.     Numerous people working in the criminal justice system have also tested positive, increasing the likelihood of exposure to and by incarcerated people: a security officer and an agent in the U.S. Attorney's Office, SDNY; an NYC Department of Corrections investigator (who has since died from COVID-19)[19]; a lawyer with an office in Midtown Manhattan (and his wife and son)[20]; a healthcare worker in Manhattan; an attorney and legal intern in local New York State courts; and an attorney at the Brooklyn Supreme Court.[21]

48.     Just this week, New York City pledged to release approximately 300 nonviolent inmates from Rikers Island. The Mayor intends to release people held on Rikers who are over 70 years-old or who have preexisting conditions that place them at heightened risk from the virus.[22]

---

[18] *Covid-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed March 27, 2020).

[19] Aliza Chasan, *NYC Corrections Officer Dies of Coronavirus*, Pix11, https://www.pix11.com/news/coronavirus/nyc-correction-officer-dies-of-coronavirus.

[20] *Midtown Lawyer, Family and Friends Test Positive*, NBC New York (March 4, 2020), https://www.nbcnewyork.com/news/local/nyc-attorneyin-critical-condition-city-works-to-trace-movements-awaits-more-tests/2311723/.

[21] *Information about Coronavirus and New York State Courts*,

https://www.nycourts.gov/whatsnew/covid.shtml; *see also* Two People with Coronavirus were in

Manhattan and Brooklyn Courts, https://twnews.us/us-news/two-people-with-coronavirus-were-inmanhattan-brooklyn-courts.

[22] Noah Higgins-Dunn, *Coronavirus: New York City to Release 300 Nonviolent Inmates from Rikers Island*, CNBC (Mar. 24, 2020, 7:25PM) https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html.

49.     Over the last several days, judges in this circuit and across the country have granted habeas petitions and ordered the release of persons who are incarcerated or being detained.[23]

50.     On March 27, 2020, Governor Cuomo announced that the State of New York is immediately releasing 1,000 individuals confined on parole violations in state prisons and jails to supervised release in the community in order to stem the spread of coronavirus among incarcerated people.

51.     Nonetheless, BOP continues to transfer people from facility to facility, ignoring the pleas of government officials and public health experts, and increasing the likelihood that the virus will be transmitted within the incarcerated population.[24]

---

[23] *See Coronel, et al., v. Decker* et al., 20 Civ. 2472 (AJN) (S.D.N.Y. Mar. 27, 2020) (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); *Basank et al. v. Decker et al.*, 20 Civ. 2518 (AT) (S.D.N.Y. Mar. 26, 2020) (granting release of ten petitioners who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19" from immigration detention); *U.S. v. Stephens,* 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, recognizing inmates may be at a heightened risk of contracting COVID-19); *Umana Jovel v. Decker* et al., 20 Civ. 308 (GBD)(SN) (S.D.N.Y. Mar. 26, 2020) (granting emergency request for release of petitioner from immigration detention in light of the COVID-19 crisis); *People ex rel. Stoughton on behalf of Little et al. v. Brann*, Index No. 260154/2020 (Sup Ct, Bronx County Mar. 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *People ex rel. Stoughton on behalf of Hogan et al. v. Brann*, (Sup Ct, NY County Mar. 27, 2020) (releasing 16 individuals held at Rikers Island jail on pre-trial detention who were particularly vulnerable to illness or death due to COVID-19); *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19); *USA v. Garlock*., No. 18 Cr 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Castillo et al. v. Barr*, 20 Civ. 605 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *U.S.A.v. Matthaei*, 19 Civ. 243 (D. Idaho Mar. 16, 2020) (granting convicted defendant additional time to self-surrender to prison in light of defendant's health problems, which place him at greater risk of complications of COVID-19); *Jimenez et al. . Wolf* et al., 18 cv 10225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *In re Request to Commute or Suspend County Jail Sentences*, Dkt. No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any inmate in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction).

[24] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transferring Inmates: Sources*, ABC News (Mar. 23, 2020, 1:22PM) https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

### III.  MDC is Failing to Take Proper Precautions, Placing People at an Increased Risk

52.    The conditions at the MDC pose a heightened public health risk for the spread of COVID-19 that is even greater than in non-carceral institutions. People live and work in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. They may be unable to maintain the recommended distance of 6.5 feet from others, and may share or touch objects used by others. Toilets, sinks, and showers are shared, without disinfection between each use. Food preparation and service is communal with little opportunity for surface disinfection. Staff arrive and leave on a shift basis, and there is limited ability to adequately screen staff for new, asymptomatic infection.

53.    Since March 4, 2020, the Federal Defenders has engaged in extensive efforts to get the MDC to address the risks associated with the spread of COVID-19 at the MDC, to little avail. von Dornum Decl. ¶ 3-7, 9-11, 20, 21, 23.

54.    The Federal Defenders initially requested that the BOP put in place the following measures at the MDC:

      a.    Make public the MDC's plans and policies for preventing a coronavirus outbreak and responding to detained people who contract coronavirus;

      b.    Put in place a comprehensive testing protocol for incarcerated people and staff;

      c.    Increase sanitation and hygiene in the facility, including increased cleaning of the housing units and making soap and tissues freely available to incarcerated people;

      d.    Provide for isolating anyone who tests positive for the coronavirus at a hospital or other medical facility, not at the jail;

    e.      Ensure that the jail is not locked down to social and legal visitors in response to the epidemic sot that lawyers and family members can have continued access to their clients and loved ones;

    f.      Coordinate with the Courts and U.S. Attorneys' Offices in advance to ensure that only in extraordinary circumstances should any new arrestee be detained at the jails during the epidemic, and no one should be admitted without testing. von Dornum Decl. ¶ 4.

55.    On March 11, 2020, for the first time, MDC officials responded to these concerns, when, at the request of the Chief Judge of the Eastern District of New York, Attorney Holly Pratesi and Associate Warden Andy Cruz attended a special meeting of the EDNY Facilities Security Committee focused on coronavirus issues. At that meeting Associate Warden Cruz indicated that the MDC was still receiving guidance from national BOP leadership as to how to handle the coronavirus epidemic. In response to specific questions, Associate Warden Cruz stated:

    a.      the facility could not make public its plans or protocols for coronavirus because of security considerations;

    b.      there was no testing protocol in place, except for the temperature readings of those people being brought to court (by order of the Chief Judge) and the facility did not anticipate having a testing protocol;

    c.      Staff were being asked to self-report if they had traveled to what were then the designated hotspot countries or had been exposed to someone known to have coronavirus;

     d.     It was unclear if staff who presented with risk factors and were sent home would be on paid or unpaid leave, because that is a national BOP decision;

     e.     the MDC had placed soap in the lobby bathroom for visitors, intended to provide a bar of soap to each inmate and to ask the inmate orderlies to increase cleaning, but could not provide hand sanitizer to inmates, and neither staff nor visitors would be allowed to bring in hand sanitizer;

     f.     the MDC did not yet know where any incarcerated person who tested positive would be placed;

     g.     the MDC did not believe it would be feasible to use the empty floors in the East (or "old") building of the MDC to house people who were symptomatic or who tested positive;

     h.     the MDC did not intend to do a lockdown on social or legal visitation;

     i.     the MDC would continue to accept new arrests;

     j.     the MDC would screen new arrests for symptoms of COVID-19 and would ask newly arriving inmates if they had traveled recently outside the United States;

     k.     the MDC had no plans to move vulnerable inmates but would make an effort to identify which inmates fell under the CDC's definition of vulnerable. *Id.* ¶ 6.

56.    On March 13, 2020, the MDC cancelled all legal and social visitation for the next thirty days. *Id.* ¶ 8.

57.    Beginning on March 14, 2020 and continuing through March 19, 2020, Federal Defenders spoke to over a hundred clients by telephone. The clients uniformly observed that:

19

a.    there had been no change in sanitation practices at the facility;

b.    only some of the units had received the bars of soap;

c.    education on the symptoms of COVID-19 or how to curb its spread is

limited to posters on the walls and a 10-minute presentation on each unit

to large groups of inmates that consisted of reading from a CDC pamphlet

that largely advised to "Stay at home" and "Avoid gatherings";

d.    no doctors came to the units to check on anyone;

e.     inmates understand that staff are being given temperature checks as they

entered the facility, but staff on the unit were not wearing gloves, masks,

or other protective gear in the facility. *Id.* ¶ 9.

58.    The MDC lacks adequate medical infrastructure to address the spread of

infectious disease and treat the people most vulnerable to COVID-19.

59.    Approximately 1,700 people are held at the MDC. The Warden of the MDC has

identified 537 of these individuals as falling into the high-risk groups identified by the CDC. *Id.*

¶ 11(a).

60.    New people arrive at the MDC from all over the world each week. These new

arrivals are screened only for fever and recent travel to designated hotspot countries.

61.    Correctional officers who live in New York, New Jersey, and Pennsylvania come

in and out of the facility each day without sufficient medical screening. Staff being screened only

for elevated temperatures as they entered the facility and sent home if they had a temperature

over 100.4 degrees Fahrenheit based on a temporal thermometer. *Id.* ¶ 11(e).

62.    Significantly, in a March 18, 2020 CDC report, an epidemiological investigation

revealed that coronavirus-infected staff members contributed to the outbreak in a nursing home

facility with ineffective infection control and prevention and staff members working in multiple facilities.

## IV. MDC Has Failed to React to Tests Confirming the Virus Is Within Its Walls

63. On March 21, 2020, the Federal Defenders learned that an inmate at the MDC had tested positive for COVID-19. *Id.* ¶ 12.

64. The inmate who tested positive had been housed on the "intake" unit on the 4th floor of the institution for approximately one week before testing positive. *Id.* ¶ 13. At the time the inmate was admitted to the institution he had been asymptomatic; he developed symptoms within three days of his admission. *Id.*

65. Between the time the inmate was admitted to the MDC and when he tested positive for COVID-19, he was in contact with many inmates and staff on the intake unit. *Id.* New inmates from other institutions who are in transit to their designated facilities were added to the intake unit on March 20, 2020, the day before the inmate on that unit tested positive. *Id.* Inmates from the intake unit, who would have been exposed to the positive inmate, were subsequently transferred into other units within the facility. *Id.*

66. Others who were housed on the unit with the individual who was recently diagnosed with coronavirus are now themselves showing symptoms, according to a person confined on that unit.

67. People housed in the MDC are terrified and panicked. Some are placing socks over the phone when they call family members to prevent infection from the phones, which are not sanitized or cleaned.

68. No professional or staff cleaners sanitized the intake unit where the inmate who tested positive had been housed, but, instead the inmate orderlies on the adjacent unit were sent

to clean the intake unit with the same cleaning supplies they regularly use and were provided insufficient gloves and masks. *Id.*

69.     Staff is providing people with industrial hand soap in diluted form to "clean" their own cells.

70.     Since, inmates have been directed by executive staff to report other inmates who they believed might be symptomatic, but, inmates were fearful of reporting their own or others' symptoms because they had heard that if you were symptomatic you would be placed in "the box." *Id.*

71.     Federal Defenders has not been informed how many inmates are symptomatic, quarantined or isolated, in addition to the inmate who tested positive. *Id.* ¶ 14.

72.     As of March 27, 2020, the Federal Defenders have learned that four staff members at the MDC have tested positive and a number of others are symptomatic.

73.     Despite the arrival of COVID-19 at the MDC, the MDC continues to implement practices that put inmates and staff at risk of contracting COVID-19. For example:

a.      Female inmates continue to be asked to launder all inmate uniforms, including from the intake unit, where the inmate tested positive. *Id.* ¶ 16(a).

b.      The phones and computers on the units are not being cleaned. *Id.* ¶ 16(c).

c.      At mealtime, the inmates are directed to line up shoulder to shoulder. *Id.* ¶ 16(d).

d.      Inmates at the MDC are housed either in small two-man cells (designed to hold a single inmate) with a single shared toilet and sink or in large open dormitory units housing up to 70 inmates with shared toilets and sinks and

22

sharing a large sleeping space and beds spaced only 3 to 5 feet apart. *Id.* ¶ 26. Windows in the units do not open. Inmates cannot go outside.

e.  No hand sanitizer is available to inmates at the MDC.

f.  Tissues are not readily available. Inmates use toilet paper to blow their noses. Each inmate is provided only one roll of toilet paper per week.

g.  Each inmate is given one small bar of soap a week, at most. Some units at the MDC have received no soap since the lockdown of the facility began on March 13, 2020. Access to additional soap is limited to those inmates who have sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.

h.  Inmates prepare all inmate meals. Meal preparation, with the exception of kosher and halal meals, is performed in a single kitchen.

i.  Inmates eat meals in large groups.

j.  Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so.

74.  Inmates have not been informed of the symptoms of COVID-19, or of how to prevent the spread of the infection except through posters on the walls of the units and general exhortations (delivered in groups) to wash their hands and practice social distancing. *Id.* ¶ 35.

75.  Inmates who are at lower risk of becoming seriously ill from the virus are not separated from those who are at higher risk (because of age and/or pre-existing medical conditions). Instead, they are mixed together in small two-man cells and locked together in those cells for at least 10 out of every 24 hours.

76.     As of March 26, no doctors have come to the units. Medical only visit inmates if the inmates volunteer that they have symptoms. *Id.* ¶ 16(b).

77.     The facility has not informed the inmate population of what the protocol will be for symptomatic inmates; absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.

## V.     MDC is Not Prepared to Treat to Individuals Who Contract Coronavirus

78.     Inmates who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because the MDC lacks the medical resources to care for symptomatic inmates.

79.     Now that COVID-19 is inside the facility, the MDC will be unable to stop the spread of the virus throughout the facility given long-documented inadequacies in BOP's medical care and in light of how these facilities function. Giftos Decl. ¶ 14.

80.     There is no separate medical unit or facility for ill inmates. Unlike many Federal Correctional Institutions and even Rikers' Island, the MDC has no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing. von Dornum Decl.¶ 41.

81.     As of March 20, 2020, MDC had only 9 nasal swab COVID-19 test kits and only one inmate had been tested at the facility. *Id.* ¶ 11. MDC currently has no ventilators and cannot intubate inmates on-site. *Id.* ¶¶ 39, 40. MDC does not have any specialized equipment or medical providers. *Id.* ¶ 42.

82.     There are only three doctors available at MDC to care for all 1,700 inmates. *Id.* Even this highly limited number is likely to decrease as doctors themselves go into quarantine. None of these doctors specialize in infectious diseases.

24

83.     People who contract COVID-19 can deteriorate rapidly, even before a test result can be received. They need constant monitoring. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires specialized equipment in limited supply as well as an entire team of specialized care providers. MDC does not have that specialized equipment or specialized providers.

84.     MDC is already short-staffed.[25] Now that three staff members have tested positive and several more are symptomatic, correctional officers are understandably hesitant to come to work. This staffing shortage will only increase as employees need to stay home to care for children whose schools are closed, elderly family members, and other personal health situations. With fewer staff, correctional officers are less able to monitor inmates' health.  Giftos Decl. ¶ 18.

## VI.     Petitioners Are Particularly Vulnerable

85.     Petitioners in this case are individuals who are particularly vulnerable to serious illness or death if infected by COVID-19 who are currently detained at MDC.

86.     <u>Hassan Chunn</u>. Mr. Chunn is 46 years old. Mr. Chunn has been incarcerated for approximately three years. He is due to be released on April 18, 2020. Mr. Chunn has been diagnosed with Coronary Heart Disease. As of 2005, he was diagnosed with chronic heart failure. He has two stents in his heart. He is pre-diabetic. He also suffers from high blood pressure, seizures, hypertension and high cholesterol. During his incarceration at MDC, he has been hospitalized on at least two occasions at outside hospitals for extreme high blood pressure.

---

[25] "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on Inmates," OIG Report (Sept. 2019).

He takes a number of medications including Plavix, Losapril, Norvax, and Lipitor. Mr. Chunn is critically vulnerable to COVID-19 because of his significant health problems.

87. <u>Nehemiah McBride</u>. Mr. McBride is 34 years old. Mr. McBride has been incarcerated since December 17, 2019, and subsequently was sentenced to 4 months' incarceration. He is due to be released on April 16, 2020. Mr. McBride has been diagnosed with asthma, which is severe, and he suffers from respiratory problems. Mr. McBride is currently experiencing breathing problems and wheezing. Mr. McBride is critically vulnerable to COVID-19 because of his significant health problems.

88. <u>Ayman Rabadi</u>. Mr. Rabadi is 59 years old. Mr. Rabadi has been incarcerated for approximately 1 year, after being sentenced to 24 months for a wire fraud-related conviction of which he has served approximately 14 months. Mr. Rabadi has been diagnosed with a serious heart condition, anxiety and diabetes. Mr. Rabadi suffered a heart attack approximately six years ago, and thereafter he had several stents placed in his heart. He has a tumor on one of his kidneys which is being monitored via ultrasound. He takes medication for high blood pressure, cholesterol, and blood thinners. He also suffers from severe anxiety and depression. Mr. Rabadi is critically vulnerable to COVID-19 because of his significant health problems.

89. <u>Justin Rodriguez</u>. Mr. Rodriguez is 26 years old. Mr. Rodriguez is scheduled to be released on June 9, 2020. Mr. Rodriguez suffers from asthma. Mr. Rodriguez is critically vulnerable to COVID-19 because of his significant health problems. Mr. Rodriguez requested an inhaler from BOP staff but as of this filing has not received one.

## LEGAL ALLEGATIONS

**I.     Section 2241 is an Appropriate Vehicle to Address Unconstitutional Conditions of Confinement**

90.     Section 2241(c)(3) authorizes courts to grant habeas corpus relief where a person is "in custody in violation of the United States." The Second Circuit has "long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as . . . prison conditions." *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (internal quotation marks omitted). This includes challenges to detention where conditions pose a threat to Petitioners' medical wellbeing. *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (approving the use of Section 2241 to challenge a prisoner's transfer where that transfer created a risk of fatal heart failure).

91.     The Second Circuit's decision in *Roba* is instructive. In that case, Petitioner alleged that an imminent transfer from New York to face charges in California would create a substantial risk of death because of his precarious heart condition. The Second Circuit held that there was Section 2241 jurisdiction to challenge his contemplated transfer, where such custody would threaten his life, citing *Estelle v. Gamble*, the Supreme Court's seminal case establishing the Eighth Amendment's deliberate indifference standard. 604 F.2d at 218–19. Critically, the court held that habeas jurisdiction was appropriate even though the transfer, and hence custody, was imminent: "Petitioner need not wait until the marshals physically lay hands on him; he is entitled now to challenge the allegedly unlawful conditions of his imminent custody." *Id.* at 219.

92.     In this case, the unconstitutional threat to Petitioners' health and life posed by being held in Respondent's custody is ongoing, not simply imminent. Every hour that Petitioners are held in the MDC, they are at a significantly elevated risk of contracting coronavirus, and because of their age and/or medical conditions, their risk of dying from coronavirus is

27

significant. For similar reasons, Judge Analisa Torres recently ordered the release of several individuals from federal immigration detention. *See* Memorandum and Order, *Basank et al. v. Decker, et al.*, No. 20 Civ. 2518 (S.D.N.Y. March 26, 2020) (ECF No. 11).

## II. Respondent Edge's Failure to Take Steps to Mitigate Transmission of Coronavirus Constitutes Deliberate Indifference to the Serious Medical Needs of Plaintiffs

93.     Respondent is violating Petitioners' Fifth and Eighth Amendment rights by continuing to incarcerate them in conditions where it is virtually impossible to take steps to prevent transmission of an infectious disease that will prove deadly because of Petitioners' vulnerable condition.

94.     All people held in the MDC, whether convicted or not, are entitled to be protected from condition of confinement that create a serious risk to health or safety, including through release from custody when necessary. *Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violate the Eighth Amendment).[26] The risk of exposure to a deadly infectious disease such as COVID-19 constitutes a serious risk to health, particularly for the Petitioners and the vulnerable class members described herein. *Helling v. McKinney*, 509 U.S. 25, 34 (1993) (noting with approval Eighth Amendment claims based on exposure to serious

---

[26] Named Petitioners are convicted and therefore their treatment is governed by the Eighth Amendment. Class members who are detained for pretrial purposes, however, are protected from deliberate indifference by the Fifth Amendment. Although pretrial class members may be entitled to even greater protection from unsafe conditions than convicted class members, *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."), for present purposes the distinction is immaterial because Respondent's continued detention of the class plainly violates the Eighth Amendment.

contagious diseases). Under the MDC's current conditions, Respondent has not and cannot protect Petitioners and the class from this risk of serious harm. In these circumstances, release is the only means of protecting Petitioners and the class they seek to represent from unconstitutional treatment.

95.     Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33. This Court need not "await a tragic event" to find that Respondent is maintaining unconstitutional conditions of confinement. *Id.* Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to [Petitioners'] future health" is sufficient. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35) (alteration omitted); *see also Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (incarcerated people "may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.") (citation and internal quotation marks omitted).

96.     The reach of the Fifth and Eighth Amendments includes "exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33; *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease").

97.     In this case, as established by the facts above, Petitioners face a significant risk of exposure to coronavirus, with the attendant risk of death that follows given their vulnerable conditions. Respondent is well aware of this risk, having been alerted to it by the CDC, the Attorney General, and advocates such as the Federal Defenders. Indeed, only last week the Second Circuit Court of Appeals, unprompted, acknowledged the "grave and enduring" risk

posed by COVID-19 in the correctional context. *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, __ F.3d __, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020); see also *Jovel v. Decker*, No. 20 Civ. 308, 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) (finding "extraordinary circumstances" of COVID-19 pandemic justified release of immigration detainee from federal detention); *United States v. Little*, No. 20 Cr. 57, 2020 WL 1439979, at *4 (S.D.N.Y. Mar. 24, 2020) ("As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC and MDC, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions.")

98. Finally, as established above, Respondent has not taken steps sufficient to protect Petitioners from the grave risks that are present every moment they are in detention in the MDC. Respondent simply is not capable of managing the risk to Petitioners in the MDC's current environment. Whether judged under the Fifth or Eighth Amendment, Respondent is holding Petitioners in violation of the Constitution by detaining them in the face of significant threats to their health and safety without taking sufficient steps to prevent that harm.

## III. Next Friends Have Standing to Assert the Interests of Real Parties In Interest

99. Migdaliz Quinones is the life partner of Petitioner Ayman Rabadi and brings this action on his behalf to seek his release from custody. Ms. Quinones and Mr. Rabadi have known each other for 36 years.

100. Jacklyn Romanoff is the mother of Justin Rodriguez.

101. In the habeas context, a "next friend" may assert the interest of an incarcerated person so long as they have a sufficient personal connection to the real-party-in-interest and there are barriers that prevent the real-party-in-interest from asserting his rights directly. In *Whitmore*

*v. Arkansas,* 495 U.S. 149 (1990), the Supreme Court recognized that "next friend" standing "has long been an accepted basis for jurisdiction in certain circumstances," usually "on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves." *Id.* at 162.

102.    The requirement of inaccessibility is met here, where Petitioners Rabadi and Rodriguez cannot easily communicate with counsel because of the current lockdown at the MDC. *See Warren v. Cardwell*, 621 F.2d 319, 321 n.1 (9th Cir. 1980) (finding next friend standing met where petitioner "could not sign and verify the petition because the prison was locked down") (internal quotation marks omitted); *cf. Padilla v. Rumsfeld*, 352 F.3d 695, 703 (2d Cir. 2003), *rev'd and remanded on other grounds*, 542 U.S. 426, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004) (holding that inaccessibility can be established when the petitioner is being held "incommunicado").

103.    The requirement of a close personal relationship is met here as well. *See Smith ex rel. Missouri Public Defender Comm'n v. Armontrout*, 812 F.2d 1050, 1053 (8th Cir.1987) (sufficiency of brothers' relationship for "next friend" standing undisputed); *Hays v. Murphy*, 663 F.2d 1004, 1009 (10th Cir.1981) (no dispute that defendant's mother proper party to seek "next friend" action); *see also Padilla*, 352 F.3d at 703-04 (finding that attorney who had represented petitioner could serve as next friend).

## CLASS ACTION ALLEGATIONS

104.    Petitioners bring this representative habeas action pursuant to 28 U.S.C. § 2241 and, alternatively, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated.

105.    Petitioners seek to represent a class consisting of all current and future detainees in custody at the MDC during the course of the COVID-19 pandemic (the "Class").

106.    The members of the Class are too numerous to be joined in one action, and their

joinder is impracticable. Upon information and belief, the class exceeds 1,700 individuals.

107.    Common questions of law and fact exist as to all Class members and predominate

over questions that affect only the individual members. These common questions of fact and law

include but are not limited to: (1) whether the conditions of confinement described in this

Petition amounts to Constitutional violations; (2) what measures Respondent took in response to

the COVID-19 Crisis; (3) whether Respondent implemented an adequate emergency plan during

the COVID-19 Crisis; (4) whether Respondent's practices during the COVID-19 Crisis exposed

people at the MDC to a substantial risk of serious harm; (5) whether the Respondent knew of and

disregarded a substantial risk of serious harm to the safety and health of the Class; and (7) what

relief should be awarded to redress the harms threatened to members of the Class as a result of

the conditions.

108.    Absent class certification, individuals detained at the MDC during the COVID-19

pandemic would face a series of barriers in accessing the relief sought. The MDC has suspended

visitation and MDC detainees have limited access to communication with the outside world,

impeding their ability to obtain legal representation and pursue litigation. A large portion of the

Class has limited educational backgrounds. And a significant percent of them suffer from

physical or mental impairments.

109.    Respondent's practices and the claims alleged in this Petition are common to all

members of the Class.

110.    The claims of Petitioners are typical of those of the Class. Petitioners are

threatened with imminent inhumane conditions of confinement at the MDC.

111.    The legal theories on which Petitioners rely are the same or similar to those on which all Class members would rely, and the harms suffered by them are typical of those suffered by all the other Class members.

112.    Petitioners will fairly and adequately protect the interests of the Class. The interests of the Class representatives are consistent with those of the Class members. In addition, counsel for Petitioners are experienced in class action and civil rights litigation.

113.    Counsel for Petitioners know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

114.    Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

115.    This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable.

116.    There will be no extraordinary difficulty in the management of this class action.

## FIRST CAUSE OF ACTION
(Declaratory and Injunctive Relief for
Violation of the Fifth and Eighth Amendments)

117.    Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

118.    Petitioners bring this claim on their own behalf and on behalf of the Class.

119.    The Due Process Clauses guarantees pretrial detainees the right to be detained in a safe situation, free from punitive conditions of confinement. See U.S. Const. Amend V. The government violates that guarantee where a widespread outbreak of a contagious disease subjects detainees to inhumane conditions without adequate protection.

33

120.    The Eighth Amendment guarantees post-conviction detainees the right to necessary and adequate medical care. See U.S. Const. Amend VIII. The Government's failure to provide adequate medical care in response to a widespread outbreak of a contagious disease constitutes deliberate indifference to the serious medical needs of detainees, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

121.    Because of the conditions at the MDC, Petitioners are not able to take steps to protect themselves—such as social distancing, using hand sanitizer, or washing his hands regularly—and the government has not provided adequate protections. As COVID-19 rapidly spreads at the MDC in a matter of days, as experts predict, the already deplorable conditions at the MDC will be exacerbated, and the ability to protect oneself will become even more impossible.

122.    Respondent's failure to adequately protect Petitioners from these punitive conditions, or release them from the conditions altogether, constitutes an egregious violation of Petitioners' due process rights and deliberate indifference to the serious medical needs of Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

123.    Respondent was aware or should have been aware of these conditions, which were open and obvious throughout the entire jail.

124.    Respondent knew of and disregarded an excessive risk to health and safety.

125.    Respondent failed to act with reasonable care to mitigate these risks.

126.    Because Respondent failed to act to remedy Petitioners' and the Class's degrading and inhuman conditions of confinement in violation of their Fifth and Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus.

127.    Because of the unlawful conduct of Respondent, Petitioners and the Class are threatened with immanent physical injury, pain and suffering, emotional distress, humiliation, and death.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners and the Class members respectfully request that the Court enter a class-wide judgment:

A.    Ordering immediate release of vulnerable persons, with appropriate precautionary public health measures, including Petitioner Chunn (scheduled to be released on 4/18/2020); Petitioner McBride (scheduled to be released on 4/16/2020); Petitioner Rabadi (scheduled to be released on 7/19/2020); Petitioner Rodriguez (scheduled to be released on 6/9/2020); and all others confined at the MDC who Respondent has identified as medically vulnerable due to underlying health conditions or age ("Vulnerable Persons")—and therefore at higher risk of developing serious COVID-19 illness;

B.    Ordering Respondent to mitigate the serious risk of illness, death, and harm from COVID-19 to those who remain confined at the MDC;

C.    Certifying this Petition as a Class Action;

D.    Appointing a Special Master on an emergency basis to Chair a Coronavirus Release Committee to evaluate Vulnerable Persons and make recommendations for ameliorative action for other persons at the MDC; and

E.    Ordering such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York          EMERY CELLI BRINCKERHOFF
       March 27, 2020                  & ABADY LLP

                                        By:    /s/ Katherine R. Rosenfeld
                                              Katherine R. Rosenfeld
                                              O. Andrew F. Wilson
                                              Samuel Shapiro
                                              Scout Katovich
                                            600 Fifth Avenue, 10th Floor
                                            New York, NY 10020
                                            (212) 763-5000

                                            CARDOZO CIVIL RIGHTS CLINIC
                                            Betsy Ginsberg
                                          Cardozo Civil Rights Clinic
                                          Benjamin N. Cardozo School of Law
                                          55 Fifth Avenue, 11th Floor
                                          New York, NY 1003
                                          (212) 790-0871

                                            Alexander A. Reinert
                                          55 Fifth Avenue, Room 1005
                                          New York, NY 1003
                                          (212) 790-0403

                                          *Attorneys for Petitioners and Putative Class*

Case 1:19-cr-00854-VSB Document 26 Filed 03/04/20 Page 57 of 69 PageID #: 37

Exhibit B

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

Southern District of New York
*Jennifer L. Brown*
Attorney-in-Charge

April 9, 2020

**BY ECF AND EMAIL**

Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

   Re: **United States v. Rabadi**
     **13 Cr. 353 (KMK)**

Dear Judge Karas:

  We write to briefly supplement our reply, filed this morning, based on factual information we just received from correctional staff at the MDC that directly contradicts information provided by the BOP to the government, and relied on by the government in opposing Mr. Rabadi's compassionate release, with respect to the measures being taken by the BOP to control the spread of COVID-19 within the facility. Specifically, we learned that the Vice-President of the Union that represents correctional staff at the MDC sent the below email to the Warden of the MDC this morning:

-----------------------------------------------------------------

Good morning,
The Preamble states that we recognize that the employees are the most valuable resource of the agency.
It has come to the Union's attention that management has shown that inmates are the most valuable asset to the Bureau. Can we please address the following concerns:

Why are staff not quarantined who have been in direct contact with inmates who have tested positive or were symptomatic? Meanwhile, you are quarantining an entire unit, and not saying a word to those staff members left behind.
When will we show staff that we care about them? You only gave us 2 surgical masks to enter the building for protection, one more mask than you gave the inmates to reuse weekly.

Why do we have 2 inmates who tested positive on regular housing units? J-73 and G-43. These inmates were released to general population even before 7days of quarantine. Why aren't those

Honorable Kenneth M. Karas                              April 8, 2020
United States District Judge                                      Page 2

housing units on quarantine with appropriate PPE for staff? if a staff member gets sick or even dies from the COVID19 virus in one of these units it's now noted that you were well aware. We are asking for N-95's on those units and for all staff entering these housing units.

Once staff test positive why haven't we informed all staff who have been in direct contact with those individuals? Why are they not quarantined? Why are we not appropriately informing the staff?

**Rhonda Barnwell,**
*A.F.G.E Local 2005 - Deputy Chief*
U.S. Department of Justice
Federal Bureau of Prisons
Metropolitan Detention Center
80 29th Street Brooklyn, NY  11232

██████████████

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        The BOP has repeatedly asserted in litigation in the Southern and Eastern Districts of New York that it is containing the spread of coronavirus by keeping positive and symptomatic inmates on isolation (*Gov't Opp.* at 17-18; April 9 Letter to Chief Judge Mauskopf, pursuant to Administrative Order No. 2020-14, from Warden Edge and Warden Licon-Vitale, attached as Ex. A), but the Union, whose members are required to work inside the facility every day, states that two inmates who have tested positive were returned to regular housing units after less than 7 days, that those units are not now quarantined, and staff on those units have not been given appropriate personal protective gear.  The Union also raises the clear problem of exposed staff not being quarantined, but rather, continuing to work on the units, and of staff members not being informed when other staff members whom they were in contact with have tested positive.

        These assertions by the Union call the credibility of the BOP's representations about the practices at MDC Brooklyn into serious question and further speak to the risk to all the inmates from such practices that are contrary to the CDC's advice, and in particular the risk to vulnerable inmates such as Mr. Rabadi.

                                Respectfully Submitted,

                                /s/
                                Sylvie J. Levine
                                Deirdre D. von Dornum
                                Federal Defenders of New York

Honorable Kenneth M. Karas                                    April 8, 2020
United States District Judge                                        Page 3




CC:    AUSA Daniel Richenthal
       AUSA Margery Feinzig
       Chief U.S. Probation Officer Michael Fitzpatrick
       Albert Dayan, Esq.

Exhibit C



**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**
*Metropolitan Correctional Center*

*150 Park Row*
*New York, New York 10007*

April 9, 2020

The Honorable Roslynn R. Mauskopf
Chief Judge
United States District Judge Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:     **Administrative Order** No. 2020-14

Dear Judge Mauskopf:

The Court has ORDERED that the MDC and MCC respond to concerns about the institutions' response to the COVID-19 pandemic.  Specifically, the Court asked about protocols for screening and testing inmates, staff and others entering or leaving each facility; the number of inmates tested and the number of positive tests, the number of staff and/or others testing positive; and all efforts undertaken to mitigate the spread of COVID-19 both generally and in response to any symptomatic inmate(s) and/or positive test(s).

Staff have been tasked with screening each and every staff member who walks in the door at both facilities. Specifically, a temperature is being taken and the staff member is asked to fill out a screening form. If the staff member has a fever or answers yes to any of the questions, a medical professional can deny entry to the institution.

Medical staff are also screening new inmate arrivals to the institution the same way. Specifically, staff who are conducting the screening are to wear appropriate personal protective equipment (PPE) in accordance with guidance promulgated by the Center for Disease Control (CDC).
Inmates with a temperature greater than or equal to 100.4 degrees, or overt respiratory symptoms are placed in isolation. New arrivals with a temperature of less than 100.4 degrees are placed in quarantine for fourteen days as a precautionary measure. Inmates leaving either BOP facility are also screened.

Any inmate currently in BOP custody who presents with COVID-19 like symptoms is assessed by the institution health services staff. An inmate exhibiting symptoms consistent with COVID- 19 will be placed in isolation. The remainder of the inmates on his or her unit will be quarantined to ensure additional inmates do not develop symptoms. The inmates' medical isolation will be evaluated by medical staff at least twice a day, and the inmates on a medically quarantined unit will have their temperature checked twice a day.

The Honorable Roslynn R. Mauskopf
April 9, 2020
Page 2

Currently, the BOP has enacted a national 14-day action plan to increase social distancing in the facilities. Specifically, inmates in every institution will be secured in their assigned cells. At MDC and MCC, the inmates will be released from their cells 3 days per week in order to shower, use the phones, and utilize the TRULINCs system. This will be done in small groups and social distancing has been encouraged. The national action plan will not, however, affect the provision of legal phone calls. Inmates will still be taken out of their cells for legal phone calls.

Inmate orderlies are cleaning the common areas of all housing units, and inmates have been instructed to continue to wipe down and sanitize their living quarters.

MCC and MDC unit team staff and officers are available to the inmate population to address any and all issues, including medical concerns, property concerns, and/or food related requests. Unit team staff are providing legal calls to attorneys. Any inmate can also request medical care from health services providers when they make rounds on the housing units.

With regard to the numbers as of April 9, 2020 for MDC:

Inmates tested: 11
Inmates positive: 3
Staff Positive: 9

With regard to the numbers as of April 9, 2020 for MCC:

Inmates tested: 6
Inmates positive: 5
Staff Positive: 12

Respectfully submitted,


s/

M. Licon-Vitale Warden
MCC New York


s/

D. Edge Warden
MDC Brooklyn

Exhibit D

U. S. Department of Labor

Occupational Safety and Health Administration

# Notice of Alleged Safety or Health Hazards

| For the General Public: |
|---|

This form is provided for the assistance of any complainant and is not intended to constitute the exclusive means by which a complaint may be registered with the U.S. Department of Labor .

Sec 8(f)(1) of the Williams-Steiger Occupational Safety and Health Act, 29 U.S.C. 651, provides as follows: Any employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized  representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employee or representative of employees, and a copy shall be provided  the employer  or his agent no later than at the time of inspection, except that, upon request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear in such copy or on any record published, released, or made available pursuant to subsection  (g)  of this section. If upon receipt of such notification the Secretary  determines  there are reasonable  grounds to believe that such violation  or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable to determine if such violation or danger exists. If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists, he shall notify the employees or representative of the employees in writing of such determination.

NOTE: Section 11(c) of the Act provides explicit protection for employees exercising their rights, including making safety and health complaints.

| For Federal Employees: |
|---|

This report format is provided to assist Federal employees or authorized representatives in registering a report of unsafe or unhealthful working conditions with the U.S. Department of Labor.

The Secretary of Labor may conduct unannounced inspection of agency workplaces when deemed necessary  if an agency does not have occupational safety and health committees established in accordance with  Subpart F, 29 CFR 1960;  or in response  to the reports of unsafe or unhealthful working conditions upon request of such agency committees under Sec. 1-3, Executive Order 12196; or in the case of a report of imminent danger when such a committee has not responded to the report as required in Sec. 1-201(h).

| INSTRUCTIONS: |
|---|

Open the form and complete the front page as accurately and completely as possible. Describe each hazard you think exists in as much detail as you can.  If the hazards described in your complaint are not all in the same area, please identify where each hazard can be found at the worksite. If there is any particular evidence that supports your suspicion that a hazard exists (for instance, a recent accident or physical symptoms of employees at your site) include the information in your description. If you need more space than is provided on the form, continue on any other sheet of paper.

After you have completed the form, return it to your local OSHA office.

NOTE: It is unlawful to make any false statement, representation or certification in any document filed pursuant to the Occupational Safety and Health Act of 1970. Violations can be punished by a fine of not more than $10,000. or by imprisonment of not more than six months, or by both. (Section 17(g))

Public reporting burden for this voluntary collection of information is estimated to vary from 15 to 25 minutes per response with an average of 17 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. An Agency may not conduct or sponsor, and persons are not required to respond to the collection of information unless it displays a valid OMB Control Number. Send comment regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to the Directorate of Enforcement Programs, Department of Labor, Room N-3119, 200 Constitution Ave., NW, Washington, DC; 20210.

*OMB Approval# 1218-0064; Expires: 11-30-2020*

Do not send the completed form to this Office.

U. S. Department of Labor
Occupational Safety and Health Administration

# Notice of Alleged Safety or Health Hazards

| | Complaint Number | |
|---|---|---|

| Establishment Name | FEDERAL BUREAU OF PRISONS | | |
|---|---|---|---|
| Site Address | 320 FIRST STREET NW    WASHINGTON, DC 20534 | | |
| | Site Phone | 202-317-2198 | Site FAX | |
| Mailing Address | 320 FIRST STREET NW    WASHINGTON, DC 20534 | | |
| | Mail Phone | 202-317-2198 | Mail FAX | |
| Management Official | Michael Carvajal, Director | Telephone | 202-317-2198 |
| Type of Business | Federal Bureau of Prisons | | |

HAZARD DESCRIPTION/LOCATION. Describe briefly the hazard(s) which you believe exist. Include the approximate number of employees exposed to or threatened by each hazard. Specify the particular building or worksite where the alleged violation exists.

## PLEASE SEE ATTACHED PAGES FOR COMPLAINT.

| Has this condition been brought to the attention of: | ☐ X Employer   ☐ Other Government Agency(specify) |
|---|---|
| Please Indicate Your Desire: | ☐ Do NOT reveal my name to my Employer |
| | ☒ My name may be revealed to the Employer |

| The Undersigned believes that a violation of an Occupational Safety or Health standard exists which is a job safety or health hazard at the establishment named on this form. | (Mark "X" in ONE box) ☐ Former Employee ☐ X Current Employee          ☐ Federal Safety and Health Committee ☐ Representative of Employees  ☐ Other (specify)——————— |
|---|---|
| Complainant Name | SHANE FAUSEY, COUNCIL PRESIDENT | Telephone | 570-419-1414 |
| Address(Street, City, State, Zip) | 22 Quarry Drive   Watsontown, PA 17777 | | |
| Signature | | Date | 3-31-20 |

If you are an authorized representative of employees affected by this complaint, please state the name of the organization that you represent and your title:

Organization Name: Council of Prison Locals 33      Your Title: President

U. S. Department of Labor
Occupational Safety and Health Administration
Notice of Alleged Safety or Health Hazards

The Federal Bureau of Prisons is in violation of The General Duty Clause, 29 CFR 1960.8, Occupational Safety and Health (OSH) Act of 1970, Section 5 (a) (1) 29 USC 654(a)(1),  which requires employers to furnish to each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm."

As a matter of record, this complaint is elevated to and considered an *Imminent Danger Report*, pursuant to OSHA of 1970, Executive Order 12196, 29 CFR 1960.8, Agency's Responsibilities, BOP Program Statement 1600.011.  The agency's actions described herein are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities.  The agency's actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities.

Specifically, the Federal Bureau of Prisons, under the direction of N.C. English, Assistant Director of Health Services Division, Jeffery D. Allen, M.D., Medical Director, and Captain Sylvie Cohen, M.D., Branch Chief for Occupational Safety and Health, have directed staff throughout the Bureau of Prisons who have come in contact with, or been in close proximity to, individuals who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines.  These guidelines state "If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community): self-quarantine at home for 14 days and return to work if symptoms do not develop".  Mr. Allen and/or Captain Cohen have advised local Institutions with these staff to order them back to work within 48 hours of suspected infection and/or contact with individuals having symptoms or confirmation of the virus.  Furthermore, staff who were screened and ordered home due to possible exposure based on the screening instruments used by the Bureau of Prisons were also ordered back to work within 48 hours.

The Bureau of Prisons also has violated the above standard by continuously moving inmates by bus and/or airlift to various prison sites across the nation.  They have authorized movement of infected inmates, inmates suspected of being infected, inmates who have been in close contact or proximity to infected inmates, to areas of the Country that do not have any rate of infections, or to Institutions that otherwise have not shown signs of any introduction of the virus, thus introducing the virus into an uninfected area.  This is a failure to follow the CDC guidelines that state where COVID-19 cases exist within an Institution, management strategies such as  "Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding" should be implemented.

The Bureau of Prisons has failed to introduce workplace controls to mitigate or prevent exposure or further exposure to the virus.  They have not implemented engineering controls such as high efficiency air filters or air scrubbers to minimize the airborne nature of this virus or otherwise improved the ventilation rates in the environment.  Administrative controls such as encouraging or

U. S. Department of Labor
Occupational Safety and Health Administration

Notice of Alleged Safety or Health Hazards

mandating potentially sick or exposed workers to stay home for self-isolation for 14 days per CDC guidelines, have not been utilized nor have they issued a mandatory lockdown if prisons, which would result in minimal contact with staff and other inmates in areas where the infection has been introduced.  Other controls failed to be implemented are modified operations where social distancing among inmates and staff can be accomplished.  They have failed to minimize contact within recreation areas, education areas, counseling/treatment rooms, resulting in multiple inmates and staff coming in dangerously close contact with each other after potentially being exposed to the virus.

OSHA's Personal Protective Equipment (PPE) standards, 29 CFR Subpart I,  29 CFR 1910.132, 29 CFR 1910.133, 29 CFR 1910.134, and 29 CFR 1910.138,  29 CFR 1910.1030, Bloodborne Pathogens, which require using gloves, eye and face protection, and respiratory protection, when respirators are necessary to protect workers, employers must implement a comprehensive respiratory protection program in accordance with the Respiratory Protection standard (29 CFR 1910.134).  While the Agency has followed or implemented fit testing protocols, the Agency has failed to provide the proper N-95 masks to staff who are transporting and have custodial control over hospitalized inmates testing positive for the virus.

To date, there are 28 confirmed inmate cases and 24 confirmed staff cases within the Federal Bureau of Prisons, with one inmate death thus far.  There are multiple staff and inmates hospitalized. Below is a listing of all Federal Bureau of Prison sites affected by this complaint under the direction of Director Michael Carvajal.

# U. S. Department of Labor
Occupational Safety and Health Administration

# Notice of Alleged Safety or Health Hazards

| | | | |
|---|---|---|---|
| Alderson, WV FPC | Fairton, NJ FCI | Mendota, CA   FCI | Terminal Island, CA   FCI |
| Aliceville, AL  FCI | Florence, CO  FCC | Miami, FL  FCI | Terre Haute, IN  FCC |
| Allenwood, PA FCC | Forrest City, AR  FCC | Miami, FL  FDC | Texarkana, TX  FCI |
| Ashland, KY FCI | Fort Dix, NJ  FCI | Milan, MI  FCI | Thomson, IL  AUSP |
| Atlanta, GA USP | Fort Worth, TX  FMC | Montgomery, AL  FPC | Three Rivers, TX  FCI |
| Atwater, CA  USP | Gilmer, WV  FCI | Morgantown, WV  FCI | Tucson, AZ  FCC |
| Bastrop, TX  FCI | Glynco, GA | New York,  NY  MCC | Victorville, CA   FCC |
| Beaumont, TX  FCC | Grand Prairie, TX | Oakdale, LA  FCC | Waseca, MN  FCI |
| Beckley, WV FCI | Greenville, IL  FCI | Oklahoma City, OK  FTC | Williamsburg, SC  FCI |
| Bennettsville, SC FCI | Guaynabo, PR  MDC | Otisville, NY  FCI | Yankton, SD  FPC |
| Berlin, NH  FCI | Hazelton, WV  FCC | Oxford, WI  FCI | Yazoo City, MS  FCC |
| Big Sandy, KY  USP | Herlong, CA  FCI | Pekin, IL    FCI | |
| Big Spring, TX  FCI | Honolulu, HI  FDC | Pensacola, FL  FPC | |
| Brooklyn, NY MDC | Houston, TX  FDC | Petersburg, VA  FCC | |
| Bryan, TX  FPC | Jesup, GA    FCI | Philadelphia, PA  FDC | |
| Butner, NC  FCC | La Tuna, TX  FCI | Phoenix, AZ  FCI | |
| Canaan, PA  USP | Leavenworth, KS  USP | Pollock, LA  FCC | |
| Carswell, TX FMC | Lee, WV  USP | Ray Brook, NY  FCI | |
| Chicago, IL  MCC | Lewisburg, PA  USP | Rochester, MN  FMC | |
| Coleman, FL  FCC | Lexington, KY  FMC | Safford, AZ  FCI | |
| Cumberland, MD  FCI | Lompoc, CA  FCC | San Diego, CA  MCC | |
| Danbury, CT  FCI | Loretto, PA  FCI | Sandstone, MN  FCI | |
| Devens, MA  FMC | Los Angeles, CA  MDC | Schuylkill, PA  FCI | |
| Dublin, CA  FCI | Manchester, KY  FCI | Seagoville, TX  FCI | |
| Duluth, MN  FPC | Marianna, FL  FCI | SeaTac, WA  FDC | |
| Edgefield, SC  FCI | Marion, IL  USP | Sheridan, OR  FCI | |
| El Reno,TX  FCI | McCreary, KY  USP | Springfield, MO  MCFP | |
| Elkton, OH  FCI | McDowell, WV  FCI | Talladega, AL  FCI | |
| Englewood, CO  FCI | McKean, PA  FCI | Tallahassee, FL  FCI | |
| Estill, SC FCI | Memphis, TN  FCI | | |

# Exhibit E

April 9, 2020

Dear Judge Rakoff:

Brian's health is compromised by his history of drug and alcohol abuse, his years as a smoker, and his family history of heart disease. The sum total of his age, sex (males are dying at a much higher rate than females), compromised organs, and family history of heart disease, equate to an infinitesimal chance of Brian being able to survive; not if, but when he contracts the virus.

Brian has a long history of drug and alcohol abuse, and he was – until his arrest – an active smoker and drinker. These behaviors have compromised his lungs, heart, kidneys and liver; all of which are the exact organs fiercely affected by the Covid-19 virus.

Brian has a genetic predisposition for heart disease. Brian's father (at age 58) and paternal grandfather died of heart failure; Brian's maternal grandparents both died of congestive heart failure; and Brian's mother is being treated for Atrial Fibrillation (an irregular heart beat).

In addition to these facts about Brian's health, we ask the Court to also consider that not only will Brian contract the virus if he remains at the MDC, but that when he's infected, he will die a terrible, painful death because the MDC will not be capable of providing care.

**The only known prevention of contracting Covid-19, is distance and isolation; neither of which are possible at MDC Brooklyn. Retaining Brian here is the equivalent of denying him life-saving measures; the result of which is a death sentence.** A merciless death sentence. Covid-19 initially attacks the lungs, filling them with fluids. As time passes, this fluid begins to harden, making it excruciatingly painful to breathe. In hospitals across the country, patients are getting this pain treated with morphine. As the virus continues to deteriorate lung function, patients are then put into medically-induced comas, so they are not conscious as they die.

Unless someone can guarantee that MDC Brooklyn has the capability to provide Brian with morphine and a medically-induced coma, he would have to suffer the unrelenting pain as his lungs harden, and be acutely aware - every second - as he drowns in his own fluids.  This manner of death is not only cruel and inhumane; but one that our legal system goes to great lengths to ensure even those on death row do not have to endure.

Your Honor, I understand there is concern that to grant my brother a compassionate release would set a precedent that could lead to the release of the many other inmates with a similar, if not greater, risk to this deadly virus.  My response to that is: Most of us only get to be observers of when a life comes into this world, and when it departs. We have no control over the when, where, and how they will occur. But at this moment, for this one man, you have been graced with the opportunity to exercise your authority, to ensure that my brother will not be retained in a place that would surely sentence him to die in the merciless manner described above.

Thank you for your consideration.

-Belinda Pickelsimer