UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x

UNITED STATES OF AMERICA,        :

                              :      19-cr-541 (JSR)

           -v-              :

                              :

HUGH BRIAN HANEY,             :      OPINION AND ORDER

                Defendant.    :

------------------------------------ x

JED S. RAKOFF, U.S.D.J.

      Defendant Hugh Haney, who has yet to serve 33 months of his 42 months' sentence for selling and laundering narcotics proceeds on a Bitcoin exchange, moves for temporary or permanent "compassionate release" from prison pursuant to the FIRST STEP Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018). See Emergency Motion for Compassionate Release, ECF No. 22 ("Def. Mem."). Normally, such an application would be frivolous on its face. But these are not normal times. The rapid spread of COVID-19 has caused a public health crisis and a national emergency that can best be reduced by the kind of social distancing not easily attained in an overcrowded federal prison facility, such as the Metropolitan Detention Center ("MDC") where Haney resides. Moreover, because of his age (61), Haney faces a somewhat higher risk of falling seriously ill from contracting COVID-19 than much of the prison population. In that context, his motion -- although strenuously opposed by the Government, see Government's Memorandum of Law in Opposition to the

Defendant's Emergency Motion for Compassionate Release, ECF No. 23 ("Gov. Opp.") -- must be given serious consideration.

But before turning to the merits, the Court must consider the Government's objection that this matter is not properly before this Court at this time, because Haney has not yet exhausted the opportunity that Congress has given to the Bureau of Prisons ("BOP") to address such motions in the first instance.

Compassionate release allows a court to reduce a term of imprisonment where, among other things, "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). Prior to the enactment of the FIRST STEP Act, only the Director of the BOP could file a motion for compassionate release. The FIRST STEP Act amended this provision to permit an inmate to file a motion in federal court seeking compassionate release, but only after <u>either</u> exhausting administrative review of a BOP denial of his request <u>or</u> after 30 days had passed since he made his request, whichever was earlier. <u>See</u> <u>id.</u>

Here, neither alternative is satisfied. Specifically, it was not until March 26, 2020 that Haney (through his counsel) sent an email to the warden of the MDC requesting compassionate release. <u>See</u> ECF No. 22, Ex. C. To this date, the BOP has yet to rule on the request, and 30 days have yet to pass.

-2-

But that is not the end of the issue, because Haney here argues that the Court has the authority in a crisis to excuse compliance with the statutory exhaustion requirement and urges the Court to exercise that authority. See Def. Mem. 3-7; Reply Memorandum of Law in Support of Hugh Brian Haney's Emergency Motion for Compassionate Release, ECF No. 24 ("Def. Reply"), at 4-12. The Government responds that the Court lacks the authority to do so. See Gov. Opp. 7-15.

Federal courts, not least in this District, are already divided on this issue, while the Second Circuit has not yet directly addressed that division.[1] The issue, in turn, raises two questions: whether the exhaustion requirement is jurisdictional; and whether, even if the exhaustion requirement is not

---

[1]    Some district courts in the Second Circuit have found the exhaustion requirement waivable. See, e.g., United States v. Perez, No. 17-cr-513-3 (AT), 2020 WL 1546422, *1-3 (S.D.N.Y. Apr. 1, 2020); United States v. Zuckerman, No. 16-cr-194 (AT), 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020); United States v. Colvin, No. 19-cr-179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020). But other courts have disagreed and have strictly enforced the exhaustion requirement. See, e.g., United States v. Roberts, No. 18-cr-528 (JMF), ECF No. 296, at 2-5 (S.D.N.Y. Apr. 8, 2020); United States v. Villanueva, No. 18-cr-472-3 (KPF), ECF No. 85 (S.D.N.Y. Apr. 8, 2020); United States v. Hernandez, No. 18-cr-834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020). The latter position has also been endorsed by the Court of Appeals for the Third Circuit. See United States v. Raia, No. 20-1033, 2020 WL 1647922 (3d Cir. Apr. 2, 2020).

jurisdictional, it is still not waivable, even in circumstances like those presented by the COVID-19 crisis.[2]

## **Whether the exhaustion requirement is jurisdictional**

The term "jurisdiction" refers specifically to "a court's adjudicatory authority." Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 160 (2010).[3] Because federal courts are "courts of limited jurisdiction," Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005), the failure to satisfy a jurisdictional requirement would require the Court to dismiss the motion for lack of subject matter jurisdiction, even if the parties themselves consented to the Court hearing the motion. Therefore, "a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 435 (2011).

The U.S. Supreme Court has emphasized the necessity of observing "the important distinctions between jurisdictional prescriptions and claim-processing rules." Reed Elsevier, 559

---

[2]     While the case law refers to this as the issue of "waiver," and the Court will adopt that usage here, it is not the ordinary use of "waiver" in the sense of one party or another waiving its statutory rights, but rather refers to the right of a court to excuse (that is, "waive") compliance with a statutory requirement.

[3]     Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

U.S. at 161. Claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." Henderson, 562 U.S. at 435. Because claim-processing rules do not "govern[] a court's adjudicatory capacity," they may, in certain cases, be waivable by the parties or by the courts. Id.

The U.S. Supreme Court has adopted a "bright line" test for when to classify statutory restrictions as jurisdictional. Arbaugh v. Y&H Corp., 546 U.S. 500, 516 (2006). A rule qualifies as jurisdictional only if "Congress has clearly stated that the rule is jurisdictional." Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 153 (2013). "[A]bsent such a clear statement," the Supreme Court has cautioned, "courts should treat the restriction as nonjurisdictional in character," with the specific goal of "ward[ing] off profligate use of the term 'jurisdiction.'" Id. In considering whether Congress has spoken clearly, courts consider both the language of the statute and its "context, including . . . [past judicial] interpretation[s] of similar provisions." Reed Elsevier, 559 U.S. at 168.

While the Second Circuit has not squarely addressed the question of whether the exhaustion requirement in § 3582(c)(1)(A) is jurisdictional, in a related context it has firmly disagreed with the characterization by certain other

circuits that § 3582(c)(2)[4] is jurisdictional. See <u>United States</u>
<u>v. Johnson</u>, 732 F.3d 109, 116 n.11 (2d Cir. 2013). The Court
finds that such holding by the Second Circuit should also extend
to the exhaustion requirement in § 3582(c)(1)(A), because §
3582(c)(1)(A) does not "clearly state" that the exhaustion
requirement is jurisdictional.

Instead, the exhaustion requirement in § 3582(c)(1)(A)
merely controls who -- the BOP or defendant -- may move for
compassionate release and when such a motion may be made. It
simply delineates the process for a party to obtain judicial
review, not referring to the adjudicatory capacity of courts.
That is, § 3582(c)(1)(A) "does not speak in jurisdictional terms
or refer in any way to the jurisdiction of the [federal]
courts." <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 394
(1982).

Moreover, § 3582 is "not part of a jurisdictional portion
of the criminal code but part of the chapter dealing generally
with sentences of imprisonment." <u>United States v. Taylor</u>, 778
F.3d 667, 671 (7th Cir. 2015). Section 3582 lists factors to be
considered in imposing a sentence and provides that a prison
sentence is final and appealable. See 18 U.S.C. § 3582.

---

[4] Section 3582(c)(2) implements the U.S. Sentencing Commission's
retroactive lowering of the Guidelines range and, as a result,
permits courts to reduce sentences when certain conditions are
met.

Similarly, subsection (c) states that courts "may not modify a term of imprisonment once it has been imposed," with few enumerated exceptions, assuming a priori courts' jurisdiction exists over these sentences. Id. § 3582(c). Tellingly, the word "jurisdiction" or its variation never appears.

Accordingly, the Court concludes that the exhaustion requirement in § 3582(c)(1)(A) is a claim-processing rule that does not deprive this Court of jurisdiction.

### Whether the exhaustion requirement is waivable

Even though the exhaustion requirement does not deprive the Court of subject matter jurisdiction to consider Haney's motion, it is a separate question whether the Court has the authority, either in general or in the particular circumstances here presented, to excuse or "waive" the exhaustion requirement and consider the merits of Haney's motion. Indeed, although, as shown above, the exhaustion requirement here in issue is a claim-processing rule, the Supreme Court has observed that such claim-processing rules may still be "important and mandatory." Henderson v. Shinseki, 562 U.S. 428, 435 (2011).

Under the present circumstances, however, the Court concludes that it has the discretion to waive the exhaustion requirement in § 3582(c)(1)(A). In so holding, the Court joins certain other courts in this District and Circuit that have

already found this exhaustion requirement to be waivable, though others have disagreed. See cases cited, supra note 1.

The Court is sensitive to the fact that the here-relevant exhaustion requirement is imposed by statute, rather than by case law. In such situations, Congressional intent is "paramount" to any determination of whether exhaustion is mandatory. McCarthy v. Madigan, 503 U.S. 140, 144 (1992) (quoting Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 501 (1982)). Therefore, although it is well-settled that courts may excuse judge-made exhaustion requirements in situations where exhaustion would unduly prejudice the defendant, or where the agency could grant effective relief, or where exhaustion would be futile, see McCarthy, 503 U.S. at 146-49; Washington v. Barr, 925 F.3d 109, 118-19 (2d Cir. 2019), courts must be more hesitant to do so with respect to an exhaustion requirement contained in the plain language of a statute. Nevertheless, the Court concludes that Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today.

Importantly, § 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense. That is, the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to

-8-

exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court.

That the statute gives the defendant this choice is crucial to understanding Congress's intent. Generally, Congress imposes exhaustion requirements in order to "serve[] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." McCarthy, 503 U.S. at 145. But the hybrid requirement in this statute —- either exhaust or wait 30 days -- substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision. Indeed, anyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial. Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary course. Thus, the reduction of the wait period to a mere 30 days also "unquestionably reflects" a third purpose, i.e., "congressional intent for the defendant to have the right to a meaningful and

prompt judicial determination of whether he should be released."
United States v. Russo, No. 16-cr-441 (LJL), ECF No. 54, at 4
(S.D.N.Y. Apr. 3, 2020).

The Court therefore has the discretion to waive the
exhaustion requirement where, as here, strict enforcement of the
30-day waiting period would not serve these Congressional
objectives. And in the extraordinary circumstances now faced by
prisoners as a result of the COVID-19 virus and its capacity to
spread in swift and deadly fashion, the objective of meaningful
and prompt judicial resolution is clearly best served by
permitting Haney to seek relief before the 30-day period has
elapsed. As Judge Liman recently observed, the 30-day rule was
intended "as an accelerant to judicial review," as "at the time
the First Step Act passed, a 30-day period before which to seek
judicial review would have seemed exceptionally quick." Russo,
at 5. But under present circumstances, each day a defendant must
wait before presenting what could otherwise be a meritorious
petition threatens him with a greater risk of infection and
worse.

As to the objective of judicial efficiency, it is true that
exhaustion requirements can conserve judicial resources, if not
by mooting a controversy entirely, at least by developing a
factual record that will be "useful . . . for subsequent
judicial consideration." McCarthy, 503 U.S. at 145. But in these

exceptional times, § 3582(c)(1)(A)'s exhaustion provision is
having the opposite effect. Because of the pandemic, prisoners
have inundated the BOP with requests for release. Frustrated
with the agency's inability to adjudicate their petitions
quickly, these prisoners are coming to courts en masse
irrespective of the 30-day rule. Thus, courts determined to
enforce the waiting period are essentially forced to consider
each such motion twice, first to conclude that the exhaustion
provision is not satisfied, and then again, days or at most a
few weeks later, to reach the merits once the requisite time has
elapsed. Courts that have attempted in recent days to avoid this
situation by ordering the BOP to decide the underlying petition
quickly have been effectively rebuffed. See, e.g., Affidavit,
United States v. Nkanga, No. 18-cr-713 (JMF), ECF No. 117-1, ¶
10 (S.D.N.Y.) ("Due to the nature of the review and the volume
of incoming requests, the BOP cannot set forth a firm date by
which the BOP will reach a decision on Petitioner's pending
application."); see also Letter from Assistant U.S. Attorney to
Judge Liman, dated April 2, 2020, United States v. Russo, No.
17-cr-441 (LJL), ECF No. 53 (S.D.N.Y.) ("[T]he Bureau of Prisons
is unable to give a specific time frame . . . .").

   For these reasons, the Court concludes that Congressional
intent not only permits judicial waiver of the 30-day exhaustion
period, but also, in the current extreme circumstances, actually

favors such waiver, allowing courts to deal with the emergency
before it is potentially too late. The Court accordingly
proceeds to consider the merits of the motion.

### <u>Whether extraordinary and compelling circumstances require Haney's release</u>

Haney, 61 years old, argues that his age, combined with the
conditions at the MDC in the context of the pandemic, justifies
finding an extraordinary and compelling reason for his release.
<u>See</u> Def. Mem. 7-12.

Application Note 1 to U.S.S.G. § 1B1.13, here applicable,
states in pertinent parts that extraordinary and compelling
reasons exist when:

(A)   Medical Condition . . .

    (ii) The defendant is — (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)  Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

    . . .

(D)   Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in

combination with, the reasons described in subdivisions (A) through (C).

Haney fails to meet any of the above criteria. He is less than 65 years old and -- unlike many of the prisoners who have applied in recent days for release because they suffer from asthma, diabetes, heart disease, or other deleterious health conditions that make them unusually vulnerable to the effects of COVID-19 -- Haney is in reasonably good health.[5] Admittedly, Haney's age of 61 places him at a higher risk of experiencing

---

[5]   Submitted as an exhibit to defendant's supplemental brief is a thoughtful letter by Haney's sister to the Court, stating her view that Haney's history of substance use, tobacco, and alcohol has "compromised his lungs, heart, kidneys and liver; all of which are the exact organs fiercely affected by the Covid-19 virus." See ECF No. 26, Ex. E. Although she is not a health professional, in one respect her claim is corroborated by the Presentence Investigation Report ("PSR"), which states that Haney has a history of opioid addiction and heavy alcohol consumption. See Presentence Investigation Report, ECF No. 19, at 16-17. However, there is no record, medical or non-medical, showing that Haney has been physically impaired or is suffering any illness as a result of his prior substance abuse. Also, the PSR does not discuss anything even remotely suggesting any problem with his lungs, heart, kidney, or liver. See PSR. Moreover, according to the PSR, Haney stated just prior to his sentencing that he "ha[d] not taken any controlled medications since the Fall of 2012." PSR 17. Given this record, the Court rejects the defense contention that Haney should be characterized as a person "with opioid use disorder" who may "be vulnerable due to those drugs' effects on respiratory and pulmonary health." Supplemental Memorandum of Law in Support of Hugh Brian Haney's Emergency Motion for Compassionate Release, ECF No. 26 ("Def. Supp."), at 13. It should also be noted that none of these supposed health problems were raised by Haney in his original motion papers, his reply brief, or during oral argument before the Court, at which time the Court, after questioning whether Haney's application was based on anything else but age, allowed both Haney and his mother to speak, along with his counsel, and still heard nothing about health problems.

complications from COVID-19 than the general prison population. But if Haney's age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress.

To be sure, the Court is ever mindful of the fact that conditions of confinement -- sharing small cells, eating together, using same bathrooms and sinks, delays in medical evaluation and treatment, and rationed access to soap -- make prisons more potentially conducive to the transmission of COVID-19 than elsewhere. See ECF No. 22, Ex. A ¶ 14; Infection Control in Jails and Prisons, Clinical Infectious Diseases 45(8):1047-1055, available at http://academic.oup.com/cid/article/45/8/1047/344842. On the other hand, it is worth noting that the BOP has taken a number of steps to mitigate the spread of the virus in federal prisons, such as increased screening of inmates, restrictions on visitors, restrictions on gatherings, and mandated social distancing.[6] Further still, on March 31, 2020,

---

[6]     The Court is aware of certain allegations that initially the MDC did not fully comply with relevant safety protocols. On April 9, 2020, the vice president of the union representing correctional staff at the MDC sent an e-mail to the warden,

the BOP commenced Phase V of its COVID-19 Action Plan, which mandated that all inmates be secured in their cells for 14 days.

There is at least some indication that the BOP's efforts are working, including at the MDC. There are 1,704 prisoners housed at the MDC. See MDC Brooklyn, http://www.bop.gov/locations/institutions/bro/ (last visited April 12, 2020). As of yesterday, April 12, 2020, the MDC had only four confirmed cases of prisoners contracting COVID-19. See Bureau of Prisons COVID-19 Cases, available at http://www.bop.gov/coronavirus (last visited on April 12, 2020). While this was an increase from the two confirmed cases previously reported to the courts, it was

stating that two inmates who had tested positive were returned to regular housing units after less than seven days had passed, that those units were not quarantined, that staff on those units were not given appropriate personal protective equipment ("PPE"), and that, more generally, exposed staff were not being quarantined. See Letter from Federal Defenders of New York to Judge Karas, dated April 9, 2020, United States v. Rabadi, No. 13-cr-353 (KMK), ECF No. 90 (S.D.N.Y.). However, there is nothing before the Court to suggest that the BOP procedures are not now being fully implemented at the MDC. Specifically, on April 10, 2020, the warden, responding to the aforesaid allegations, stated that all inmates placed in isolation based on positive results had not been released prior to the expiration of the relevant time period. See Letter from the U.S. Attorney's Office to Judge Karas, dated April 10, 2020, United States v. Rabadi, No. 13-cr-353 (KMK), ECF No. 92 (S.D.N.Y.). The warden also wrote that every staff member is screened upon entering the facility, is encouraged to remain home if they believe they are symptomatic or exposed, and is told to isolate if they begin to develop COVID-19 symptoms. See id. The response states that all staff have been provided with PPE and that, as more PPE arrives at the facility, they will be provided with additional masks. See id. Lastly, the warden wrote, staff assigned to work on a quarantined or isolation housing are provided additional PPE each shift. See id.

still a very small number on any analysis. See Letter from
Wardens of MCC New York and MDC Brooklyn to Chief Judge Mauskopf
of the U.S. District Court for the Eastern District of New York,
dated April 3, 2020, ECF No. 24, Ex. B ("April 3, 2020 Letter");
; see also Letter from Wardens of MCC New York and MDC Brooklyn
to Chief Judge Mauskopf of the U.S. District Court for the
Eastern District of New York, dated April 9, 2020, ECF No. 25-2
("April 9, 2020 Letter"). Of course, these numbers must be
treated with great caution, as the BOP has so far only tested
for COVID-19 those prisoners who seem to be sufficiently
unhealthy as to be in need of possible hospitalization.[7] Still,
despite rumors, there is no meaningful counter-evidence
suggesting that the COVID-19 virus is rapidly spreading in the
MDC, or anything of the kind.

Given all this, it would be grossly inappropriate, even in
current circumstances, to grant Haney compassionate release and
thereby, in effect, reduce his sentence from 42 months to less
than 9 months.

## Whether the Court can fashion an alternative remedy of temporary release

Implicitly recognizing that he is a less than suitable
candidate for such total release, but also still taking account

---

[7]   As of April 3, 2020 and April 9, 2020, only 7 and 11
inmates, respectively, had been tested. See April 3, 2020
Letter; April 9, 2020 Letter.

of the risks to his health if he remains in prison during the
COVID- 19 epidemic, Haney suggests that a compromise would be "a
reduction in sentence so that [he] can remain on home detention
for some period –- perhaps three to six months –- and then
return to custody." Def. Reply 2. But this raises the threshold
issue of whether the Court even has such authority. Haney
suggests that there are no fewer than six ways that a court is
authorized to grant such relief, which will be considered in
turn.

First, Haney argues that the Court already has the
authority under the FIRST STEP Act to craft temporary release
under the compassionate release provisions of § 3582(c), because
that section provides no limiting language on the form such
sentencing reductions may take. See Def. Reply 3; Def. Supp. 2.

However, as previously quoted, the statute simply
authorizes a court to "reduce the term of imprisonment," and
says nothing about temporary release or other such exotic
possibilities. See also United States v. Credido, No. 19-cr-111-
1 (PAE), ECF No. 66, at 5 (S.D.N.Y. Apr. 2, 2020); United States
v. Roberts, No. 18-cr-528-5 (JMF), ECF No. 296, at 6 (S.D.N.Y.
Apr. 8, 2020). In ordinary language, a sentence reduction is far
different from a temporary release, and the absence of any
reference to temporary release in the statute is, if anything,
further confirmation that it was not contemplated. Accordingly,

-17-

the Court concludes that § 3582(c) does not grant the Court power to grant temporary release.

Second, the defense argues that the Court can temporarily release Haney by granting the instant motion, reducing his sentence to time served, and then later reconsidering its decision based on changed circumstances after the COVID-19 risks subside. See Def. Reply 3. The Court is not about to engage in such obvious hypocrisy, and it doubts, moreover, that, having given Haney a final order of time served, it could constitutionally then re-open the matter and sentence him to years in prison.

Third, the defense suggests releasing Haney on bail pending the Court's decision on the instant motion for compassionate release, which could then be conveniently delayed until after the COVID-19 crisis had passed. See Def. Supp. 4. Once again, the Court declines to engage in such transparent hypocrisy. What the defense is saying, in effect, is that even if the Court does not believe that the FIRST STEP Act authorizes temporary release, it should nevertheless pretend that it is a serious enough question to warrant release on bail, and then issue its denial of the motion only after the COVID-19 crisis had passed. This, to put it as gently as possible, does not comport with the rule of law.

As for Haney's fourth suggestion -- which is that the Court grant the instant motion while simultaneously vacating its prior judgment, schedule a resentencing hearing to determine the size of the appropriate reduction under § 3582(c)(1) at a later date, and release Haney on bail pending resentencing, see Def. Supp. 7 -- the same objections to such gross hypocrisy equally apply.

Fifth, Haney suggests that the Court should construe his motion as the equivalent of a habeas petition under 28 U.S.C. § 2241(c)(3), which allows federal courts to entertain habeas petitions from federal prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States," and should then release him on bail pending determination of that petition. See Def. Supp. 7-8; see also Thompson v. Choinski, 525 F.3d 205, 209 (2d Cir. 2008). To that effect, the defense requests that the Court incorporate into the instant motion the habeas petition filed in the Eastern District of New York on behalf of a class of high-risk individuals at the MDC, attached as an exhibit to defendant's supplemental brief. See Class Action Petition Seeking Writ of Habeas Corpus Under 28 U.S.C. § 2241, Chunn v. Edge, No. 20-cv-1590 (RPK) (RLM), ECF No. 1 (E.D.N.Y.).[8]

---

[8]    The petition asserts that § 2241's exhaustion requirement should be excused, that the conditions at the MDC are unconstitutional, and that the MDC's alleged failure to take

As a threshold matter, the Court will not, and cannot, construe what is not a habeas petition as a habeas petition, especially given that Haney is represented by able counsel. Haney must first file a habeas petition under § 2241 for this Court to review such a petition.

But even if a § 2241 petition were properly before this Court, the Court would likely lack jurisdiction to consider it. As a jurisdictional matter, Haney's § 2241 petition must be filed in the Eastern District of New York, where the MDC is located. See Rumsfeld v. Padilla, 542 U.S. 426, 443 (2004) ("[F]or core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement."); Braden v. 30th Judicial Cir. Ct. of Ky., 410 U.S. 484, 495 (1973) (holding that the court issuing the writ must have "jurisdiction over the custodian"). And even assuming that the Government could waive this jurisdictional objection (which is doubtful), the Government here has effectively declined to do so.[9]

_____

steps to mitigate the transmission of the virus constitutes deliberate indifference to petitioners.

[9]    At the end of oral argument, the Court directed the Government to address "whether . . . the Government would waive venue or not" and, "if the Government is not willing to waive venue, . . . to explain in their [supplemental brief] why not." Transcript, 4/8/2020 at 19:14-16, 23-25. However, as the Court now recognizes, more than an issue of venue is here involved and the Government therefore appropriately responded by stating in

Sixth, and finally, Haney asks that the Court construe the instant motion as a petition to "vacate, set aside or correct" Haney's sentence pursuant to 28 U.S.C. § 2255, on the basis that (1) defense counsel was ineffective for not seeking an adjournment of the sentencing hearing held on February 12, 2020 and release on bail in light of the encroaching pandemic, and (2) the imposition of sentence in light of the pandemic violated the Eighth Amendment's prohibition on cruel and unusual punishment. See Def. Supp. 8. Then, the Court would have the option of releasing him on bail pending determination of the petition. See id.

It is true that, in contrast to a petition filed under § 2241, this Court would have jurisdiction over a § 2255 habeas petition, because a § 2255 petition must be brought to "the court that imposed the sentence." 28 U.S.C. § 2255. But, once again, no such petition has in fact been filed. And it is totally impossible to construe Haney's current motion as a § 2255 petition setting forth the grounds he hypothesizes. For example, such a petition would have to make a highly particularized, evidentiarily supported showing that Haney's sentencing counsel was constitutionally ineffective for failing to foresee, prior to the sentencing hearing on February 12,

---

its supplemental brief that "it is unclear whether the Government could waive objection." Letter from Assistant U.S. Attorneys to Judge Rakoff, ECF No. 25, at 5.

2020, that COVID-19 would evolve into a pandemic and to seek adjournment. Not only is such a suggestion facially dubious, but even if it were put forth in the hypothesized petition, it would have to be sufficiently strong to warrant Haney's release on bail, an even more doubtful proposition. Nonetheless, because there is at least one decision in this District giving some support to Haney's argument, see United States v. Nkanga, No. 18-cr-713 (JMF), ECF No. 120 (S.D.N.Y. Apr, 7, 2020), the Court declines to rule finally on a hypothesized petition not yet before the Court. Suffice to say, in the absence of such a petition, the Court has no lawful basis to grant bail, for the reasons set forth above.

## Conclusion

For the foregoing reasons, defendant's motion for compassionate release is hereby denied. The Clerk is directed to close the entry bearing docket number 22.

SO ORDERED.

Dated:   New York, NY
         April 13, 2020

_____
JED S. RAKOFF, U.S.D.J.